## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | |
|---|---|
| TERESA SABBIE, individually, as personal representative of the ESTATE OF MICHAEL SABBIE, and as parent and natural guardian of her minor children, T.S., T.S., and M.S.; SHANYKE NORTON, as parent and natural guardian of her minor child, M.S.; KIMBERLY WILLIAMS; MARCUS SABBIE; and CHARLISA CRUMP, <br><br> Plaintiffs, <br><br> v. <br><br> SOUTHWESTERN CORRECTIONAL, LLC d/b/a LASALLE CORRECTIONS, LLC and LASALLE SOUTHWEST CORRECTIONS; LASALLE MANAGEMENT COMPANY, LLC; BOWIE COUNTY, TEXAS; the CITY of TEXARKANA, ARKANSAS; TIFFANY VENABLE, LVN, individually; M. FLINT, LVN, individually; GREGORY MONTOYA, M.D., individually; CLINT BROWN, individually; NATHANIEL JOHNSON, individually; BRIAN JONES, individually; ROBERT DERRICK, individually; DANIEL HOPKINS, individually; STUART BOOZER, individually; ANDREW LOMAX, individually; SHAWN PALMER, individually; SIMONE NASH, individually; and JOHN and JANE DOES 1-10, <br><br> Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § <br><br> CIVIL ACTION NO.: _____ <br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFFS' ORIGINAL COMPLAINT

i

## TABLE OF CONTENTS

**Table of Authorities** …………………………………………………....................iii

**Introduction** …………………………………………………………………...1

**Jurisdiction and Venue**…………………………………………….…………….1

**Parties**…....…………………………………………………………………...2

**Factual Allegations**…….....……………………………………………………..8

**Causes of Action**……………....………………………………………………27

**Jury Demand**…..…………………………………………………………...........30

**Prayer for Relief**………………………………………………..………………30

## <u>TABLE OF AUTHORITIES</u>

**STATUTES**

42 U.S.C. § 1983…………………………………………………...……1, 3, 4, 5, 21, 27, 28, 29

28 U.S.C. § 1343…………………………………………………………….....…....………1

28 U.S.C. § 1367(a)…………………………………………………………………………….1

28 U.S.C. § 1391(3)…………………………………………………………………………….2

Ark. Code Ann. § 12-49-301……………………………………………………….....9

Ark. Code Ann. § 16-62-101…………………………………………………….....….....28, 29

Ark. Code Ann. § 16-62-102……………………….………………………..……7, 28, 29

Ark. Code Ann. § 16-123-105…………………………………………………….……5, 28, 29

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. amend. X1V………………………………………………………1, 21, 27, 28, 29

Ark. CONST. art. 2 § 8……………………………………………………..……28, 29

Ark. CONST. art. 2 § 15…………………………………………………….....…....…..28, 29

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

Plaintiffs, by and through their undersigned counsel, file this Original Complaint against Defendants and allege as follows:

## I.     INTRODUCTION

1.      This is a civil rights action under 42 U.S.C. § 1983 and Arkansas law resulting from events that happened during the pre-trial detention of Michael Todd Sabbie at the Bi-State Justice Center Jail, which sits on the border of Texas and Arkansas and is run by a private, for-profit correctional corporation. The events that give rise to this complaint began on July 19, 2015 and culminated in the unnecessary death of Michael Sabbie three days later—on July 22, 2015. Defendants caused Mr. Sabbie's death by violating his rights under the Fourteenth Amendment to the United States Constitution and under the laws of the State of Arkansas.

2.      Defendants' unlawful actions include depriving Mr. Sabbie of his prescription medications, denying him adequate medical care, using constitutionally excessive force against him (rather than providing him with needed medical care), ignoring his ongoing serious medical needs, including his obvious acute respiratory distress, failing to monitor him despite his severe and life-threatening medical condition, otherwise forcing him to endure extreme and needless pain and suffering, and causing his death.

## II.    JURSIDCTION AND VENUE

3.      This Court has original subject matter jurisdiction over the plaintiffs' civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). This Court has supplemental jurisdiction over the plaintiffs' related state claims pursuant to 28 U.S.C. § 1367(a).

4.     This Court has personal jurisdiction over each of the named defendants because they either (1) reside in this judicial district, or (2) they have sufficient minimum contacts in the State of Texas, and the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

5.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(3) because all defendants are subject to this Court's personal jurisdiction in this action.

### III.    PARTIES

**A.    <u>Plaintiffs</u>**

6.     Plaintiff Teresa Sabbie is a United States Citizen and resident of Texarkana, Arkansas. She is the surviving spouse of the decedent, Michael Sabbie. She is also the personal representative of the Estate of Michael Sabbie, which was duly formed under Arkansas law (in the Miller County Circuit Court), and the mother of the decedent's three minor children—T.S., T.S., and M.S.[1]—each of whom are residents of Texarkana, Arkansas, and live with their mother. Teresa Sabbie is a plaintiff in her individual capacity, in her capacity as the personal representative of her late husband's estate (for the benefit of all statutory beneficiaries), and in her capacity as the parent and natural guardian of her and the decedent's minor children.

7.     Shanyke Norton is a United States Citizen and resident of Texarkana, Arkansas. She is a plaintiff in her capacity as parent and natural guardian of her and the decedent's minor child, M.S., who is also a resident of Texarkana, Arkansas, and lives with her mother.

8.     Kimberly Williams is a United States Citizen and resident of Texarkana, Arkansas. She is Michael Sabbie's sister and is a plaintiff in her individual capacity.

---

[1] All minor plaintiffs are referred to by their initials as required by Fed. R. Civ. P. 5.2.

9.      Marcus Sabbie is a United States Citizen and resident of Honolulu, Hawaii. He is Michael Sabbie's brother and is a plaintiff in his individual capacity.

10.     Charlisa Crump is a United States citizen and resident of Toledo, Ohio. She is Michael Sabbie's sister and is a plaintiff in her individual capacity.

**B.      Defendants**

**1.      The Municipal Defendants**

11.     Defendant Bowie County is a governmental entity and a political subdivision of the State of Texas and is a "person" for purposes of 42 U.S.C. § 1983 and Ark. Code. Ann. § 16-123-105. Bowie County is responsible for operating the Bi-State Justice Center Jail ("Bi-State Jail"), which sits on the border of Texas and Arkansas in Texarkana and is physically located on both sides of the state line. The Bi-State Jail houses pretrial detainees and convicted inmates from both Texas and Arkansas. All pretrial detainees confined at the Bowie County Jail are entitled to constitutional protections under the Fourteenth Amendment to the United States Constitution, including the right to constitutionally-adequate medical care and the right to be free from constitutionally excessive force. Bowie County has a non-delegable duty to ensure that the Bi-State Jail meets such constitutional requirements. Bowie County may be served via its County Judge, the Honorable James Carlow, at 710 James Bowie Drive, New Boston, Texas 75570.

12.     Defendant City of Texarkana is a governmental entity and a political subdivision of the State of Arkansas and is a "person" for purposes of 42 U.S.C. § 1983 and Ark. Code. Ann. § 16-123-105. Texarkana shares responsibility over the Bi-State Jail with Bowie County and routinely arrests and brings Arkansas detainees, such as Michael Sabbie, to the Bi-State Jail for pretrial detention and post-conviction sentencing. Defendant Texarkana, Arkansas, has a non-

3

delegable duty to ensure that the Bi-State Jail satisfy its constitutional duties to Arkansas citizens in its custody. Texarkana, Arkansas does not maintain a registered agent in the State of Texas. Thus, such defendant may be properly served through the Texas Secretary of State via certified mail to Secretary of State, P.O. Box 12079, Austin, Texas 78711. The Texas Secretary of State is then requested to forward service to Texarkana's City Mayor, Ruth Penney Bell, at 216 Walnut Street, Texarkana, Arkansas 71854.

13.     In February 2013, Defendant Bowie County (with the approval of Texarkana, Arkansas) contracted with a private, for-profit correctional corporation, known as Southwestern Correctional, LLC, to operate and manage all aspects of the Bi-State Jail, including the provision of medical care to the jail's population of pretrial detainees and post-conviction prisoners. Pursuant to the contract, Bowie County is obligated to conduct monthly inspections of the Bi-State Jail. Although Defendants Bowie County and Texarkana sought to privatize the operation of their jail by delegating their final policy-making authority to Southwestern Correctional, LLC, the defendants cannot contract-away their constitutional obligations and are liable for any unconstitutional corporate customs or policies that resulted in harm to any detainees and inmates confined in the jail.

**2.     The Corporate Defendants**

14.     Defendant Southwestern Correctional, LLC, d/b/a LaSalle Corrections, LLC and LaSalle Southwest Corrections (hereinafter "LaSalle"), is a Texas Limited Liability Company doing business in this judicial district for purposes of profit. LaSalle is considered a "person" under 42 U.S.C. § 1983 and Ark. Code. Ann. § 16-123-105. LaSalle, which is owned, controlled, or managed by Defendant LaSalle Management Company LLC, manages the day-to-day

4

operations of the Bi-State Jail. LaSalle is a final policy-maker for Bowie County for purposes of providing jail-related services and meeting the needs of its convicted inmates and pretrial detainees. According to the Texas Secretary of State, LaSalle's registered agent is Tim Kurpiewski at 26228 Ranch Road 12, Dripping Springs, Texas, 78620. At all material times, this defendant was acting under color of state law.

15.     Defendant Lasalle Management Company, LLC ("LaSalle Management") is a Louisiana Limited Liability Company doing business in this judicial district for the purpose of profit. LaSalle Management is considered a "person" under 42 U.S.C. § 1983 and Ark. Code. Ann. § 16-123-105. LaSalle Management is the parent company of Defendant LaSalle and is responsible for ensuring that its subsidiary meets its constitutional obligations in running the jail. Because LaSalle Management does not maintain a registered agent in the State of Texas, it may be properly served through the Texas Secretary of State via certified mail at Secretary of State, P.O. Box 12079, Austin, Texas 78711. The Texas Secretary of State is then requested to forward service to LaSalle Management's registered agent in Louisiana: William K. McConnell, 192 Bastille Street, Suite 200, Ruston, Louisiana 71270. At all material times, this defendant was acting under color of state law.

### 3.     The Individual Defendants

16.     Defendant Tiffany Venable is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Venable was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing medical care to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

17.     Defendant M. Flint (first name unknown) is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant M. Flint was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing medical care to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

18.     Defendant Gregory Montoya, M.D. is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Montoya was an agent, employee, and/or subcontractor of Defendant LaSalle. There is conflicting information as to whether Dr. Montoya was involved in the care of Michael Sabbie during his pretrial detention at the Bi-State Jail. (His reported involvement is described below.) If he was not involved, plaintiffs will promptly dismiss him from this case. To the extent he was involved, Dr. Montoya was acting under color of state law at all material times.

19.     Defendant Clint Brown is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Brown was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

20.     Defendant Nathaniel Johnson is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Johnson was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

21.     Defendant Brian Jones is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Jones was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

22.     Defendant Robert Derrick is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Derrick was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

23.     Defendant Daniel Hopkins is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Hopkins was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

24.     Defendant Stuart Boozer is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Boozer was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

25.     Defendant Andrew Lomax is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Lomax

7

was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

26.     Defendant Shawn Palmer is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Palmer was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

27.     Defendant Simone Nash is a United States Citizen who, on information and belief, resides in either Bowie County, Texas, or Miller County, Arkansas. Defendant Nash was an agent, employee, and/or subcontractor of Defendant LaSalle and was responsible for providing jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, this defendant was acting under color of state law.

28.     Defendants John and Jane Does 1-10 are United States Citizens who reside in either Bowie County, Texas, or Miller County, Arkansas. These defendants (identities unknown) were agents, employees, and/or subcontractors of Defendant LaSalle and were responsible for providing medical care and/or other jail-related services to Michael Sabbie during his pretrial detention at the Bi-State Jail. At all material times, they were acting under color of state law.

## IV.     FACTUAL ALLEGATIONS

### A.     <u>Facts Applicable to All Defendants</u>

29.     In the beginning of July 2015, Michael Todd Sabbie was 35 years old, living in Texarkana, Arkansas, with his wife, Teresa, and three of his minor children—T.S, T.S., and M.S.

Mr. Sabbie also had another minor child, a daughter, M.S., who was also living in Texarkana, Arkansas, with her mother, Shanyke Norton.

30.     On July 19, 2015, Mr. Sabbie was arrested by the Texarkana, Arkansas Police Department (TAPD), following a verbal domestic dispute with his wife. After his arrest, the TAPD transported Mr. Sabbie to the Bi-State Jail where he was booked and confined. As an Arkansas resident who was arrested by Arkansas law enforcement, Mr. Sabbie was an Arkansas pretrial detainee. Any criminal charges against Mr. Sabbie would have ultimately been resolved in the Arkansas district court located in same building as the Bi-State Jail.

31.     Arkansas maintained "jurisdictional situs" over Mr. Sabbie at all times during his pretrial detention in the Bi-State Jail even though a portion of the alleged misconduct occurred on the Texas side of the border. This is pursuant to the Bi-State Criminal Justice Center Compact between Arkansas and Texas. The Bi-State Criminal Justice Center Compact is contained in Ark. Code Ann. § 12-49-301 and is incorporated by reference herein.

32.     At the time of his booking, on the evening of July 19th, Mr. Sabbie informed jail intake staff that he suffered from heart disease, asthma, hypertension, diabetes, and other medical conditions. The corporate jail medical providers, including the named defendant-nurses, were aware that Mr. Sabbie took multiple prescription medications to treat his various medical conditions; however, they did not provide him any medication during his pretrial detention. By depriving Mr. Sabbie of necessary prescription medication, defendants caused or contributed to the serious medical distress he would later experience.

33.     During his intake screening, Mr. Sabbie's blood pressure was 166/99, which is high. Because of this and because Mr. Sabbie suffered from hypertension and diabetes, the intake

nurse appropriately ordered Mr. Sabbie to be placed on daily blood pressure checks and daily blood sugar checks. Despite this order and despite Mr. Sabbie's ensuing medical complications (discussed below), the corporate medical providers, including the defendant-nurses named herein, did not check either his blood pressure or his blood sugar at any point during his pretrial detention.

34.      In the early morning of July 20th, at approximately 3:30 a.m., Mr. Sabbie was seen by Defendant-Nurse M. Flint due to respiratory distress. He reported shortness of breath and told Defendant Flint that he was "unable to breathe while lying down." Defendant Flint documented that he had a low blood oxygen level. Specifically, his oxygen saturation, which measured 98% at intake, was now 90%. In addition, his heart rate (which was 60 bpm at intake) was now 108-115 bpm, indicating tachycardia. Based on the symptoms he presented, Mr. Sabbie should have been taken to a hospital, or, at a bare minimum, evaluated by a physician; however, he was neither taken to a hospital nor seen by a doctor.

35.      Shockingly, despite knowing that Mr. Sabbie's blood pressure was high at intake, that he suffered from hypertension and heart trouble, that he had not been given any blood pressure medication, and that he was complaining of respiratory distress, Defendant Flint did not even take Mr. Sabbie's blood pressure. In addition, although she knew that Mr. Sabbie was an insulin-dependent diabetic, she did not check his blood sugar. Nor did she order or administer any medication. Instead, she sent him back to his jail cell without further medical evaluation or assistance. In response to Mr. Sabbie's complaint that he was unable to breathe while lying down, she advised him to "sit up." Defendant Flint's actions on the morning of July 20th violated

basic standards of medical care and constituted deliberate indifference to Mr. Sabbie's serious medical needs.

36.     The following morning, on July 21st, at approximately 10:15 a.m., another inmate alerted the jail's control room because Mr. Sabbie had collapsed and was on the floor of his cell. Several corrections officers responded, including Defendants Nathaniel Johnson, Clint Brown, Shawn Palmer, and Stuart Boozer, each of whom are named defendants in this case. Mr. Sabbie was clearly in respiratory distress. These defendants put Mr. Sabbie in a wheelchair and brought him to the nurse's station, where he was seen by Defendant-Nurse Tiffany Venable at approximately 10:20 a.m.

37.     Mr. Sabbie reported to Defendant Venable that he was suffering from shortness of breath. He was coughing and clearly experiencing acute respiratory distress. Mr. Sabbie further reported that he believed he had pneumonia. In fact, Mr. Sabbie's acute respiratory distress was most likely the result of pulmonary edema related to his heart disease and his untreated hypertension and was an extremely serious medical condition requiring immediate hospital transport.

38.     Notwithstanding his symptoms of acute respiratory distress, Defendant Venable did not arrange for Mr. Sabbie to be transported to a hospital. Nor did she conduct any of several vital medical tests. For example, despite the intake nurse's order for daily blood pressure and blood sugar checks (coupled with Mr. Sabbie's history of hypertension and insulin-dependent diabetes), she did not check either. Nor did she measure his rate of respiration or order or administer any medication. Instead, she sent him back to his jail cell without further medical assistance—in violation of basic standards of medical care and in deliberate indifference to his

serious medical needs. Records indicate there was a doctor in the room during this visit. Upon information and belief, this was Dr. Gregory Montoya.

39.     Frustrated at the lack of medical assistance, Mr. Sabbie reportedly stood up from his wheelchair and began walking back to his pod or cell. While walking back to his pod or cell, Mr. Sabbie collapsed to the floor—further demonstrating the seriousness of his medical condition. Rather than bringing him back to the medical staff or arranging hospital transport, Defendants Johnson, Brown, Palmer, and Boozer simply took Mr. Sabbie back to his pod. The failure to bring him back to the nurse's station or arrange for hospital transport was a violation of basic correctional standards and amounted to deliberate indifference to his serious medical needs. Indeed, correctional staff, via Defendant Shawn Palmer, later issued Mr. Sabbie an "infraction" for "creating a disturbance" "by feining [sic] illness and difficulty breathing." The infraction notes that the nurse had found "no signs of illness" (even though she did not check his blood pressure or blood sugar or measure his rate of respiration).

40.     That afternoon, Mr. Sabbie, an Arkansas pretrial detainee, had a court appearance at the Arkansas City District Court, which, as mentioned above, is in the same building as the Bi-State Jail. An Arkansas District Court Bailiff escorted Mr. Sabbie and approximately 10 other inmates to the courtroom. The court bailiff noticed that Mr. Sabbie was "coughing and sweating heavily around his head and face area," further evidencing the serious medical symptoms from which he was suffering.

41.     During his court appearance, in which he plead not guilty, an Arkansas Court Docket Coordinator reportedly noticed that Mr. Sabbie sounded "short of breath." The Arkansas City District Court judge also noticed that Mr. Sabbie was in medical distress, told him that he

sounded as if he had asthma or bronchitis, and asked him if he wanted to sit down, which Mr. Sabbie did. According to jail investigative records, Mr. Sabbie then told the district judge, in open court, that he needed to go "to the hospital" and that he had been "spitting up blood." The obviousness of Mr. Sabbie's medical distress thereafter continued and grew increasingly obvious.

42.     Following the court appearance, Mr. Sabbie and the other 10 detainees were led back to their pod by corrections officer-defendant Clint Brown. A jail surveillance camera recorded what happened next. The relevant portion of that video footage, which is incorporated herein by reference, can be found here: https://budgeandheipt.wistia.com/medias/ubr6es6gol.

43.     This incorporated video shows that as Defendant Brown is leading the detainees from one area in the jail to another, Mr. Sabbie, who is in obvious respiratory distress (as noted by court personnel), stops and leans against a wall. He then puts both hands on his knees in a "tripod" position and is plainly struggling to catch his breath. It would have been clear to any reasonable corrections officer that Mr. Sabbie was in medical distress and needed immediate medical attention.

44.     As the video shows, Defendant Brown approached Mr. Sabbie. Although there is no sound, it is clear from the video (and the accounts of witnesses leading up to that point) that Mr. Sabbie was in medical distress. Defendant Brown was in a clear position to see and hear Mr. Sabbie's respiratory distress. Defendant Brown was also aware that Mr. Sabbie had been experiencing respiratory distress earlier that morning. At some point after a verbal exchange between Defendant Brown and Mr. Sabbie, in which Mr. Sabbie apparently indicated a desire to make a phone call, Mr. Sabbie attempted to open the door leading to the booking area (where the

phone was located). Despite Mr. Sabbie's respiratory distress and his lack of assaultive or threatening behavior, Defendant Brown roughly grabbed him and threw him violently to the ground. Mr. Sabbie did not do anything to justify this uncontrolled and unprofessional use of force. Defendant Brown's action was objectively unreasonable—particularly given Mr. Sabbie's obvious respiratory distress.

45.     Once he was on the ground, multiple additional corrections officers immediately piled on top of Mr. Sabbie, even though he was in a prone position on the ground and struggling to breathe. The additional officers included Defendants Robert Derrick, Andrew Lomax, Shawn Palmer, and Stuart Boozer. Defendants Brian Jones and Nathaniel Johnson also arrived on the scene, as did others. The video then shows another officer with a handheld video camera, who begins filming. From this point forward, plaintiffs have additional video footage from that handheld camera, which has sound. The additional video, which is incorporated in this complaint by reference, can be found here: https://budgeandheipt.wistia.com/medias/7bv2i4jvur.

46.     Mr. Sabbie can be heard in the handheld video camera footage repeatedly pleading, "I can't breathe, I can't breathe," underneath the pile of officers, while also making gasping sounds consistent with respiratory distress. The officers involved in handcuffing Mr. Sabbie were in control of him, and he did not pose any sort of threat to them. Mr. Sabbie was not actively resisting and continued to tell them he could not breathe.

47.     While Mr. Sabbie was lying in a prone position, fully controlled with multiple officers on top of him—struggling to breathe and repeatedly communicating his respiratory distress—a Bi-State Jail lieutenant sprayed Mr. Sabbie directly in the face with his can of OC (pepper) spray. The pepper spray was administered by Defendant-Lieutenant Johnson on a

14

human being posing no threat and struggling to breathe. Before pepper spraying Mr. Sabbie, Defendant Johnson was aware of his respiratory distress due to Mr. Sabbie's repeated statements that he could not breathe and because of the labored breathing/gasping sounds he was making.

48.     Defendant Johnson was also aware that Mr. Sabbie had been taken to the nurse earlier that very same morning due to respiratory distress. As alleged in paragraph 36 above, Defendant Johnson was among those who found Mr. Sabbie on the floor of his cell that morning (after his fellow inmate alerted the control room) and transported him to the nurse's office in a wheelchair. Defendant Johnson later saw Mr. Sabbie collapse that morning and, on information and belief, was one of several officers who took him back to his cell. Given his knowledge about Mr. Sabbie's preexisting respiratory distress, as well as Mr. Sabbie's ongoing breathing difficulty, the number of officers at the scene, and the lack of active resistance or threatening behavior by Mr. Sabbie, it was objectively unreasonable of Defendant Johnson to pepper spray him. Other corrections officers who were participating in the restraint of Mr. Sabbie, including defendants Brown, Palmer, and Boozer, were also present earlier that morning to witness Mr. Sabbie's respiratory distress.

49.     After Defendant Johnson pepper sprayed Mr. Sabbie, the other corrections officers handcuffed him and pulled him up to a standing position. Defendants Brown, Boozer, and Lomax then led him to the nurse's station. On the way, Mr. Sabbie repeatedly said, "I can't breathe" and continued to make sounds of labored breathing consistent with acute respiratory distress. The officer-defendants then sat Mr. Sabbie down in a chair in the nurse's office and stayed there while Defendant-Nurse Tiffany Venable "examined" him.

50.     Defendant-Nurse Venable was well-aware of Mr. Sabbie's ongoing serious medical needs. As alleged in paragraphs 36-38 above, she was the nurse who saw Mr. Sabbie at approximately 10:20 a.m. that morning when he was brought to her office in a wheelchair, reported his difficulty breathing to her, and displayed signs of acute respiratory distress. In addition, Defendant Venable was aware that Mr. Sabbie had hypertension, heart disease, asthma, diabetes, and other serious medical conditions. She was also aware that he had previously visited another jail nurse for respiratory distress on the morning of July 20—the day before his 10:20 a.m. visit with her—and that Mr. Sabbie had not been given his prescription medications. In addition, because Defendant Venable was present before and during the use of force incident described above, she knew that Mr. Sabbie continued to be in acute respiratory distress. For example, she heard him saying that he could not breathe immediately prior to being pepper sprayed; she witnessed him being pepper sprayed directly in the face; she heard him continue to annunciate his breathing difficulty; and she heard his audible gasping, labored breathing, and accelerated respiration.

51.     The view of Mr. Sabbie in the chair at the nurse's station is partially blocked by the officers standing between him and the individual with the handheld camera. However, Mr. Sabbie can be heard repeatedly saying "I can't breathe" and reiterating his belief that he had pneumonia. In addition, the sounds of Mr. Sabbie's labored breathing/gasping continued throughout the visit. His acute respiratory distress was also evident from his rapid rate of respiration, as he was taking many more breaths per minute than a normal healthy adult.

52.     The visit with Defendant Venable was extremely short-lived. Her "exam" took less than a minute. Although it is not clear exactly what she did to evaluate him during this brief

visit (due to the partially obstructed view), it is clear that she did not do anything remotely close to a thorough medical examination. For instance, she did not check Mr. Sabbie's blood pressure or blood sugar; she did not look at his jail medical chart; she did not check his heartrate; she did not count his respiration rate (i.e., his number of breaths per minute); she did not listen to his lungs or heart through a stethoscope; she did not take his temperature; she did not ask him any questions about his medical history, medications, or symptoms; she did not check for swelling in his lower legs; and she did not give him his prescription (or any other) medications—all in clear violation of basic standards of medical care and in deliberate indifference to his serious medical needs. She did not even document his visit that day.

53.     After Defendant Venable's grossly substandard medical "exam," she, again, sent Mr. Sabbie back to his jail cell. Several corrections officers (including Defendants Brown, Boozer, Lomax, Derrick, and Johnson) then lead Mr. Sabbie out of the nurse's room, down a hall, and into a shower—purportedly to decontaminate the pepper spray from his face and body. On the way to the shower, Mr. Sabbie continued to tell the officer-defendants that he could not breathe, and his labored breathing/gasping, as well as his abnormally high rate of respiration, is audible on the incorporated video footage.

54.     Once in the shower, Mr. Sabbie had difficulty standing, and the officers, including Defendants Brown, Boozer, Lomax, and Johnson ordered him to "stay up." As the hot water sprayed his face, Mr. Sabbie repeatedly complained that he couldn't breathe. When he leaned against a wall, in an apparent effort to hold himself up, Defendant Johnson, who previously pepper sprayed him, ordered him to stop doing so and threatened that if he did not comply, "a chemical agent [would] be administered again." This threat is outrageous, as Mr. Sabbie was not

doing anything that would come close to justifying the use of additional pepper spray or even the threat of it.

55.     At some point, while in the shower, Mr. Sabbie collapsed. On the video, he appears to pass out and/or lose consciousness while on his feet, and his body slams to the ground. While he is lying motionless on the floor, Defendants Brown, Boozer, Lomax, and Johnson simply stood there. They expressed no concern whatsoever over what just happened. One of them announced, oddly, that "the offender is perfectly sit[ing] down," when Mr. Sabbie was clearly not sitting—he was lying motionless on the shower floor, most likely unconscious. Defendants Jones, Palmer, and Venable were standing directly outside the door to the shower and could see and hear what was happening. Mr. Sabbie's collapse should have triggered the defendant-officers to call for an all-out emergency medical response. Yet, no one radioed for emergency medical assistance, and Defendant-Nurse Venable did nothing. Instead, the guards lifted Mr. Sabbie (who had regained consciousness) up from the ground and dragged him to a jail cell.

56.     In addition to their failure to secure medical care for Mr. Sabbie upon his collapse, the way the defendant-officers "decontaminated" him violated basic correctional practices. The brief spraying of hot shower water to Mr. Sabbie's face was woefully insufficient to decontaminate him and most likely worsened the effects of the OC spray and/or reactivated the chemical agent. Instead, the oil-based spray should have been deactivated and cleaned using cold water and non-oily soap, such as mild dish detergent, or a decontaminating solution provided by the manufacturer of the product.

57.    In addition to properly decontaminating the chemical spray from his face and skin, officers should have removed and sealed Mr. Sabbie's contaminated clothing and provided him with a fresh set of clean, dry clothes. The failure of Defendants Brown, Boozer, Lomax, and Johnson to adequately decontaminate Mr. Sabbie with an appropriate solution—and leaving him in his wet, pepper-spray-contaminated clothing—was constitutionally unreasonable and violated basic correctional and law enforcement practices. These violations caused Mr. Sabbie to suffer continued unnecessary pain and exacerbated his acute respiratory distress.

58.    As the defendant-officers dragged Mr. Sabbie back to his cell—in soaking wet, pepper-spray-contaminated clothing, with his pants pulled down below his waist and his naked buttocks exposed—Mr. Sabbie's labored breathing, gasping, and abnormally high respiration rate continued. He repeatedly bent forward at the waist, trying catch his breath, and made sounds consistent with respiratory distress. Defendants Boozer, Brown, Johnson, Palmer, Lomax, Jones, and Venable all witnessed Mr. Sabbie's obviously serious medical condition and knew that he had not been properly decontaminated; yet none of them intervened to assist him.

59.    When the defendant-officers opened his cell door, Mr. Sabbie's knees buckled, and he fell to the ground at the cell entrance. The defendant-officers then dragged him into his cell and put him on the concrete floor. As they were removing his handcuffs, Mr. Sabbie again told them he could not breathe. This is at least the 19th time that Mr. Sabbie can be heard saying, "I can't breathe" on the incorporated handheld video footage. In addition to the defendant-officers, Nurse Venable was present. Dr. Montoya was reportedly present as well. Each of them could clearly see that Mr. Sabbie was in dire need of medical attention but chose to ignore his serious medical needs.

60.     The officer with the camera continued to film Mr. Sabbie, briefly, while he was lying on his back in the cell. It was clear that Mr. Sabbie was in serious medical distress and in need of emergency medical attention. Nonetheless, the defendants left the cell and closed the door, leaving Mr. Sabbie to suffer as he lay on the concrete floor—still wearing soaking wet, pepper-spray-contaminated clothing, with his pants still pulled down below his waist. The video footage ends there.

61.     Approximately an hour-and-a-half later, Defendants Derrick, Hopkins, and Boozer came back to Mr. Sabbie's cell. Mr. Sabbie was lying motionless on his back with his pants pulled down and his genitals exposed. He was in obvious distress and dire need of emergency medical attention. Although these three officer-defendants took photographs of Mr. Sabbie and could clearly see his condition, they did nothing to secure desperately-needed emergency medical care for him in violation of basic correctional standards and in deliberate indifference to his extremely serious medical needs. After taking the photos, these three defendants left Mr. Sabbie alone in his cell—lying on his back, motionless.

62.     According to standard jail protocols (and Bi-State Jail protocols), an officer was supposed to check on Mr. Sabbie every 30 minutes. (Indeed, given his serious medical condition, they should have checked on him more often than that.) Defendant-Officer Simone Nash documented that she conducted the requisite 30-minute checks throughout her 12-hour night shift. However, she did not actually do the mandatory checks. Instead, she simply fabricated documentation that she did them. Defendant Nash's failure to conduct the mandatory checks (and her falsification of government records) violated basic correctional standards and reflected deliberate indifference to Mr. Sabbie's serious medical needs.

63.     On the few times that Defendant Nash allegedly checked on Mr. Sabbie during the night, she documented that she observed him to be in the same position—on the concrete floor, on his back, with his pants pulled down and his genitals exposed. Despite the fact that Mr. Sabbie's life was in imminent danger and that he was in obvious need of emergency medical care, Defendant Nash failed to secure any such care. Rather, she ignored Mr. Sabbie in violation of basic correctional standards and in deliberate indifference to his serious medical needs.

64.     The next morning, shortly after 6:00 a.m., more than 12 hours after he was put in his cell, Bi-State Jail officers entered Mr. Sabbie's cell because he had "refused" orders to pull his pants up. Mr. Sabbie was dead. His body was stiff and cold to the touch. It is not yet known how long Mr. Sabbie lay dead while jail staff ignored him. However, had defendants summoned appropriate medical care at any point before his death, Mr. Sabbie could have been saved and would still be alive today.

65.     The conditions in which Mr. Sabbie was confined were inhumane in the extreme, beyond all bounds of human decency, and in violation of his rights under the Fourteenth Amendment to the United States Constitution and Arkansas law. From the beginning of his pretrial detention on July 19, 2015 until his unnecessary death on July 22, 2015, Mr. Sabbie's well-established federal constitutional (and state law) rights were continuously and repeatedly violated by the defendants named herein—resulting in three days of mental and physical agony, culminating in his death, and giving rise to this action under 42 U.S.C. § 1983 and the laws of the State of Arkansas.

66.     All the individual medical provider defendants named in this complaint, including Nurses Venable and Flint and Dr. Montoya, acted in violation of the applicable standards of

21

medical care and with deliberate indifference to Mr. Sabbie's serious medical needs. All the individual correctional defendants named in this complaint, including Defendants Jones, Johnson, Brown, Derrick, Hopkins, Boozer, Palmer, Lomax, and Nash, acted in violation of the applicable standards of correctional care and with deliberate indifference to Mr. Sabbie's serious medical needs. In addition, Defendant Brown's act of throwing Mr. Sabbie to the ground and Defendant Johnson's act of pepper spraying him were unreasonable and amounted to excessive uses of force. The act of failing to properly decontaminate him from the pepper spray and leaving him in soaking wet, contaminated clothing was an additional violation of his federal constitutional and state law rights and was committed by Defendants Johnson, Brown, Boozer, Palmer, Lomax, Jones, and Venable

67. The individual defendants had a duty to treat Mr. Sabbie in accordance with the applicable standards of medical and correctional care. The individual defendants breached those duties, and Mr. Sabbie's damages, including his unnecessary pain and suffering and death, were the direct and foreseeable result of their actions and inactions alleged herein.

68. Moreover, the supervisory defendants, including Defendants Jones and Johnson, had a duty to oversee their subordinates and ensure compliance with correctional standards of care. Defendants Jones and Johnson breached those duties. These two individuals either actively participated in the unconstitutional conduct described in this complaint or they acquiesced in the constitutionally offensive conduct by personally directing it, tacitly authorizing it, or otherwise failing to train or supervise their subordinates—thereby giving rise to individual supervisory liability for the constitutional deprivations alleged herein.

69.     All acts and omissions committed by each of the individual defendants were committed with intent, malice, and/or with reckless disregard for Mr. Sabbie's federal constitutional rights. Moreover, the individual defendants either (a) intentionally pursued a course of conduct for the purpose of causing injury, or (b) knew or should have known that their conduct would naturally and probably result in injury or damage and, nevertheless, continued the conduct with malice or in reckless disregard of the consequences.

**B.      Additional Facts Applicable to the Corporate Defendants**

70.     The unconstitutional conduct alleged herein was carried out in accordance with the official policies, procedures, practices, and customs of the Corporate Defendants (LaSalle and LaSalle Management).

71.     The Corporate Defendants engaged in and permitted to exist a pattern, practice, or custom of unconstitutional conduct toward inmates with serious medical needs, including denying prescription medication and failing to secure medical care for such individuals. As of the time of Mr. Sabbie's pretrial detention, there had been numerous instances in the Bi-State Jail (and in other correctional facilities managed by the Corporate Defendants) of inmates and detainees being denied prescription medication and deprived of needed medical care by LaSalle and their agents or employees. Failing to conduct blood pressure checks and blood sugar tests was also commonplace, even in the face of orders to conducts such checks and tests. This same pattern of misconduct continued following the death of Mr. Sabbie and lead to the death of Morgan Angerbauer, an insulin-dependent diabetic. Like Mr. Sabbie, she was denied crucial medication. In both instances, the LaSalle nursing staff failed to perform crucial medical tests

and checks. And like Mr. Sabbie, she was not transported to the hospital despite her serious medical needs, even when those needs were obvious—as evidenced by video footage.

72.     The failure to secure needed medical care for Mr. Sabbie was motivated by constitutionally impermissible profit-driven reasons. The Corporate Defendants had a policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care to make higher profits on the contract. It was foreseeable that the insufficient jail medical budgeting and spending would cause harm to detainees in need of medical care.

73.     The Corporate Defendants also had a pattern, practice, and custom of failing to properly monitor inmates and detainees with serious medical and/or mental health needs. This includes a practice of failing to conduct 30-minute checks mandated by the Texas Commission on Jail Standards and internal policies. The Commission cited the Bi-State Jail for failing to comply with these mandated-checks shortly after the death of Michael Sabbie and, again, approximately one year later. Other LaSalle-run facilities have also been written up for similar non-compliance. Moreover, like Defendant Nash, corrections officers in other LaSalle-run jails in Texas have engaged in a pattern of falsifying documents indicating they conducted such checks when they did not. In the LaSalle-run Jack Howell Detention Center, for instance, three corrections officers were arrested (following an inmate's death) for falsifying documents to make it appear that they conducted mandated headcounts when they did not in fact do so.

74.     The Corporate Defendants also engaged in and permitted to exist a pattern, practice, or custom of using excessive force on inmates and detainees, including the excessive and unconstitutional use of pepper spray on such individuals. As of the time of Mr. Sabbie's pretrial detention, there had been numerous instances in the Bi-State Jail (and in other

correctional facilities managed by the Corporate Defendants) of inmates and detainees being subjected to excessive force, including the unreasonable use of pepper spray, by agents or employees of the Corporate Defendants. In the TAPD's post-death investigation, one inmate reported that the detention staff used unjustified force "on a daily basis" and that he was aware of "at least 15 assaults" by jail guards. Other inmates also reported experiencing excessive force.

75.     The Corporate Defendants failed to adequately train their personnel on recognizing and responding to the serious medical needs of inmates and detainees and the rights of such individuals to be free from excessive force. This includes their deliberate choice not to provide training on the permissible use of pepper spray and the proper manner of decontaminating individuals who have been subjected to pepper spray despite the known and obvious consequences of this inaction. The need for this training was obvious because LaSalle hired detention staff with little or no corrections experience, and it was foreseeable that the lack of such training would cause harm to inmates and detainees. The Corporate Defendants also failed to train their corporate nursing staff on how to conduct adequate medical examinations, including the need to conduct blood pressure and blood sugar tests where indicated. The need for this training was obvious because LaSalle staffed the jail with licensed vocational nurses, rather than registered nurses, and it was foreseeable that such training deficiencies would cause harm to inmates and detainees.

76.     The corporate policies, practices, and customs described above were the moving force behind Mr. Sabbie's suffering and death and the constitutional violations alleged herein. The Corporate Defendants also ratified the unconstitutional conduct of its employees and agents with respect to the detention and death of Michael Sabbie. Despite clear video evidence of

unconstitutional misconduct, LaSalle approved the constitutionally deficient actions of its medical staff and the unconstitutional conduct of the involved corrections officers.

77.     All acts and omissions committed by the Corporate Defendants were committed with intent, malice, and/or with reckless disregard for Mr. Sabbie's federal constitutional rights. Moreover, the Corporate Defendants either (a) intentionally pursued a course of conduct for the purpose of causing injury, or (b) knew or should have known that its conduct would naturally and probably result in injury or damage and, nevertheless, continued the conduct with malice, deliberate indifference, and reckless disregard of the consequences.

78.     The Corporate Defendants had a duty to treat Mr. Sabbie in accordance with the applicable standards of medical and correctional care. The Corporate Defendants breached those duties, and Mr. Sabbie's damages, including his pain and suffering and his death, were the direct and foreseeable result of the tortious actions and inactions of the Corporate Defendants alleged herein.

## C.     Additional Facts Applicable to the Municipal Defendants

### 1.     Bowie County

79.     Defendant Bowie County delegated its final policy-making authority to the Corporate Defendants. Despite this, Bowie County had a continuing duty to ensure that its corporate policymakers were meeting the constitutional needs of its detainees. Bowie County adopted and ratified the policies, customs, and practices of the Corporate Defendants as its own. As such, Defendant Bowie County is liable for any unconstitutional corporate policies, customs, or practices that resulted in harm to any detainees and inmates confined in the jail, including the unconstitutional policies, customs, and practices of Defendants LaSalle and LaSalle Management

that caused the death of Michael Sabbie. It was foreseeable that such policies, customs, and practices would put the lives of Bi-State Jail and detainees at risk, and such policies and customs caused and/or substantially contributed to the death of Michael Sabbie.

### 2. Texarkana

80.    Defendant Texarkana delegated its final policy-making authority to the Corporate Defendants. Despite this, Texarkana had a continuing duty to ensure that its corporate policymakers were meeting the constitutional needs of its detainees. Texarkana adopted and ratified the policies, customs, and practices of the Corporate Defendants as its own. As such, Defendant Texarkana is liable for any unconstitutional corporate policies, customs, and practices that resulted in harm to any detainees and inmates confined in the jail, including the unconstitutional policies, customs, and practices of Defendants LaSalle and LaSalle Management that caused the death of Michael Sabbie. It was foreseeable that such policies, customs, and practices would put the lives of Bi-State Jail detainees at risk, and such policies, customs, and practices caused and/or substantially contributed to the death of Michael Sabbie.

### V.    CAUSES OF ACTION

**A.    <u>Against the Corporate Defendants</u>:**

### 1.    42 U.S.C. § 1983

81.    Based on the allegations in this complaint, the Corporate Defendants (LaSalle and LaSalle Management) are liable under 42 U.S.C. § 1983 for violating the plaintiffs' rights under the Fourteenth Amendment to the United States Constitution. This includes depriving Mr. Sabbie of his Fourteenth Amendment right to adequate medical care and to be free from excessive force,

as well as depriving his surviving family members of their constitutional liberty interest in their relationship and their society and companionship with him.

### 2.      Arkansas Wrongful Death and Survival

82.     Based on the allegations set forth in the complaint, the Corporate Defendants (LaSalle and LaSalle Management) are liable under the Arkansas Wrongful Death and Survival laws, Ark. Code Ann. §§ 16-62-101 & 102, for tortuously causing the death and pre-death pain and suffering of Michael Sabbie by violating the applicable correctional and medical standards of care and by violating Article 2 § 8 and Article 2 § 15 of the Arkansas Constitution—giving rise to a claim under the Arkansas Civil Rights Act, Arkansas Code § 16-123-105.

### B.      Against the Municipal Defendants

### 1.      42 U.S.C. § 1983

83.     Based on the allegations in this complaint, the Municipal Defendants (Bowie County and Texarkana) are liable under 42 U.S.C. § 1983 for violating the plaintiffs' rights under the Fourteenth Amendment to the United States Constitution. This includes depriving Mr. Sabbie of his right to adequate medical care and to be free from excessive force, as well as depriving his surviving family members of their constitutional liberty interest in their relationship and companionship with him.

### 2.      Arkansas Wrongful Death and Survival

84.     Based on the allegations set forth in the complaint, the Municipal Defendants (Bowie County and Texarkana) are liable under the Arkansas Wrongful Death and Survival laws, Ark. Code Ann. §§ 16-62-101 & 102, for tortuously causing the death and pre-death pain and suffering of Michael Sabbie by violating the applicable correctional and medical standards of

care and by violating Article 2 § 8 and Article 2 § 15 of the Arkansas Constitution—giving rise

to a claim under the Arkansas Civil Rights Act, Arkansas Code § 16-123-105.

**C.**     **Against Individual Defendants**

     **1.**     **42 U.S.C. § 1983**

85.     Based on the allegations in this complaint, all individual defendants are liable

under 42 U.S.C. § 1983 for violating the plaintiffs' rights under the Fourteenth Amendment to

the United States Constitution for depriving Mr. Sabbie of his right to adequate medical care and

for depriving his surviving family members of their constitutional liberty interest in their

relationship and society and companionship with him. Additionally, Defendants Johnson, Brown,

Boozer, and Lomax are liable for their constitutionally excessive use of pepper spray, which

includes Defendant Johnson's unreasonable application of the chemical agent and the ensuing

failure of each of them to decontaminate Mr. Sabbie. Individual liability under 42 U.S.C. § 1983

also extends to the supervisory defendants identified herein, including Defendants Jones and

Johnson, for their failure to oversee their subordinates and ensure compliance with correctional

standards of care as described in this complaint.

     **2.**     **Arkansas Wrongful Death and Survival**

86.     Based on the allegations set forth in the complaint, the individual defendants are

liable under the Arkansas Wrongful Death and Survival laws, Ark. Code Ann. §§ 16-62-101 &

102, for tortuously causing the death and pre-death pain and suffering of Michael Sabbie by

violating the applicable correctional and medical standards of care and by violating Article 2 § 8

and Article 2 § 15 of the Arkansas Constitution—giving rise to a claim under the Arkansas Civil

Rights Act, Ark. Code Ann. § 16-123-105.

## VI.   JURY DEMAND

87.   Plaintiffs hereby demand a trial by jury.

## VII.   PRAYER FOR RELIEF

Plaintiffs ask that the Court award them the following relief:

A.   All available compensatory damages, including, but not limited to: damages to the decedent for his mental and physical pain and suffering and the loss of the value of his life; damages to his surviving family members for their loss of society and companionship, loss of love and affection, loss of financial support, loss of household services, and loss of care, comfort, and guidance; and all compensatory damages available under state and federal law;

B.   Punitive damages against all individual and corporate defendants;

C.   Attorneys' fees and costs;

D.   Prejudgment interest as appropriate; and

E.   Any such other relief that this Court deems just and equitable.

DATED this 24th day of May, 2017.

Respectfully submitted,

BUDGE & HEIPT, PLLC                         FLINT & SOYARS, PC


_/s/ Erik J. Heipt_____          _/s/ Matthew Q. Soyars_____
Erik J. Heipt                               Matthew Q. Soyars
Edwin S. Budge                              Bruce A. Flint
705 2nd Ave., Suite 910                     2821 Richmond Road
Seattle, Washington 98104                   Texarkana, Texas 75503
ed@budgeandheip.com                         bflint@bruceflint.com
erik@budgeandheipt.com                      msoyars@bruceflint.com
Telephone: (206) 624-3060                   Telephone: (903) 334-8928

Attorneys for Plaintiffs                    Attorneys for Plaintiffs