**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| TERESA SABBIE, individually, as personal representative of the ESTATE OF MICHAEL SABBIE,  and as parent and natural guardian of her minor children, T.S., T.S, and M.S.; SHANYKE NORTON, as parent and natural guardian of her minor child, M.S.; KIMBERLY WILLIAMS; MARCUS SABBIE; and CHARLISA CRUMP<br><br>v.<br><br>SOUTHWESTERN CORRECTIONAL, LLC d/b/a LASALLE CORRECTIONS, LLC and LASALLE SOUTHWEST CORRECTIONS; et al. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CASE NO. 5:17cv113-RWS-CMC |

---

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

---

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636.  Before the Court are the following pending motions:

> **Defendant Bowie County, Texas' Motion for Summary Judgment (Docket Entry # 85);**

> **Defendant City of Texarkana, Arkansas' Motion for Summary Judgment (Docket Entry # 86);**

> **Defendant LaSalle Management Company's Motion for Summary Judgment (Docket Entry # 87); and**

> **Defendants' Motion for Summary Judgment (Docket Entry # 88).**

1

The Court, having considered the relevant briefing, recommends the LaSalle Defendants' motion be

**GRANTED IN PART and DENIED IN PART** and the three remaining motions be **DENIED**.

### Table of Contents

I.      Background……………………………………………………………………….......3
II.     Legal Standard……………………………………………………………….......6
III.    Summary Judgment Evidence ................................................................8
    A.    Evidence applicable to all defendants..........................................................8
    B.    Additional evidence applicable to Plaintiffs' claims against LaSalle....................50
IV.     Applicable Law……………………………………………………….....................57
    A.    Fourteenth Amendment Due Process.............................................57
    B.    42 U.S.C. § 1983.................................................................57
    C.    42 U.S.C. § 1988.................................................................59
    D.    Constitutional rights of a pretrial detainee..............................65
        1.    Governed by the Fourteenth Amendment................................65
        2.    Supreme Court caselaw..............................................65
        3.    Fifth Circuit caselaw..............................................69
V.      LaSalle Defendants' Motion ……………………………………………………...74
    A.    The issues.........................................................................74
    B.    Whether Plaintiffs' claims could also properly be characterized as a condition  of confinement claim against LaSalle..........................................77
    C.    Whether Plaintiffs' claims against the Individual Defendants should be dismissed because of insufficient evidence of subjective intent to harm.............................82
        1.    Plaintiffs' allegations..............................................82
        2.    Applicable standard..................................................83
        3.    Analysis.............................................................85
    D.    Plaintiffs' claims against supervisory defendants........................93
    E.    Plaintiffs' excessive force claims.........................................98
        1.    The LaSalle Defendants' assertions.................................98
        2.    Plaintiffs' response................................................99
        3.    The legal standard..................................................99
        4.    Analysis............................................................101
    F.    Causation............................................................................111
        1.    The LaSalle Defendant's assertions................................111
        2.    Plaintiffs' response...............................................114
        3.    Analysis............................................................115
    G.    Plaintiffs' claims against LaSalle for the alleged constitutional deprivations.....119
        1.    Applicable law.....................................................119
        2.    Analysis............................................................125
    H.    Plaintiffs' state law claims...............................................133
        1.    Plaintiffs' allegations.............................................133

|  |  | 2. | Common law negligence claim | 133 |
|  |  | 3. | Loss of society and companionship claim | 135 |
| VI. | LaSalle Management's Motion | | | 148 |
|  | A. | The parties' assertions | | 148 |
|  | B. | Summary judgment evidence | | 149 |
|  | C. | Discussion | | 152 |
| VII. | Municipal Defendants' Motion | | | 153 |
|  | A. | The parties' assertions | | 153 |
|  | B. | Summary judgment evidence | | 154 |
|  | C. | Discussion | | 156 |
|  |  | 1. | The non-delegable duty doctrine | 156 |
|  |  | 2. | Immunity defenses to state law claims | 164 |
| VIII. | Recommendation | | | 167 |
|  | Objections | | | 168 |

## I. BACKGROUND

This is a civil rights action under 42 U.S.C. § 1983 and Arkansas law resulting from events that happened during the pretrial detention of Michael Todd Sabbie at the Bi-State Jail, which sits on the border of Texas and Arkansas. Docket Entry # 1, ¶1. A resident of Arkansas, Mr. Sabbie was arrested by Arkansas police and brought to the Bi-State Jail on July 19, 2015, where he remained until his death on July 22, 2015. *Id.*

Teresa Sabbie, individually, as personal representative of the Estate of Michael Sabbie, and as parent and natural guardian of her minor children, T.S., T.S., and M.S.;[1] Shanyke Norton, parent and natural guardian of her minor child, M.S.; Kimberly Williams; Marcus Sabbie; and Charlisa Crump (collectively "Plaintiffs") bring claims against Southwestern Correctional, LLC d/b/a LaSalle Corrections, LLC and LaSalle Southwest Corrections; LaSalle Management Company, LLC (together, "Corporate Defendants"); Tiffany Venable, LVN, individually; Mia Flint, LVN, individually; Clint Brown, individually; Nathaniel Johnson, individually; Brian Jones, individually; Robert Derrick, individually; Daniel Hopkins, individually; Stuart Boozer, individually; Andrew Lomax, individually; Shawn Palmer, individually; Simone Nash, individually (together, "Individual Defendants"),[2] as well as Bowie County, Texas and the City of Texarkana, Arkansas (together, "Municipal Defendants") (collectively "Defendants"). According to Plaintiffs, Defendants' unlawful

---

[1] The Court notes Teresa Sabbie has moved to voluntarily dismiss with prejudice all claims asserted by her in her individual capacity, including all claims for damages to herself personally (i.e. for her personal mental anguish, grief, despair, and/or loss of society, services and companionship of her husband) which may be derivative to her through the Estate of Michael Sabbie or otherwise. *See* Docket Entry # 118. Defendants have filed a response to the motion.

[2] On October 2, 2017, District Judge Schroeder granted the parties' Joint Motion for Dismissal With Prejudice, dismissing Plaintiffs' claims against Defendant Gregory Montoya, M.D. with prejudice. Docket Entry # 28.

actions include depriving Mr. Sabbie of his prescription medications, denying him adequate medical care, using constitutionally excessive force against him (rather than providing him with needed medical care), ignoring his ongoing serious medical needs, including his obvious acute respiratory distress, failing to monitor him despite his severe and life-threatening medical condition, otherwise forcing him to endure extreme and needless pain and suffering, and causing his death. *Id*. at ¶ 2.

Plaintiffs allege the following causes of action against Corporate Defendants, Individual Defendants, and Municipal Defendants under federal law brought pursuant to 42 U.S.C. § 1983: (1) violation of Mr. Sabbie's right under the Fourteenth Amendment to adequate medical care; and (2) violation of Mr. Sabbie's family's right to their relationship with Mr. Sabbie based upon inadequate medical care and excessive force. *See* Docket Entry # 1, ¶ 81 (against Corporate Defendants), ¶ 83 (against Municipal Defendants), ¶ 85 (against Individual Defendants).  Additionally, Plaintiffs allege Officer Brown's act of throwing Mr. Sabbie to the ground and Lt. Johnson's act of pepper spraying him were unreasonable and amounted to excessive uses of force.  *Id.*, ¶ 66.

Plaintiffs assert a §1983 cause of action against Corporate Defendants, Municipal Defendants, and individual defendants Johnson, Brown, Boozer, and Lomax for the "constitutionally excessive use of pepper spray, which includes Defendant Johnson's unreasonable application of the chemical agent and the ensuing failure of each of them to decontaminate Mr. Sabbie."  *Id*., ¶ 81 (excessive force claim against Corporate Defendants), ¶ 83 (excessive force claim against Municipal Defendants), ¶ 85 (excessive force claim against Johnson, Brown, Boozer, and Lomax ).  According to Plaintiffs, individual liability under§ 1983 also extends to the supervisory defendants (Jones and Johnson) for their failure to oversee their subordinates and ensure compliance with correctional standards of care as described in the Original Complaint. *Id*., ¶ 85.

5

Plaintiffs assert separate state law causes of action against Corporate Defendants, Individual Defendants, and Municipal Defendants for: (1) medical negligence giving rise to wrongful death and survival under Arkansas law, Ark. Code Ann. §§ 16-62-101 & 102 (*id.* at ¶ 82 (against Corporate Defendants), ¶ 84 (against Municipal Defendants), ¶ 86 (against Individual Defendants)); and (2) violation of Mr. Sabbie's right to adequate healthcare and to be free from excessive force under the Arkansas Constitution.  *See id.* ("for tortuously causing the death and pre-death pain and suffering of Michael Sabbie by violating the applicable correctional and medical standards of care and by violating Article 2 § 8 and Article 2 § 15 of the Arkansas Constitution—giving rise to a claim under the Arkansas Civil Rights Act, Arkansas Code § 16-123-105").

Before the Court are four separate motions for summary judgment filed by the following: (1) Southwestern Correctional, LLC d/b/a LaSalle Corrections, LLC and LaSalle Southwest Corrections ("LaSalle"), together with Individual Defendants Venable, Flint, Brown, Johnson, Jones, Derrick, Hopkins, Boozer, Lomax, Palmer, and Nash; (2) LaSalle Management Company, LLC ("LaSalle Management"), the parent company of LaSalle; (3) Bowie County, Texas; and (4) the City of Texarkana, Arkansas. Because the summary judgment evidence is voluminous, the Court first outlines the relevant facts and then considers the specific arguments raised in the motions.

## II.  LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that

6

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor…unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Computer Corp.*, 98 Fed. Appx. 335, 338 (5th Cir. 2004). Rather, the court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The court must consider all

of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

### III. SUMMARY JUDGMENT EVIDENCE

**A.    Evidence applicable to all defendants**

*Mr. Sabbie's pretrial detention at Bi-State Jail*

In July of 2015, Michael Sabbie was thirty-five years old, living in Texarkana, Arkansas, with his wife and three of his minor children. *See* Docket Entry # 1, ¶ 29. On July 19, 2015, Mr. Sabbie was arrested by the Texarkana, Arkansas Police Department ("TAPD"), following a verbal domestic dispute with his wife. *Id.*, ¶ 30. TAPD transported Mr. Sabbie to the Bi-State Jail that evening, where he was booked and confined.[3] *Id*. The Bi-State Jail, which sits on the border of Texas and Arkansas, is run by a private, for-profit corporation called Southwestern Correctional, LLC, d/b/a LaSalle Corrections, LLC and LaSalle Southwest Corrections ("LaSalle").

In February 2013, Defendant Bowie County (with the approval of Texarkana, Arkansas) contracted with LaSalle to operate and manage all aspects of the Bi-State Jail, including the provision of medical care to the jail's population of pretrial detainees and post-conviction prisoners. *Id.*, ¶¶ 13-14. Pursuant to the contract, Bowie County is obligated to conduct monthly inspections of the Bi-State Jail. *Id.*, ¶ 13. According to Plaintiffs' Original Complaint, although Bowie County and City of Texarkana, Arkansas sought to privatize the operation of their jail by delegating their final policy-making authority to LaSalle, they have a "non-delegable duty" to ensure the Bi-State Jail

---

[3] As an Arkansas pretrial detainee, Arkansas maintained "jurisdictional situs" over Mr. Sabbie at all times during his pretrial detention in the Bi-State Jail even though a portion of the alleged misconduct occurred on the Texas side of the border. Docket Entry # 1, ¶¶ 30, 31. According to Plaintiffs' Original Complaint, this is "pursuant to the Bi-State Criminal Justice Center Compact between Arkansas and Texas," contained in Ark. Code Ann. § 12-49-301. *Id.*, ¶ 31.

satisfies its constitutional duties to pretrial detainees, including the right to adequate medical care and the right to be free from constitutionally excessive force. *Id.*, ¶¶ 11-13. Plaintiffs allege Municipal Defendants cannot contract-away their constitutional obligations and are liable for any unconstitutional corporate customs or policies that resulted in harm to any detainees and inmates confined in the jail. *Id.*, ¶ 13.

Plaintiffs allege LaSalle, which is owned, controlled, or managed by Defendant LaSalle Management Company LLC ("LaSalle Management"), manages the day-to-day operations of the Bi-State Jail. *Id.*, ¶ 14. Plaintiff further alleges LaSalle is a final policy-maker for Bowie County for purposes of providing jail-related services and meeting the needs of its convicted inmates and pretrial detainees. *Id.*

### *Medical personnel at Bi-State Jail*

During Mr. Sabbie's pretrial detention in July 2015, the jail's only full-time on-site medical staff consisted of four licensed vocational nurses ("LVNs") and/or licensed practical nurses ("LPNs"),[4] who worked rotating twelve-hour shifts. Venable Dep. at 19:5-18; 20:1-7; 23:19-24:4. The Bi-State Jail LVN/LPNs were supervised by Registered Nurse ("RN") Regina Lynch, who spent most of her time in a different jail. *See id.* at 20:22-25; *see also* Deposition of Regina Lynch ("Lynch Dep.") at 29:14-30:1.

The four LVN/LPNs working at the Bi-State in July 2015 were Tiffany Venable and Kelly Bowens (each worked the day shift from 5:00 a.m. to 5:00 p.m.) and Mia Flint and Christina Johnson

---

[4] There is no practical difference between an LVN and an LPN. *See* Deposition of Tiffany Venable ("Venable Dep.") at 12:4-9.

(each worked the night shift from 5:00 p.m. to 5:00 a.m.).[5]  *See* Lynch Dep. at 31:7-24.  While working her rotating shift, the LVN/LPN on duty would be the only one present. Venable Dep. at 19:5-18.  RN Lynch would usually go to the Bi-State Jail about two times a week for half a day each visit.[6]  Lynch Dep. at 29:21-30:1.

There was no full-time doctor working on site at the jail.  *See* Venable Dep. at 21:20-22:2. A doctor came to the jail every two weeks. *Id*. at 22:3-7. Otherwise, he never came to the jail. *Id.* at 22:8-13.  The LVN/LPNs could access the doctor by phone or e-mail.  *Id*. at 22:13-14.

Unlike doctors and physician assistants, LVN/LPNs cannot prescribe medication or diagnose patients.  *Id.* at 13:3-10; *see also* Lynch Dep. at 182:14-17. Unlike RNs, LVN/LPNs cannot do complex medical assessments. Lynch Dep. at 15:16-22.   They are not allowed to practice independently; they must be supervised by an RN or higher medical professional.  *See* Venable Dep. a 13:11-13; Lynch Dep. at 15:5-10.

### *Mr. Sabbie's intake medical screening*

During Mr. Sabbie's booking on the night of July 19, 2015, jail intake staff filled out a medical questionnaire indicating he suffered from hypertension, diabetes, asthma, and heart trouble. *See* Declaration of Erik J. Heipt ("Heipt Decl."), Ex. A (medical questionnaire); *see also* Deposition

---

[5] RN Lynch was not aware of any interaction with Christina Johnson and Mr. Sabbie.  Lynch Dep. at 124:2-4; *see id.* at 226:3-14 (stating Nurse Johnson failed to check/get a visual on Mr. Sabbie at the end of one of her shifts).

Nurse Bowens did not witness what happened to Mr. Sabbie at the jail between the afternoon or evening of July 19 and the morning of July 22, but she unsuccessfully tried to resuscitate Mr. Sabbie when he was found in his cell.  Deposition of Kelly Bowens ("Bowens Dep.") at 71:18-22; 74:7-13. LVN Venable and LVN Flint both treated Mr. Sabbie in July 2015 and are defendants in this case.

[6] RN Lynch had no contact with Mr. Sabbie in July 2015; she was not involved in his care; and no one contacted her about him. Lynch Dep. at 31:1-6.

of Mia Flint ("Flint Dep.") at 42:8-43:5. This became a part of Mr. Sabbie's jail medical chart and was readily available to the LVN/LPNs. *See* Flint Dep. at 43:6-8 & 44:10-14; Venable Dep. at 86:2-22. Later that night, at 8:36 p.m., Mr. Sabbie underwent an intake medical screening with Nurse Flint.[7] *See* Flint Dep. at 48:2-10; *see also* Heipt Decl., Ex. B (intake screening form).

During the intake medical screening, Nurse Flint documented that Mr. Sabbie suffered from insulin-dependent diabetes, hypertension, and asthma and required a diabetic diet. Flint Dep. at 49:2-18; *see also* Heipt Decl., Ex. B (intake screening form). Like the medical questionnaire, the intake screening form became a part of Mr. Sabbie's jail medical chart and was readily available to the LVN/LPNs. Flint Dep. at 44:3-14; Venable Dep. at 87:3-10. The charts were kept in the jail's medical office where the nurses were stationed. *See* Flint Dep. at 46:2-9.

Nurse Flint also took Mr. Sabbie's blood pressure, which was 166/99. *Id.* at 48:11-14. She knew a blood pressure of 166/99 was high. *See id.* at 48:13-18. She knew insulin-dependent diabetes and hypertension were both serious medical conditions that could each put Mr. Sabbie at risk of death if untreated. *Id.* at 52:10-20. She understood daily blood pressure and blood sugar checks were necessary. *Id.* at 53:6-9. For these checks to happen, however, she needed to start a blood pressure assessment log and a blood sugar monitoring log.[8] *See* Flint Dep. at 53:10-17.

---

[7] Nurse Flint received her LVN license in early 2015 and began working at the Bi-State Jail three months previously. Flint Dep. at 11:21-23; 13:10-13. It was her first job in correctional healthcare. *Id.* at 41:3-8.

[8] The monitoring and assessment logs, if initiated, would have required nurses to check and document Mr. Sabbie's blood pressure and blood sugar and give him medication—clonidine for his blood pressure and insulin for his blood sugar—if his levels were high. *See* Venable Dep. at 56:6-14; 57:8-18; and 101:8-102:24.

11

Although Nurse Flint claims she started these two logs, there are no logs in Mr. Sabbie's 2015 jail medical records, and none have been produced. According to Nurse Venable, if Mr. Sabbie's blood pressure had been checked after his intake, it would be in his medical chart. *See* Venable Dep. at 93:25-94:6 ("If it is not in the chart, then no, it wasn't checked."). Despite Mr. Sabbie's high blood pressure at intake, no one ever checked his blood pressure again. Consequently, he was given no medication to treat his hypertension. *Id.* at 94:9-95:5. Given his history of hypertension, his high blood pressure at intake, and his lack of any medication, it is likely Mr. Sabbie's blood pressure remained high throughout his confinement. *See id.* at 95:6-24 (agreeing that during those three days it is reasonably likely Mr. Sabbie's blood pressure was high).

Mr. Sabbie's blood sugar was never checked. Heipt Decl., Ex. D. As a result, he was never given insulin or any other medication to control his blood sugar. *See* Venable Dep. at 97:22-98:4. In short, because Nurse Flint never initiated the necessary paperwork, the daily checks were not done. According to Nurse Venable and RN Lynch, Nurse Flint was responsible for these failures. *Id.* at 96:3-17 & 97:1-11; Lynch Dep. at 124:12-22. Given his uncontrolled diabetes and his insulin-dependence, it is also likely Mr. Sabbie's blood glucose levels were high throughout his confinement. According to an expert witness retained by Plaintiffs, both untreated conditions contributed to his death. *See* report and accompanying materials attached to Declaration of Nizam Peerwani ("Peerwani Report") at 19.[9]

According to a nursing expert retained by Plaintiffs, Nurse Flint's failure to start the requisite medical checks violated basic nursing standards. *See* report and supplemental report and

---

[9] Dr. Peerwani is the Chief District Medical Examiner for Tarrant County Medical Examiner's District and Crime Lab. Peerwani Report at 21.

accompanying materials attached to Declaration of Lori Roscoe ("Roscoe Report") at 15.[10]  Nurse Practitioner Roscoe opines Nurse Flint also violated the standard of care when she failed to check Mr. Sabbie's blood sugar at his intake. *See id.*; *see also* Lynch Dep. at 124:12-22 (agreeing that failing to start a blood sugar log, which was Nurse Flint's responsibility, was a violation of policy and of the standard of care); *see also* Flint Dep. at 65:23-25 (stating she had no explanation for why Mr. Sabbie's blood sugar level was never checked). She also failed to set up a diabetic diet for Mr. Sabbie.[11]

In addition, Nurse Practitioner Roscoe opines Nurse Flint should have followed the jail's hypertension protocol and scheduled Mr. Sabbie for a blood pressure recheck; however, she failed to do so.[12]  Roscoe Report at  4, 8. According to Nurse Practitioner Roscoe, she also should have notified the jail's designated medical provider, Dr. Jagdish Shah, that Mr. Sabbie was a newly-admitted insulin-dependent diabetic, who suffered from hypertension and asthma, and obtained orders for insulin and other necessary medication, but she failed to do this as well. *Id.* at 4, 8; *see*

---

[10] Nurse Practitioner Roscoe, a correctional nursing and administrative expert retained by Plaintiffs, is an Advanced Practice Registered Nurse, certified as an Adult Nurse Practitioner. Roscoe Report at 1.

[11] Nurse Flint was responsible for initiating a diabetic diet slip or sheet, which, if it existed, would be in Mr. Sabbie's medical chart. *See* Venable Dep. at 98:5-17 (agreeing this failure would be another violation of policy). No such document exists in Mr. Sabbie's July 2015 medical chart. *See* Heipt. Decl., Ex. D.

[12] A copy of LaSalle's Hypertension Protocol is attached as Exhibit E to the Heipt Declaration.

*also* report and accompanying materials attached to Declaration of Richard O. Cummins ("Cummins Report") at 7.[13]

### Mr. Sabbie returned to Nurse Flint after reporting shortness of breath

Following his intake on the evening of July 19, 2015, jail guards took Mr. Sabbie to a general population cell in the B-Pod. The next morning, at 3:30 a.m., they brought him back to Nurse Flint, who was still on duty. *See* Heipt. Decl., Ex. C; *see also* Flint Dep. at 69:9-13. Mr. Sabbie told Nurse Flint he was short of breath and could not breathe while lying down. *See* Heipt. Decl., Ex. C; Flint Dep. at 69:9-17, 99:22-100:1. She did not listen to his rate of respiration or to his lungs. *Id*. at 77:4-11. Instead, she used a pulse oximeter to check his pulse and blood oxygen levels and learned his heart rate was high and had nearly doubled to 115 beats per minute in the six to seven hours since intake. *See* Flint Dep. at 82:23-24; 84:16-22. She knew a heart rate of more than 100 beats per minute is tachycardic, *see id.* at 83:6-10, and that it was concerning. *Id.* at 84:23-24. Moreover, his blood oxygen saturation level, which was 98% at intake, was only 90%. *See id.* at 77:20-78:9. She knew a normal range is typically between 95% to 100%.[14] *Id.* at 78:4-6.

In sum, Nurse Flint knew Mr. Sabbie was an insulin-dependent diabetic with hypertension and asthma who (1) had high blood pressure at intake, (2) had not been given any medication to treat it, (3) had an abnormally high resting heart rate (tachycardia) that had nearly doubled since intake, (4) had low blood oxygen levels, (5) was suffering from shortness of breath, and (6) could not

---

[13] Dr. Cummins is a medical doctor retained by Plaintiffs. He is a member of the faculty of the Department of Emergency Medicine at the University of Washington Medical Center of the University of Washington and has also been an attending physician, working in emergency medicine, since 1982. Cummins Report at 1-2.

[14] According to Nurse Flint, it went up to 92% when Mr. Sabbie coughed. Flint Dep. at 10-15.

breathe while lying down. She further knew untreated high blood pressure could lead to organ damage, heart failure, and pulmonary edema, *see id*. at 52:24-53:5, and that heart failure and pulmonary edema can each cause shortness of breath.  *Id*. at 75:9-18. She also knew it was important to know what was causing Mr. Sabbie's shortness of breath. *Id.* at 91:6-10.

However, Nurse Flint did not check Mr. Sabbie's blood pressure in response. *Id.* at 113:13-22. She did not check his blood sugar levels at this time and had no explanation for this. *Id*. at 65:23-25. Of the four primary vital signs—body temperature, pulse rate, respiration rate, and blood pressure—the only one Nurse Flint took was Mr. Sabbie's pulse rate, which was abnormally high. *Id.* at 114:16-19.

The shortness of breath protocol required Nurse Flint to document the onset of Mr. Sabbie's shortness of breath; note whether he had a productive cough and describe his sputum; list his current medications and his medical history; take a complete set of vitals; examine his respiratory rhythm; document any retractions or accessory muscle use; measure his peak air flow; examine his skin, pupils, and lungs; indicate any nausea, vomiting, unusual breath odors, or distress; provide supplemental oxygen; and notify the physician.[15] *Id*. at107:2-109:23.  Nurse Flint did not do any of these things because she did not "know to."[16] *Id.* at 110:2-9. At her deposition, she agreed she  did not "come anywhere near close to following these protocols." *Id.* at 114:20-115:3.

Although Mr. Sabbie exhibited a "classic sign of congestive heart failure" when he reported

---

[15] A copy of LaSalle's Shortness of Breath Protocol is attached as Exhibit F to the Heipt Declaration.

[16] Nurse Flint testified she did not do the shortness of breath protocol; she had no awareness of the protocol in July 2015; she did not know a policy or the standard of nursing care required her to check Mr. Sabbie's blood pressure upon a report of shortness of breath; and she did not know she was supposed to take his vital signs.  *See* Flint Dep. at 71:19-73:12; 74:20-23.

his inability to breath while lying down, *see* Roscoe Report at 9, Nurse Flint did not check for swelling in his lower legs. *See* Flint Dep. at 113:23-25. Though she knew heart failure and pulmonary edema can cause shortness of breath, *see id.* at 75:9-18, she did not listen to his heart or lungs. *Id.* at 77:9-11; Heipt Decl., Ex. C; Roscoe Report at 9. Nurse Flint testified she "would have assumed" Mr. Sabbie's weight was the source of his shortness of breath. Flint Dep. at 101:2-9 ("I would have assumed it was his weight, honestly. Most people that are morbidly obese are short of breath, if you want to know my assumption."). When later asked if she thought Mr. Sabbie's shortness of breath could have been related to his untreated high blood pressure, she responded: "No. As I said earlier, when you are morbidly obese, you tend to stay short of breath." *Id.* at 110:13-17.

In response to Mr. Sabbie's report of being unable to breathe while lying down, Nurse Flint advised him to "sit up," which she claimed at her deposition was an appropriate treatment plan. *See* Heipt Decl., Ex. C; *see also* Flint Dep. at 106:14-17. Nurse Flint did not notify either Dr. Shah or RN Lynch of Mr. Sabbie's shortness of breath or of his inability to breathe while lying down. Flint Dep. at 114:10-15; 115:4-6; Roscoe Report at 4. According to Nurse Flint, her "nursing judgment told [her] to put him in medical observation so [she] could monitor his shortness of breath" and "observe him." Flint Dep. at 76:14-22, 79:2-11; *see also* Heipt. Decl., Ex. C. However, during the hour-and-a-half remainder of her shift, she did not check on Mr. Sabbie. Flint Dep. at 79:12-18 (she told him to let her know if anything else was going on). Though it was her responsibility to ensure Mr. Sabbie was actually placed in a medical observation cell, *see* Venable Dep. at 116:11-13, Nurse Flint did not do this and did not know at her deposition if Mr. Sabbie ever made it into one. Flint Dep. at 87:5-7.

16

If Mr. Sabbie had been put in a medical observation cell, there should have been documentation in his jail records to reflect it, but no documentation exists. *Id.* at 87:8-14 (stating she would expect there to be some documentation if Mr. Sabbie did go to medical observation); *see also* Venable Dep. at 116:18-21, 119:15-23; Lynch Dep. at 210:16-23, 212:3-6.   Mr. Sabbie's cell assignment history records show him in a transit cell (when he first arrived), a cell in the B-Pod (July 19-21), and a cell in the L-Pod (July 21-22). *See* Heipt Decl., Ex. G. It does not reflect any time in a medical observation cell. *Id.*

According to Plaintiffs, even if Nurse Flint did put Mr. Sabbie in medical observation as she claims she did, it was grossly insufficient to meet his medical needs because inmates were not medically monitored in these cells in 2015; instead, they were checked by jail security guards every thirty minutes. *See* Venable Dep. at 114:17-23. The nurses did not do any monitoring of them. *Id.* at 115:8-15. Nurse Flint knew this. *See* Flint Dep. at 79:12-21. She knew the security guards would not be monitoring Mr. Sabbie's vital signs or conducting any medical tests or checks. *Id.* at 79:22-80:14. She knew no nurse would even look at Mr. Sabbie for the next thirteen to fourteen hours. *Id.* at 92:4-93:2 (agreeing that the policy in 2015 was for nurses to do their checks at the end of their shift instead of at the beginning); *see also id.* at 90:1-6 (stating that other than once every twelve hours, the nurses were not required to do any further medical observation). Even then, the nurse would not be taking his blood pressure, pulse rate, oxygen saturation levels, temperature, or any other vital signs while in medical observation. *Id.* at 91:15-93:2.

According to Dr. Cummins, Mr. Sabbie's combination of symptoms of shortness of breath, orthopnea (inability to breath lying down), tachycardia, and a low oxygen saturation of 90% were "alarming abnormalities."   Cummins Report at 7. In his opinion, "Mr. Sabbie was probably going

into early pulmonary edema from his untreated hypertension and congestive heart failure" and that as of 3:30 a.m. on the morning of July 20, Nurse Flint should have immediately "referred [him] to the local emergency department for further medical evaluation and treatment." *Id.* She did not do that or even notify the jail's medical provider, Dr. Shah, who was available by phone or e-mail. *See* Flint Dep. at 114:10-12. Nor did she notify her nursing supervisor, RN Lynch, who worked at a nearby jail. *Id.* at 114:13-15. The only person Nurse Flint notified about Mr. Sabbie was the LPN who worked the next shift, Tiffany Venable, who took over for Nurse Flint at 5:00 a.m. on the morning of July 20, 2015. *Id*. at 93:6-8.

### *Nurse Venable's July 20, 2015 shift*

Before Nurse Flint left the jail, Nurse Flint and Nurse Venable spoke about Mr. Sabbie:

Q. And, do you recall that Tiffany Venable took over at 5:00 a.m.?

A. Yes.

Q. Did you communicate with her that Michael Sabbie was experiencing shortness of breath?

A. Yes.

Q. Did you communicate with her that he was tachycardia?

A. No.

Q. Did you communicate with her that he had high blood pressure at intake?

A. Yes.

Q. Did you communicate with her that you placed him on medical observation?

A. I did.

Flint Dep. at 93:6-20; 94:20-23; 96:6-10.

Nurse Venable was familiar with Mr. Sabbie, his medically vulnerable condition, and his need for medication. She personally treated him in 2014 and knew he suffered from insulin-dependent diabetes and hypertension. *See* Venable Dep. at 90:25-91:7. She knew he was vulnerable to dangerous spikes in blood pressure and blood sugar. *Id.* at 91:25-92:20 (stating she recorded Mr. Sabbie's blood pressure as 203 over 121 at one point in 2014). She also knew these conditions required monitoring, medication, and physician involvement.  *Id.* at 59:22-62:25 (stating she had e-mailed Dr. Shaw in 2014 regarding Mr. Sabbie's high blood pressure and had received a response and provider order from him); 71:6-73:2 (stating Mr. Sabbie had been given clonidine for his high blood pressure in 2014); 75:23-78:5 (stating Mr. Sabbie was also treated with two types of insulin for his high blood sugar in 2014).

Like Nurse Flint, Nurse Venable knew insulin-dependent diabetes and hypertension were both serious medical conditions and that either condition could put Mr. Sabbie at risk of death if untreated. *Id.* at 91:14-24. She knew Mr. Sabbie could die if not given insulin or high blood pressure medication. *Id.* She also knew high blood pressure can lead to organ damage. *Id.* at 57:8-18. Nurse Venable knew daily blood pressure and daily blood sugar checks were necessary for Mr. Sabbie's medical well being. *Id.* at 92:24-93:2. Moreover, she knew shortness of breath can be caused by multiple serious medical conditions, including heart problems, lung problems, and asthma. *Id.* at 110:3-15. She knew high blood pressure can lead to serious conditions that cause shortness of breath, such as heart failure and pulmonary edema. *Id.* at 106:10-18.

Thus, at the beginning of her July 20 shift, Nurse Venable knew Mr. Sabbie (1) had a history of high blood pressure and insulin-dependent diabetes, (2) needed physician involvement and medication, (3) had high blood pressure at intake, (4) later began suffering shortness of breath, and

19

(4) was supposed to be in a medical observation cell. Nurse Venable did not visit Mr. Sabbie during her twelve-hour July 20 shift to check his blood pressure, test his blood sugar levels, or follow up on his shortness of breath. *Id.* at 131:3-9; 136:10-16.

The following morning, July 21, between 8:00 and 9:00 a.m., Officer Shawn Palmer brought Mr. Sabbie to Nurse Venable because he was coughing up blood into a jail-issued cup. *Id.* at 136:10-23 (agreeing this would not be a "sick call visit" but "would be an emergency visit"); *see also* Deposition of Shawn Palmer ("Palmer Dep.") at 33:5-39:4. Officer Palmer had been walking through the B-Pod when inmates alerted him something was wrong with Mr. Sabbie, who was in his cell. Palmer Dep. at 35:3-37:5. When Officer Palmer went into Mr. Sabbie's cell, Mr. Sabbie was sitting and told Officer Palmer he was either coughing or spitting up blood. *Id.* at 37:8-13. Officer Palmer took Mr. Sabbie to medical with the "jail-issued Styrofoam cup" that held the blood. *Id.* at 34:9-16; 37:14-25.

Nurse Venable was on-duty when Officer Palmer brought Mr. Sabbie in. *Id.* at 38:24-39:4. According to Officer Palmer, Nurse Venable clamped a pulse oximeter on Mr. Sabbie's finger and said the "pulse ox was fine" and the blood in the cup "wasn't the type of blood that someone would either cough or spit up." *Id.* at 39:21-40:23. Nurse Venable did not look inside Mr. Sabbie's mouth to confirm.  *Id.* at 41:2-14. She told Officer Palmer the blood was "really bright red" and was consistent with "biting the inside of one's cheek." *Id.* at 41:15-25. Officer Palmer reiterated the only thing she did to reach this conclusion was look at the blood, which he also saw in the cup. *Id.* at 42:1-10. Officer Palmer then took Mr. Sabbie back to his cell. *Id.* at 43:8-12.

According to Plaintiff's nursing expert, Nurse Practitioner Roscoe, Nurse Venable should have conducted a thorough and complete physical examination, including obtaining a complete set

of vitals (blood pressure, pulse, respirations, temperature, oxygen saturation, and finger stick blood sugar) and auscultation of his lungs and heart. Roscoe Report at 9. Nurse Venable should have conducted an oral inspection of Mr. Sabbie's mouth, especially if she believed he was faking the source of the blood. *Id*. Dr. Cummins also opines it was "inappropriate for her to render a medical diagnosis about 'coughing up blood;' she had not even performed a physical examination of his mouth" and had no basis for making such an assessment. *See* Cummins Report at 8.

About two hours later, at 10:30 a.m., several corrections officers (Derrick, Boozer, Brown, Johnson) brought Mr. Sabbie back to Nurse Venable's office in a wheelchair because of difficulty breathing or shortness of breath. *See* Deposition of Clint Brown ("Brown Dep.") at 31:14-18, 32:16-23; Deposition of Stuart Boozer ("Boozer Dep.") at 25:14-18, 27:20-24; Deposition of Nathaniel Johnson ("Johnson Dep.") at 45:10-15. Another inmate called the control room because Mr. Sabbie was on the floor of his cell and could not breath. *See* Boozer Dep. at 29:13-16. Mr. Sabbie told the guards he was having difficulty breathing. *See* Johnson Dep. at 48:25-49:2; Boozer Dep. at 105:23-106:4. The officers then put him in a wheelchair and wheeled him to medical for his second visit to Nurse Venable that morning. *See* Heipt Decl., Ex. H (Defendant Venable's Answers and Responses to Plaintiffs' First Discovery Requests) at 5; Boozer Dep. at 105:23-106:1. Here is the complete text of Nurse Venable's 10:30 a.m. note:

> Inmate brought to medical via wheel chair per CO's. Reports SOB. Inmate coughing and deep breathing. SP02 93%-97%. Lung clear to auscultation. Pulse 99. Unable to obtain BP due to movement. Asked inmate what was going on with him, and he advised that he couldn't breathe and had pneumonia before coming to jail. This nurse advised him that his vitals were good and his lungs were clear and he was able to carry on a conversation, so he could go back to his pod. Inmate jumped out of wheel chair and said 'stupid bitch' after he exited medical walking without difficulty.

*See* Heipt Decl., Ex. C; *see also* Cummins Report at 8-9.

21

Even though Mr. Sabbie was complaining of shortness of breath, *see* Venable Dep. at 138:2-7, she did not follow the shortness of breath protocol, which required her to do all the medical tests and checks described above. *See* Heipt Decl., Ex. F; Venable Dep. at 138:13-148:4. She knew the protocol was in effect in July 2015 and that she was required to follow it. Venable Dep. at 39:14-19. Of the four primary vital signs, the only vital sign she obtained was Mr. Sabbie's pulse, which was 99 beats per minute (two beats shy of tachycardia). *Id.* at 113:19-21; 162:3-15.

Given Mr. Sabbie's hypertension history and his reported shortness of breath, Nurse Venable knew obtaining his blood pressure was "crucial." *Id.* at 151:5-8. However, she did not obtain a blood pressure reading, temperature, or respiration rate because, she claims, he was "moving" too much. *Id.* at 142:1-143:18 (stating she could not obtain respirations because he was moving);144:7-8 (A. "How do you get a thermometer in your mouth or under your arm if you are rolling in the chair?"); 162:22-23 (stating Mr. Sabbie would not allow her to get enough information); 163:3-15. Nurse Venable documented she could not obtain his blood pressure,[17] but she did not document she was unable to obtain his temperature or respirations because of movement.  *Id.* at 143:7-11; 145:5-10. According to Nurse Venable, she assessed Mr. Sabbie to her "full ability in this particular visit." *Id.* at 145:22-23.

Nurse Venable did not do anything to find out whether it was discomfort that was causing Mr. Sabbie to move around. *Id.* at 143:13-21. She stated at her deposition she did not know, one way or the other, whether Mr. Sabbie's movement may have been associated with his breathing difficulties. *Id.* at 149:19-22.  Nurse Venable advised Mr. Sabbie his "vitals were good," *see id.* at

---

[17] Nurse Venable stated Mr. Sabbie went to court shortly after this visit.  Venable Dep. at 150:2-9.  She did not consider trying to check his blood pressure later after a designated period of time. *Id.* at 150:2-23.

161:20-22, even though she did not obtain his blood pressure, his temperature, or his respiratory rate, and admittedly did not have enough information to make that conclusion. *Id.* at 162:3-163:2.

Officer Palmer wrote Mr. Sabbie an infraction for "feining [sic] illness and difficulty breathing" following his visit with Nurse Venable. *See* Heipt Decl., Ex. I; *see also* Palmer Dep. at 58:24-60:1. When asked how he could have determined Mr. Sabbie was "faking his difficulty breathing," he responded: "Because the nurse arrived at that conclusion." *Id.* at 61:17-21. Nurse Practitioner Roscoe opines as follows: "Allowing the preconceived opinion that Mr. Sabbie was feigning his condition to overshadow prudent nursing care is egregious, significantly deviates from the nursing standard of care, and is reckless." Roscoe Report at 15. According to Dr. Cummins, Mr. Sabbie "was clearly experiencing a medical emergency" and "needed to be transported to a hospital," a fact Nurse Venable and the officers "clearly ignored." Cummins Report at 9.

According to Officer Boozer, at some point, Mr. Sabbie said, "So y'all aren't going to help me;" he then stood up out of his wheelchair and began walking back toward the direction of his pod. Boozer Dep. at 35:2-21 (also noting there was some "verbal exchange" but he could not recall exactly). On the way back to his pod, Officer Boozer and Officer Lomax (the officers escorting Mr. Sabbie) saw Mr. Sabbie fall to the floor in front of H-Pod. *Id.* at 36:10-21. According to Plaintiffs' experts, the corrections officers should have returned Mr. Sabbie to the nurse's office. *See* Sanders Report at 6; Cummins Report at 9. However, pursuant to an order from their commanding officer, Lt. Johnson, the officers picked him up and brought him back to his pod. Boozer Dep. at 38:14-39:11. According to Officer Boozer, they set Mr. Sabbie on a round stool at a metal table in B-Pod, and he could tell Mr. Sabbie was upset with the situation. *Id*. at 39:15-25.

23

### Mr. Sabbie's court appearance

That same afternoon, Mr. Sabbie had a court appearance in the same building as the Bi-State Jail. *See* Docket Entry # 88 at 4, ¶ 5. While processing inmates for their court appearances, the court bailiff noticed Mr. Sabbie was "sweating very heavily and coughing." Heipt Decl., Ex. J.  Mr. Sabbie told the bailiff he had pneumonia.  *Id.* During his court appearance, in which he pleaded not guilty, court staff noticed Mr. Sabbie was "out of breath." Heipt Decl., Ex. K at 1, 2. As Mr. Sabbie was talking, "he started wheezing" and "you could hear [his] shortness of breath." *Id.* at 3. The judge also noticed this and allowed Mr. Sabbie to sit down. *Id.* at 2. Mr. Sabbie then told the judge, in open court, that he needed to go "to the hospital" and that he had been "spitting up blood" in the jail. *Id.* He was also "sweating really bad." *Id.* at 5.

According to Dr. Cummins, these observations add to the "consistent theme of a man in respiratory distress, who was getting progressively worse" and also provide "important clinical context for what was going to happen in the next hours. . . ."  Cummins Report at 9.  In Dr. Cummins' opinion, "Mr. Sabbie was suffering a life-threatening respiratory emergency by the time he finished his court hearing." *Id.* at 10.

### Officers' uses of force

Following the court appearance, at approximately 4:15 p.m., Officer Brown, who had been working at the Bi-State Jail for about five months at that time, escorted Mr. Sabbie and ten other detainees back to their pod. *See* Brown Dep. at 43:1-24; 55:17-25. Officer Brown was leading the inmates through an area of the jail called the "triangle," when Mr. Sabbie stopped and put his left hand against the wall as if he was trying to catch his breath. *See* Brown Dep. at 46:1-12; 46:23-25. A jail surveillance camera recorded what happened next.

The surveillance video begins by showing Mr. Sabbie, who was in severe respiratory distress according to Dr. Cummins, resting against a wall, bending over, and putting both hands on his legs. *See* Cummins Report at 9 (stating Mr. Sabbie stopped in the hallway to "clearly catch his breath," leaned against the wall, and then assumed "the tripod position with his hands on his knees" and further stating Mr. Sabbie's respiratory rate was about 40-50 breaths per minute by his estimation). Officer Brown, who took Mr. Sabbie to the nurse that morning for difficulty breathing, *see* Brown Dep. at 31:14-21; 52:20-24, agreed Mr. Sabbie had his hands on his knees or thighs "the way people do when they're out of breath." *Id.* at 49:19-22; *see also id* at 46:23-25 (agreeing it appears from the way Mr. Sabbie was standing that he was trying to catch his breath).

Officer Brown then approached Mr. Sabbie, and a verbal exchange ensued. Officer Brown testified Mr. Sabbie was asking to make a phone call. *Id.* at 53:2-18 (stating he did not know why Mr. Sabbie wanted to make a phone call or whether it was out of desperation because he was in a medical crisis). Officer Brown denied the request. *Id.* at 54:22-24 (stating he did not let Mr. Sabbie make the phone call because he had been instructed by his supervisor to get the Arkansas court offenders back to Zone 1).[18] Mr. Sabbie turned and headed toward the booking area where a phone was located, despite Officer Brown's orders not to do so. *Id.* at 56:15-25.

As the surveillance video shows, Officer Brown then grabbed the back of Mr. Sabbie's shirt with both hands, roughly pulled him away from the door, spun him around, leaned back, and forcefully threw him to the ground. *Id.* at 61:18-62:21. Mr. Sabbie's pants came down as Officer Brown was spinning him around, and at one point, Mr. Sabbie's entire body was off the ground and

---

[18] According to Officer Brown, the "[o]ffenders were going to be given adequate time when . . . the booking area cleared out[] to make phone calls. He had already instructed them of that." Brown Dep. at 55:2-4.

parallel to the floor. *Id.* at 62:5-17, 63:2-6; surveillance video at 0:37-0:50. Officer Brown agreed this was not a "takedown technique [he was] taught by LaSalle in training" or by any correctional or law enforcement agency. Brown Dep. at 63:7-12.

> LaSalle's Use of Force policy provides as follows:

> LaSalle Corrections (LSC) shall restrict the use of physical force to instances of justifiable self-defense, protection of others, protection of property and prevention of escapes and then only as a last resort and in accordance with appropriate statutory authority. All reasonable steps shall be taken to reduce and prevent any incident of or necessity for the Use of Force (UOF). In a given situation, force is justified only when no reasonable alternative exists and then only the minimum force reasonably believed necessary should be used. In no event is physical force justifiable as punishment.

*See* Heipt Decl., Ex. L at 1.

According to Officer Brown's use of force participation statement, prior to implementing force, Officer Brown did not listen to Mr. Sabbie, attempt to calm him, or explain the consequences of his actions. Brown Dep. at 60:1-61:3. Officer Brown did not check the box of the form suggesting Mr. Sabbie was trying to escape or that he had attempted to assault Officer Brown or any staff member or had engaged in any threatening behavior. *Id.* at 79:18-80:23. Officer Brown was aware Mr. Sabbie was complaining of shortness of breath before he threw him to the ground. *Id.* at 84:15-17.

According to correctional practices expert, Captain Kenny Sanders, the takedown technique Officer Brown used was "unrecognizable, not contained in any known law enforcement training curriculum, and was not justified." Sanders Report at 15-16; *see also id.* at 6-7. According to Captain Sanders:

> Defendant Brown admittedly made no attempt to diffuse the situation. He didn't attempt to calm or reason with Mr. Sabbie, explain the consequences to him, notify

a supervisor, or request additional staff.  He didn't even attempt to handcuff Mr. Sabbie or restrain him without force.  Instead, he grabbed Mr. Sabbie by the shirt with both hands, spun him around, leaned back, and forcefully threw him to the ground.  Given the totality of the circumstances, Defendant Brown was not justified and was unreasonable.

*Id*. at 16.

After Mr. Sabbie landed on the ground, multiple other individuals (Officer Derrick, Officer Lomax, Officer Palmer, Officer Boozer, Officer Stiger, Lt. Johnson, Captain Jones, and Nurse Venable) immediately began to arrive at the scene.  Brown Dep. at 63:18-65:25; Johnson Dep. at 62:24-63:18.  Officers Brown, Derrick, Lomax, Palmer, and Boozer piled on top of Mr. Sabbie's prone body and attempted to place Mr. Sabbie in hand restraints.[19]  Brown Dep. at 67:3-68:23; Johnson Dep. at 62:24-63:12; Deposition of Andrew Lomax ("Lomax Dep.") at 29:11-14; Venable Dep. at 173:7-12.

Captain Jones, the most senior officer at the scene, arrived on the scene and knew Mr. Sabbie was saying he could not breathe.  Deposition of Brian Jones ("Jones Dep.") at 94:18-95:12; Brown Dep. at 65:24-25. Lt. Johnson arrived on the scene as well. *See* Brown Dep. at 65:10-11; Johnson Dep. at 62:9-63:5.  Nurse Venable was also present; she was very close and could see and hear what was happening. *See* Venable Dep. at 174:4-11. As the video shows, Officer Stiger had a handheld camera and began filming at that point.  Brown Dep. at 65:12-17; Johnson Dep. at 63:16-18, 66:2-4. From this point forward, there is additional video footage from that camera, which has sound.

While prone on the ground, Mr. Sabbie did not say anything threatening. *See, e.g.*, Brown

---

[19] LaSalle's UOF policy defines "prone" as "[l]ying down, with the front of the body turned toward the supporting surface."  Heipt Decl., Ex. L at 2.

Dep. at 85:2-4; Lomax Dep. at 40:1-6. Mr. Sabbie did not hurt or try to hurt any officers. *See, e.g.*, Brown Dep. at 85:8-13; Lomax Dep. at 40:13-15. Officer Brown did not see anything to indicate Mr. Sabbie was trying to be physically aggressive toward anyone. Brown Dep. at 87:10-13. As can be heard on the handheld video, and as the defendant-officers heard at the time, Mr. Sabbie repeatedly stated, "I can't breathe," underneath the pile of officers. *See, e.g.*, Brown Dep. at 83:7-10, 84:18-23; Lomax Dep. at 33:12-15, 35:25-36:3. Officer Lomax stated the officers did not have all of their weight on Mr. Sabbie; they had his feet and his arms secured.  Lomax Dep. at 36:4-10.  However, he agreed it is possible that someone who is already struggling to breathe and who is a relatively obese man lying on his stomach with some weight on top could struggle to breathe when he is lying down in the position Mr. Sabbie was in.  *Id*. at 36:13-19.

While Mr. Sabbie was on the floor, following the initial use of force by Officer Brown, Lt. Nathaniel Johnson, who was standing by Mr. Sabbie's head, sprayed Mr. Sabbie in the face with a chemical agent (Oleoresin Capsicum ("OC") spray, also referred to as pepper spray). Sanders Report at 8.  At his deposition, Lt. Johnson stated as follows:

> [O]ur goal was – we couldn't get him physically in handcuffs.  I told them to clear back.  I administered a brief amount of – it wasn't even  – it wasn't even enough – we usually do two or three seconds, is our standard.  I did one second.  And as soon as I did that, we managed to get him in cuffs.

Johnson Dep. at 74:12-18; *see also* Docket Entry # 88, Ex. D at 3 (indicating the amount of O.C. spray expelled from the canister was one-half ounce).

According to Captain Sanders, Plaintiffs' corrections practices expert, the use of the chemical agent was unnecessary, unjustified, and unreasonable.  Sanders Report at 8.  Captain Sanders states

the video supports that Mr. Sabbie was at most passively resisting, but not "actively resisting."[20] *Id.* According to Captain Sanders, Mr. Sabbie was prone on the ground with his extremities secured and his right arm and wrist remained grasped firmly; for active resistance to have occurred, Mr. Sabbie would have had to fight against the restraint, resist application of the restraint, or move an appendage from a secured position. *Id.* "Therefore, force was used on Mr. Sabbie, all while he was unable to move due to being held in place by the Defendants." *Id.*

LaSalle's UOF policy refers to the use of chemical agents as "major force" and higher on the LaSalle force continuum than "hard hand" techniques, such as punching and kicking. *See* Heipt Decl., Ex. L at 2, 12. According to the UOF policy, if time permits before authorizing the calculated UOF, the "ranking officer should seek information from others such as professional medical staff" and should consider, among other factors, medical/mental history, "especially medical conditions or diseases which may be adversely affected by chemical agents, pepper mace or other non-lethal weapons." *Id.* at 5. The level of force used in a confrontational situation is "directly related to the amount of inmate resistance." *Id.* at 11.

Before spraying Mr. Sabbie, Lt. Johnson did not see any behavior that could be construed as assaultive or active resistance. Johnson Dep. at 76:20-77:13 (stating he did not hear Mr. Sabbie make any threats or say anything threatening to the officers during that time). Lt. Johnson was aware of Mr. Sabbie's respiratory distress before spraying him, but he did not consider asking Nurse Venable (who was standing there) "if pepper spraying Mr. Sabbie was contraindicated." *Id.* at 73:2-8; 73:15-

---

[20] At his deposition, Officer Brown did not agree that any so-called resistance by Mr. Sabbie may have been due to the fact he was having trouble breathing while in a prone position with officers putting weight on him, but he did agree as a layperson that when a person says "I can't breathe," that could be a "scary thing." Brown Dep. at 83:2-6, 15-18.

18; 75:11-16. According to Lt. Johnson, the "whole goal [was] to get the inmate in handcuffs by whatever means, so [they could] get compliance with him and less risk to him or staff."[21] *Id.* at 75:18-21. It did not matter to Lt. Johnson whether Mr. Sabbie's purported "resistance" was active or passive, *see* Johnson Dep. at 79:7-11, even though the jail's use of force policy authorizes the use of chemical agents only on inmates engaged in "active aggression" and provides for the use of "soft hands" when dealing with inmates engaged in "passive resistance." *See* Heipt Decl., Ex. L at 12 (chart 1); *see also* Sanders Report at 10.

"The primary effects of OC [spray] exposure include pain and irritation of the mucous membranes of the eyes, nose, and the mouth." Peerwani Report at 18. OC vapors may also "cause significant pulmonary irritation and prolonged cough due to inflammation of the lining mucosa." *Id.* A person exposed to it "will exhibit not only involuntary closing of the eyes, but also coughing, choking, discharge of mucous, lack of coordination, and nausea." *Id.* According to Dr. Peerwani, deployment of OC spray "posed a significant respiratory and cardiac threat to Sabbie who was a known asthmatic and hypertensive and further complicated his cardiorespiratory status." *Id.* at 19. Dr. Cummins similarly opines that having a "powerful chemical agent" sprayed into his face and airway "profoundly worsened" Mr. Sabbie's "hypertensive crisis-induced congestive heart failure and acute pulmonary edema." Cummins Report at 10-11. According to Dr. Cummins, Mr. Sabbie's "reactive airways were stimulated by the chemical agent into even more bronchospasm," and without immediate intervention Mr. Sabbie was going to die. *Id.* at 11.

---

[21] According to Captain Sanders, a reasonable juror would conclude that Mr. Sabbie's right arm was being pinned to the ground by an officer, thereby preventing him from putting it behind his back. *See* Sanders Report at 8.

After Mr. Sabbie was pepper sprayed and handcuffed, some of the officers at the scene felt the effects of the OC spray, even though it was aimed at Mr. Sabbie's face. Boozer Dep. at 52:12-18; Brown Dep. at 89:8-90:15; Johnson Dep. at 83:3-15. The OC spray used on Mr. Sabbie is made by Fox Labs, *see* Boozer Dep. at 53:10-12, and is "pretty strong stuff." *See* Johnson Dep. at 83:16-20 (agreeing that Fox OC spray is "pretty strong stuff"); Boozer Dep. at 53:15-16 (same); Brown Dep. at 89:23-90:1 (same). Officer Brown testified how the chemical agent affects him: "[I]t's rough on me," "it wipes me out," it's "bad, I don't -- I don't do well with spray," "I hate using it," and "I hate using it because everybody gets it." Brown Dep. at 90:2-91:10; *see also id.* at 92:2-5 ("It's terrible.").

According to Dr. Peerwani, deployment protocols recommend that after a person is exposed to OC spray, "officers will bring the restrained person to a seated upright position as soon as possible and check the person's vital signs to determine any apparent medical difficulties." *See* Peerwani Report at 18 (further stating persons with pre-existing medical conditions such as asthma or who complain of difficulty breathing should receive prompt higher level medical care); *see also* Roscoe Report at 15-16; Venable Dep. at 188:10-19; Boozer Dep. at 57:4-7 (agreeing that in 2015 a medical evaluation by a nurse was standard practice after an inmate had been pepper sprayed); Johnson Dep. at 85:25-86:2 (same).

### Post-pepper spray exam with Nurse Venable

After Lt. Johnson sprayed Mr. Sabbie, who was now handcuffed, Officers Brown and Boozer picked him up and escorted him to the nurse's office for a standard post-pepper spray exam with Nurse Venable. *See, e.g.*, Johnson Dep. at 85:21-86-6; *see also* Boozer Dep. at 58:5-7. On the way to the medical office, Mr. Sabbie's pants were down, his buttocks and genitals were exposed, and he repeatedly stated he could not breathe. *See* Boozer Dep. at 58:8-10; 60:18-25. Mr. Sabbie is seen

31

and heard on the video struggling to breathe as two officers, one on each arm, take him to the medical office. Nurse Venable was there before, during, and after the OC spray deployment. *See* Johnson Dep. at 86:19-25; Boozer Dep. at 61:1-4.

At approximately 4:17 p.m., officers brought Mr. Sabbie into Nurse Venable's office and sat him in a chair. Boozer Dep. at 63:20-22. He continued to state, "I can't breathe!" *See id.* at 64:5-8. This was Mr. Sabbie's third time in Nurse Venable's office that day.

The jail's "Pepper Spray/Chemical Exposure" nursing protocol required Nurse Venable to document any burning, asthma, shortness of breath, or difficulty breathing; take a complete set of vitals; indicate his level of distress; examine his respiratory rhythm; listen to his heart and lungs; note any excessive sweating; eliminate contact with the chemical agent; clean his face, eyes, nose, and mouth with wet cloths; irrigate his eyes with copious amounts of water; give him oxygen for respiratory distress; call the physician for specific orders if respiratory distress occurs; and prepare for hospital transport if necessary. *See* Heipt Decl., Ex. M. Nurse Venable did not do any of these things. *See* Venable Dep. at 181:6-183:20.

Nurse Venable's entire pepper spray exam lasted less than one minute. *Id.* at 180:25-181:2. She did not ask Mr. Sabbie a single question. *Id.* at 181:6-13. The only medical test she conducted involved the use of a pulse oximeter. *Id.* at 181:3-5, 191:1-7. However, she did not contemporaneously document the results.[22] She knew Mr. Sabbie had been experiencing shortness of breath since at least the early morning of July 20. *See* Venable Dep. at 180:5-8; Flint Dep. at 93:3-

_____

[22]  Nurse Venable later entered a nursing progress note about the visit and the pulse ox results. But she did not do so until the next afternoon—hours after Mr. Sabbie was found dead. *See* Venable Dep. 191:1-19. She claims she made a contemporaneous written sticky note containing the information but that she put it "in the shredder, or in the trash." *Id.* at 191:20-192:4. Her post death progress notes indicate Mr. Sabbie's pulse ox reading was normal.  Heipt Decl., Ex. C at 3.

11 (stating she told Nurse Venable Mr. Sabbie had shortness of breath and high blood pressure at intake). Nurse Venable knew he was coughing, deep breathing, and struggling to breathe that morning. *See* Venable Dep. at 180:11-14. She knew that right before and after he was pepper sprayed, Mr. Sabbie was saying he could not breathe. *Id.* at 180:15-17. She knew he continued to say it on the way to her office and once he was seated in her office. *Id.* at 180:18-21.  She testified at her deposition none of that factored into her examination. *Id.* at 180:22-24. When asked about why she did not call a doctor when her patient was repeatedly saying, "I can't breathe, I can't breathe," she replied: "I don't notify the doctor for a use of force." *Id.* at 183:17-20.

Despite her failure to follow any of the protocol's requirements, Nurse Venable initially testified she believed her pepper spray exposure examination was consistent with jail nursing protocols. *See* Venable Dep. at 183:21-24. But when shown the protocol and asked again, she stated as follows: "This protocol doesn't apply, they have to be decontaminated by security. So, no, I did not because he was not decontaminated." *Id.* at 184:11-18. When it was then pointed out to her that the protocol required her to do the initial decontamination (*e.g.*, clean his face with a cloth and irrigate his eyes with copious amounts of water), she agreed she did not "come anywhere close to following" the protocol in her post pepper spray examination. *Id.* at 184:19-185:2. Even after he was later showered, she did not follow the protocol, stating: "Security should have brought him to medical." *Id.* at 187:21-24. She could not recall if she told them to do so.  *Id.* at 187:25-188:1.  Nurse Venable then agreed Mr. Sabbie should have been evaluated both pursuant to the pepper spray protocol and the shortness of breath protocol, and it was a violation of policy and of the nursing standards of care for that not to happen.  *Id.* at 188:10-19.

Nurse Venable knew Mr. Sabbie's blood pressure was high on the night of his July 19 intake medical screening. Because of his hypertension and shortness of breath, she knew it was "crucial" to obtain his blood pressure. *See* Venable Dep. at 151:5-8. Six hours later, during her post-pepper spray examination, she did not attempt to recheck Mr. Sabbie's blood pressure. *Id.* at 181:25-182:3. Nor did she obtain his rate of respiration.[23] *Id.* at 190:11-15. Nurse Venable wrote "zero injuries reported" in her belated progress note. *See* Heipt Decl., Ex. C at 3. When asked about this at her deposition, she testified he had "zero visible injuries." Venable Dep. at 192:10-18 (further stating she did not recall if she asked Mr. Sabbie if he had any injuries). When asked whether she could determine, "in less than a minute," if a person "has any physical injuries without asking them any questions," she claimed she could.[24] *Id.* at 199:9-12.

Plaintiffs' nursing expert opines Nurse Venable's failure to properly evaluate Mr. Sabbie after the use of force on July 21, 2015 significantly deviated from the nursing standard of care. *See* Roscoe Report at 15-16; *see also id.* at 11-12 (noting Nurse Venable should have conducted a full assessment of Mr. Sabbie, including auscultating his lungs and heart and obtaining his blood pressure, pulse, respirations, temperature, oxygen saturation and blood glucose, and should have documented all in his health record). According to Dr. Cummins, Nurse Venable's dismissal of Mr. Sabbie "after just a perfunctory check of his oxygen saturation" was "jaw-dropping." *See* Cummins

---

[23] During her deposition, Nurse Venable agreed a respiratory rate of 50-60 breaths per minute is "substantially higher than the normal respiratory rate" and that it would have been "medically concerning" if Mr. Sabbie's respiratory rate was that high. Venable Dep. at 190:16-23.

[24] The autopsy revealed Mr. Sabbie had sustained a recent head contusion, which Dr. Peerwani states could have been caused when Officer Brown threw him to the ground. *See* Peerwani Report at 5, 15.

Report at 12. Dr. Cummins states Nurse Venable displayed on the video a "remarkable indifference to Mr. Sabbie's welfare and her professional responsibility." *Id.* at 11. He further states as follows:

> She checks Mr. Sabbie's oxygen saturation (94% to 96%) and heart rate (99 bpm). However, she did not document her findings until the next day after Mr. Sabbie was pronounced dead. Thus, her recollection of these two vital signs may be suspect. She does not interview Mr. Sabbie. She does not measure his blood pressure. She does not listen to his lungs. She does not count his respirations (which I estimate now at 50-60 breaths per minute). She appears to completely ignore his constant grunting and gasping and statements '*I can't breathe*!' He is drenched in sweat. He is also begging for water which no one gives him.

*Id.* at 10. "Watching the video, one can only conclude that this man, glistening with sweat, grunting for breath, struggling to breath[e] 50 times a minute, was experiencing a life-threatening emergency. He needed immediate transfer to a source of emergency care." *Id*. at 11. According to Dr. Cummins, Nurse Venable's failure to reach this conclusion indicates reckless disregard for her patient's welfare. *Id.*

### Post-pepper spray decontamination

When Nurse Venable's evaluation ended, Officers Boozer and Lomax took Mr. Sabbie out of the medical office, one on each handcuffed arm, and headed toward the L-Pod shower. *See* Johnson Dep. at 101:4-12; *see also* Lomax Dep. at 47:10-48:14. Their plan was to lead him down a series of hallways toward a housing unit, called the L-Pod, and into a shower where they intended to "decontaminate" him from the OC spray. Lomax Dep. at 48:15-18. Two other defendants, Lt. Johnson and Officer Boozer, and the handheld camera operator, followed closely behind. *See* Lomax Dep. at 48:19-22; Johnson Dep. at 101:4-20. When they left the medical office and headed toward the L-Pod, Mr. Sabbie still had OC spray visibly on his face. *See* Boozer Dep. at 66:2-7. On the way to the shower, Mr. Sabbie repeatedly stated he could not breathe, his breathing was labored, and he

35

frequently stopped and bent over. *See* Boozer Dep. at 67:20-68:10 (agreeing the number of breaths Mr. Sabbie was taking were "heavy"). Officer Boozer stated anyone that had been administered chemical agents would have trouble breathing, but he agreed Mr. Sabbie had been having trouble breathing before he was administered the OC spray. *Id.* at 69:18-25.

When Mr. Sabbie was put in the shower, he was still handcuffed with his hands behind his back and wearing his clothes. *See* Boozer Dep. at 71:16-18 & 72:13-15; Brown Dep. at 109:10-18. Lt. Johnson, along with Officers Boozer, Brown, and Lomax, were standing a few feet away—right outside the exposed shower stall. *See* Boozer Dep. at 71:6-12. As a stream of hot water was spraying in his face for no more than ten seconds, Mr. Sabbie continued to state he could not breathe. *See* Jones Dep. at 110:10-12; Derrick Dep. at 17:21-23; Sanders Report at 11. No one washed off Mr. Sabbie's face, and the officers did not give him soap or a washcloth to help with the decontamination. *See* Boozer Dep. at 72:16-18; Johnson Dep. at 104:20-22; Sanders Report at 11, 16. According to Captain Sanders, the "short period of time spent in the shower, clothed and handcuffed, would not have provided sufficient decontamination."[25] Sanders Report at 16.

---

[25] According to Sanders' Report, the "decontamination was unreasonably short in duration, ineffective in how it was conducted, and no need existed to prevent Mr. Sabbie from fully decontaminating." Sanders Report at 5. Captain Sanders states the officers should have used cool water and soap if available to rinse the oily residue from his skin. *Id.* at ll. LaSalle's own pepper spray exposure protocol mandates officers to clean Mr. Sabbie's "face, eyes, nose, and mouth with wet cloths" and "irrigate [his] eyes with copious amounts of water." Heipt Decl., Ex. M. It also mandates a fresh set of "clean clothes." *see id.* According to Captain Sanders, Mr. Sabbie was left in a cell in "contaminated wet clothing," which guaranteed he would remain in a "contaminated environment." *Id.* at 17.

Plaintiffs allege the failure of Defendants Brown, Boozer, Lomax, and Johnson to adequately decontaminate Mr. Sabbie with an appropriate solution—and leaving him in his wet, pepper-spray-contaminated clothing—was constitutionally unreasonable, violated basic correctional and law enforcement practices, and caused Mr. Sabbie to suffer continued unnecessary pain and exacerbated his acute respiratory distress. Docket Entry # 1, ¶ 57.

Mr. Sabbie had difficulty standing, and he continued to state, "I can't breathe." *See* Boozer Dep. at 74:16-21. Lt. Johnson, who previously pepper sprayed Mr. Sabbie, threatened to spray him again with a chemical agent. *See* Brown Dep. at 110:1-4; Boozer Dep. at 74:22-25. According to Officer Brown's testimony, Mr. Sabbie was not being aggressive or noncompliant. *See* Brown Dep. at 110:5-25; Boozer Dep. 75:1-76:4; Lomax Dep. at 51:25-52:4; Jones Dep. at 112:3-7; Sanders Report at 11-13, 16.

Seconds later, right after repeating, "I can't breathe!" Mr. Sabbie collapsed and his body fell to the ground. *See* Boozer Dep. at 74:1-15, 76:16-20; Brown Dep. at 112:1-10 (agreeing Mr. Sabbie's body and head were fully down on the shower floor). According to Dr. Cummins, the officers made no effort to assist or evaluate Mr. Sabbie, "simply staring down at him until he regain[ed] consciousness." Cummins Report at 10. They did not notify Nurse Venable about the collapse, even though she was in the adjacent dayroom.[26] *Id*. Lt. Johnson, who is narrating the film, stated "the offender is perfectly sit down." *See* Johnson Dep. at 112:5-12 (agreeing there was no way to describe Mr. Sabbie as sitting); *see also* Lomax Dep. at 54:19-55:3 (agreeing Mr. Sabbie was not sitting but was "laying down").

According to Captain Sanders, given the totality of the circumstances, when Mr. Sabbie fell in the shower a reasonable officer would have, and should have, called for another medical evaluation. Sanders Report at 13. "Instead of notifying trained professionals, Defendants simply

---

[26] According to Nurse Practitioner Roscoe, Nurse Venable was there and should have intervened and evaluated Mr. Sabbie when he collapsed and had a moment of unresponsiveness. She states the officers attending Mr. Sabbie should have also noted "his collapse in the shower and his inability to walk more than a few steps (he fell again before getting into his cell), and they should have brought him back to medical for further evaluation." Roscoe Report at 12.

lifted [Mr. Sabbie's] limp body by his handcuffed arms," putting "enormous strain on his shoulders." *Id.*

Officer Lomax could not explain "why [he] didn't summon medical care right then and there." Lomax Dep. at 55:5-7. Officers Boozer and Brown both testified it was not their decision to make—it was Lt. Johnson's. *See* Boozer Dep. at 78:25-79:8; Brown Dep. at 113:25-114:8. Officer Lomax later agreed with this. *See* Lomax Dep. at 55:8-20. Officers Lomax, Brown, and Boozer all testified that if it was up to them, they would have called medical. *See* Boozer Dep. at 79:9-12; Brown Dep. at 114:15-18; Lomax Dep. at 55:14-20. Mr Sabbie's fall was not reported.  Sanders Report at 13.

Captain Jones, the highest-ranking official at the scene, testified he was there with Nurse Venable and Officer Palmer and was watching through the door what was happening in the shower. *See* Jones Dep. at 95:5-9; 108:19-109:14. He heard Mr. Sabbie stating he could not breathe.[27] *Id.* at 109:23-110:12. He saw Mr. Sabbie slide down the wall to the base of the shower. *Id.* at 112:8-15. He saw Mr. Sabbie lying on the shower floor with his head on the mat. *Id.* at 113:20-114:3. He did not know whether Nurse Venable, who was standing next to him, saw it as well because his eyes were on Mr. Sabbie, and he "wasn't watching her." *Id.* at 114:10-13; *see also id.* at 123:16-23. Captain Jones did not consider telling Nurse Venable to immediately evaluate Mr. Sabbie at that

---

[27] Captain Jones knew Mr. Sabbie had been seen by the nurse for spitting up blood that morning. *See* Jones Dep. at 49:18-50:12. He knew Mr. Sabbie had later been brought to medical for shortness of breath. *Id.* at 45:11-22; 57:1-15. He knew Mr. Sabbie was repeatedly saying, "I can't breathe," when on the ground in the triangle area before being pepper sprayed. *Id.* at 94:18-95:12. He knew Mr. Sabbie continued to state he could not breathe on the way to the medical office and once inside. *Id.* at 103:25-104:2; 104:20-23.

point. *Id.* at 114:14-16. He did not even tell her what happened. *Id.* at 123:24-124:2.  Captain Jones testified as follows:

> In my opinion, the inmate was playing his games and stuff.  He sat down, and he leaned over.  And right there, right after that, staff assisted him up, and they tell him to walk, and he walks to L pod.

*Id.* at 124:10-15.  He also "personally disagree[d]" with Officers Boozer, Brown, and Lomax that Mr. Sabbie should have been medically evaluated, "[b]ecause of the games inmates play." *Id.* at 127:8-14.

Nurse Venable testified she did not recall seeing Mr. Sabbie collapse in the shower.  Venable Dep. at 196:17-19.  She stated she would have wanted to know if he collapsed in the shower "and went down pretty hard on the floor" and that she would expect corrections officers to tell her. *Id.* at 196:20-197:9, 197:24-25. She also testified that if the officers had told her Mr. Sabbie collapsed in the shower, "[h]e would need to come to medical to be evaluated." *Id.* at 197:18-23; *see also* Roscoe Report at 12.  She stated the officers should have brought Mr. Sabbie to medical to be evaluated. Venable Dep. at 196:15-16.

### *Mr. Sabbie taken to L-Pod cell*

Officers Boozer, Brown, and Lomax lifted Mr. Sabbie up by his handcuffed arms and shirt, while Lt. Johnson watched, and dragged him out of the shower. *See* Boozer Dep. at 79:13-80:18. The officers took Mr. Sabbie to an L-Pod cell (L1). *See* Sanders Report at 17.  Mr. Sabbie was still wearing wet, contaminated clothes. *Id.*  Mr. Sabbie's pants were pulled down, and his hands were handcuffed behind his back. *See* Boozer Dep. at 86:21-24; Lomax Dep. at 65:17-18. Officers Brown and Lomax were holding Mr. Sabbie up by his handcuffed arms. *See* Boozer Dep. at 86:25-87:8; Brown Dep. at 123:12-23; Lomax Dep. at 65:11-66:1. Defendants Boozer, Johnson, Palmer, Jones,

Derrick, and Venable were at the scene as Mr. Sabbie was being taken to his cell. *See* Brown Dep. at 122:1-7; Derrick Dep. at 93:8-94:4.

"Mr. Sabbie was having trouble breathing and standing and was bent over at the waist." Sanders Report at 13. According to Dr. Cummins, the officers "push and drag Mr. Sabbie from the shower to his cell," and at one point, "appear to drag almost his entire weight by his arms and shoulders, his wrists handcuffed behind his back." Cummins Report at 10. When they arrived at Mr. Sabbie's cell, he again collapsed to the floor, wrists still handcuffed behind his back. *Id.* Plaintiffs allege Defendants Boozer, Brown, Johnson, Palmer, Lomax, Jones, and Venable all witnessed Mr. Sabbie's obviously serious medical condition and knew he had not been properly decontaminated; yet none of them intervened to assist him. Docket Entry # 1, ¶ 58.

At the cell doorway, Mr. Sabbie was bent over at the waist, and Officers Lomax and Brown were holding his handcuffed hands up behind his back, *see* Lomax Dep. at 65:11-66:1; Brown Dep. at 124:11-14, putting tremendous strain on his shoulders. Sanders Report at 13. Mr. Sabbie then fell forward to his knees with his hands cuffed behind his back. *See* Lomax Dep. at 66:2-5; Brown Dep. at 124:18:21. As he fell forward, these two officers had him by the arms and were bringing him into the cell. Lomax Dep. at 67:4-8.

Seconds later, Mr. Sabbie's hands, which were in the back, were now on the front side of his body. *See* Sanders Report at 13 ("As they led him into the cell, Mr. Sabbie fell while, at the same time, Defendants pulled him into the cell by his handcuffed arms."). During his deposition, Officer Lomax agreed "there's no question that his handcuffed hands were pulled over the top of his head to the front of his body." Lomax Dep. at 68:5-8; *see also id.* at 67:9-18 (agreeing a logical explanation for that is that they went over the top of his head); *see also* Boozer Dep. at 88:4-89:12;

Brown Dep. at 125:16-127:1. According to Captain Sanders, the "technique used by the Defendants is not in any known curriculum, and caused the handcuffs to move in an extraordinary method from behind Mr. Sabbie's back, over the top of his head, and to the front of his body."  Sanders Report at 13-14. The view of Mr. Sabbie was briefly obstructed by the officers, but when Mr. Sabbie is seen again on the video his handcuffed wrists "are now located in front of his body, where the officers proceed to unlock and remove the handcuffs."  Cummins Report at 10.

According to medical experts, Mr. Sabbie may have sustained severe shoulder damage when this occurred and required an immediate medical evaluation. *See* Cummins Report at 11; Roscoe Report at 12. According to Plaintiffs' correctional practices expert, "[i]t was a gross violation of the standard of care not to immediately summon medical staff to evaluate Mr. Sabbie's for potential damage to his shoulders."  Sanders Report at 17.

Officer Lomax recognized that pulling Mr. Sabbie's arms over his head could have possibly caused serious damage to his tendons, muscles, ligaments, or joints. *See* Lomax Dep. at 68:16-23; *see also* Brown Dep. at 127:23-128:1, 129:3-6 (agreeing it could have caused "pretty severe damage" to his shoulders). They also agreed it warranted a medical evaluation. *See, e.g.*, Brown Dep. at 129:8-13; Lomax Dep. at 69:7-70:11. However, even though Nurse Venable was standing right outside the door as the officers were putting Mr. Sabbie in the cell, *see* Venable Dep. at 195:15-17, no one told her it happened.  Lomax Dep. at 68:24-69:6 (stating he was not the supervisor on the scene).

Before he left Mr. Sabbie alone in his cell, Officer Boozer heard Mr. Sabbie continue to say he could not breathe. Boozer Dep. 94:7-12; Venable Dep. at 196:1-12 (stating she had no reason to doubt Mr. Sabbie was lying on the floor saying he was "burning and could not breathe"). The officers closed the door, leaving Mr. Sabbie on the concrete floor—still wearing wet, pepper spray-

contaminated clothing—in a cell with no mattress or blanket. *See* Brown Dep. 131:3-6; Boozer Dep. at 110:23-111:5; Derrick Dep. at 142:12-16; Deposition of Simone Nash ("Nash Dep.") at 122:10-20; Peerwani Report at 14. Leaving Mr. Sabbie in contaminated clothing "guaranteed that he would remain in a contaminated environment." Sanders Report at 17. "Everyone at the scene . . . knew that Mr. Sabbie was being left in wet, contaminated clothing and was complaining of an inability to breathe." *Id.* Mr. Sabbie was left in his cell at approximately 4:30 p.m. *See* Boozer Dep. at 94:13-18.

### *Post-use of force photos*

About an hour-and-a-half later at 6:00 p.m., Sgt. Hopkins and Officers Boozer and Derrick, came back to Mr. Sabbie's cell to take photos of him pursuant to LaSalle's use of force policy. *See id.* at 96:19-97:13. The three of them entered the cell together and saw Mr. Sabbie. *Id.* at 97:14-18. He was lying on the floor of his cell on his back; his pants were pulled down, and his genitals were exposed. *Id.* at 97:17-98:3. His arms were above his head, flat on the floor, and bent at the elbows. *Id.* at 98:4-8.

According to Dr. Cummins, Mr. Sabbie appears dead in the two photos dated July 21, 2015. Cummins Report at 11 (noting the photos taken the next day, after Mr. Sabbie's dead body was discovered, displayed the exact same posture and appearance). Mr. Sabbie's eyes were half-open, and he had a white substance emanating from his nostrils.[28] *See id.*; *see also* Boozer Dep. at 101:1-18. Although Mr. Sabbie was breathing, he was not breathing "heavily," and other than that, he was not moving at all. *See id.* at 98:9-25.

---

[28] The white substance was pulmonary edema foam—literally lung fluid. *See* Cummins Report at 11.

According to Officers Boozer and Derrick, Mr. Sabbie responded to two questions by answering "no" to both in a "faint," "weak," or "muddled" voice. *See* Boozer Dep. at 99:3-100:3; Derrick Dep. 104:16-105:1. All three of them could "plainly see" Mr. Sabbie did not look good. *See* Boozer Dep. at 101:19-23; *see also* Hopkins Dep. at 17-19. According to Officer Boozer, the three officers commented on the fact that he did not look good. Boozer Dep. at 110:20-22. When asked if he would call for medical help if he saw a friend or family member in that condition, Officer Boozer testified: "Yes, sir." *Id.* at 108:25-109:5. Neither Officer Boozer, nor anyone else, asked Mr. Sabbie if he needed medical help. *Id.* at 109:6-10.

And none of them called for medical help.[29] *Id.* at 104:2-8; *see also* Derrick Dep. at 117:4-15. Instead, they took two photos of him and left. As Officers Boozer and Derrick were leaving the cell, they were caught on surveillance camera footage laughing. Derrick Dep. at 123:4-17 (stating he was not laughing about Mr. Sabbie's condition and further stating he could not recall what they were laughing about). Plaintiffs allege Defendants Derrick, Hopkins, and Boozer could clearly see Mr. Sabbie's condition, but "they did nothing to secure desperately-needed emergency medical care for him in violation of basic correctional standards and in deliberate indifference to his extremely serious medical needs." Docket Entry # 1, ¶ 61.

Both Officer Boozer and Officer Derrick were among those who had taken Mr. Sabbie to medical that morning due to his shortness of breath and knew he had been reporting difficulty breathing earlier in the day. *See* Boozer Dep. at 105:23-106:9; Derrick Dep. at 119:8-11. Officer

---

[29] According to Officer Boozer, it would have been Sgt. Hopkins' responsibility to call for medical help. Boozer Dep. at 104:9-11; Hopkins Dep. at 35:22-36:7 (agreeing any call would have come from him). Sgt. Hopkins testified he did not tell any of his supervisors or anyone else that Mr. Sabbie did not look good. *See* Hopkins Dep. at 63:9-11.

Derrick knew Mr. Sabbie had been pepper sprayed.  Derrick Dep. at 119:12-13.  Officer Boozer knew Mr. Sabbie had been saying he could not breathe all day (including on the way to medical, in the medical office, twice just before he collapsed in the shower and "all the way up until the point where he was left in L1").  *See* Boozer Dep. at 106:2-15; *see also id.* at 48:17-19; 58:5-10; 64:5-8; 68:1-5; 69:18-25; 74:8-21; 76:16-20; 94:7-10.

The officers also knew Mr. Sabbie was still wearing the same clothing he had been wearing when Lt. Johnson pepper sprayed him and that his clothes were still wet. *See* Boozer Dep. at 110:23-111:19; Derrick Dep. at 142:12-143:1.  According to Officer Boozer, he did not get Mr. Sabbie a fresh set of dry clothes. *See* Boozer Dep. at 111:20-22; *see also id.* at 112:4-6 (agreeing someone should have provided him with fresh clothes). Officer Derrick testified he went to get Mr. Sabbie a pair of towels and clothes and soap.[30]  Derrick Dep. at 89:9-12.

After leaving Mr. Sabbie's cell, Officer Derrick reported to Lt. Johnson Mr. Sabbie was moving and was all right. *See* Derrick Dep. at 126:25-127:17. Captain Sanders opines the three officers who entered Mr. Sabbie's cell at approximately 6:00 p.m. to take photographs of him "acted in gross violation of well-established standards of correctional practice," noting it was obvious Mr. Sabbie needed immediate medical attention. *See* Sanders Report at 17.

***Visual checks***

According to jail standards and policy, an officer was supposed to visually check on Mr. Sabbie every thirty minutes beginning when he was first placed in L1 at 4:30 p.m. *See* Derrick Dep.

---

[30] Plaintiffs dispute this, asserting there were no clean clothes or soap in Mr. Sabbie's cell the next morning—only two towels. *See* Hopkins Dep. at 50:6-51:23 (stating he did not see any other clothes in the pictures and he did not remove any and agreeing it would have been inappropriate for him to remove any items from the cell); Bowens Dep. at 71:18-74:6 (stating she did not recall seeing a set of fresh, dry clothes or bar of soap in the cell, but noting she was not looking either).

at 132:20-25, 135:1-6; Sanders Report at 15.  Officer Derrick was the first one assigned to do these checks.  Officer Derrick handwrote entries into a "Thirty Minute Housing Checks/L-Pod" log, indicating he did visual checks of Mr. Sabbie at 4:46 p.m., 5:15 p.m., 5:44 p.m., 6:13 p.m., 6:42 p.m., and 7:11 p.m. *See* Heipt Decl., Ex. Q; Derrick Dep. at 135:7-136:10.  Although he was supposed to check on Mr. Sabbie five times between 4:30 p.m. and 7:00 p.m., the only time Officer Derrick saw him during that time was when Officer Derrick went into Mr. Sabbie's cell with Hopkins and Boozer to take photos around 6:00 p.m. *See* Derrick Dep. at 127:23-128:2; 132:15-19.

Even though Officer Derrick wrote down he did a check at 7:11 p.m., he testified he left his shift and went home at 7:00 p.m.  *Id.* at 127:18-22; 141:15-142:1 (stating it was "normal practice to carry it over" or to "write down a check and then leave it there even if you didn't do it" and further stating he had done it "countless times").  According to Officer Derrick, he would write down the checks whenever he would get a chance to get to his book, and if he did not do them he "did a roundabout time that [he] walked in there." *Id.* at 139:4-12.  Even though Officer Derrick agreed he only saw Mr. Sabbie once between 4:30 p.m. and 7:00 p.m., he did not "think to go back and cross out checks that [he] wrote that [he] didn't actually do." *Id.* at 139:19-25. When asked if he realized that if the jail was later audited by an outside agency "they could look at [his] 30-minute housing checks and think [he] actually did the checks at the listed times even if [he] didn't" and if he saw the problem with that, Officer Derrick responded, "yes." *Id.* at 142:6:11.

The next officer responsible for doing thirty-minute visual checks of Mr. Sabbie was Defendant Simone Nash, who had only been working at the Bi-State Jail for three or four weeks. Nash Dep. at 16:3-6; 44:15-17.  Officer Nash worked the twelve-hour night shift and was on duty from 7:00 p.m. to 7:00 a.m.  *Id*. at 32:13-19. She was the only officer assigned to the L-Pod during

her twelve-hour shift. *Id.* at 43:21-23. She knew her duties included doing face-to-face checks of L-Pod inmates every thirty minutes.  *Id.* at 45:3-5. Like Officer Derrick, Officer Nash documented on her thirty-minute housing check log for L-Pod that she did each of the twenty-four checks during her twelve-hour shift.  *Id.* at 60:9-61:12; *see also* Heipt Decl., Ex. R.  However, she did not actually do twenty-four "face-to-face checks as indicated" on the log.[31] Nash Dep. at 61:24-62:4; *see also* Sanders Report at 18 (stating Officers Derrick and Nash failed to follow widely accepted minimum standards for checking inmates in the required time periods and "actively engaged in falsifying records of 30-minute checks of Mr. Sabbie.").

Defendant Nash knew in general terms, but with no details, that force had been used on Mr. Sabbie. *Id.* at 52:21-53:8. She knew he had been pepper sprayed. *Id.* at 56:15-24. And she knew he had been "complaining of pepper spray [residue] on his body." *Id.* at 56:25-57:2. No one told her before her shift started that Mr. Sabbie suffered from hypertension, diabetes, heart trouble and asthma; that he had gone to medical the morning of July 20 because he was short of breath; that he had been taken to medical in a wheelchair the morning of July 21 because he was having trouble breathing; that he had been complaining of difficulty breathing the afternoon of July 21 in the triangle area of the jail prior to the use of force; that he continued to say he could not breath after he had been held down by five officers and sprayed in the face with a chemical agent; that he collapsed to the ground in the shower after saying he could not breath; that his handcuffs were pulled over the

---

[31] Although she did not do the requisite face-to-face checks, Officer Nash did see Mr. Sabbie a handful of times during her twelve-hour shift because of a separate obligation to conduct four "head counts" during her shift. *See* Nash Dep. at 45:24-47:8; 61:13-20. The head counts were supposed to be done at 7:00 p.m., 11:00 p.m., 2:00 a.m., and 4:00 a.m. *Id.* 46:23-47:8.

top of his head to the front of his body as he was being led into his cell; or that he was left in the cell while wearing wet, pepper-spray contaminated clothing. *Id*. at 51:23-54:16.

Because Officer Nash saw Mr. Sabbie on her four head counts, she could tell (even with the lights off) that Mr. Sabbie was lying on the concrete floor on his back, in a cell with no mattress or blanket, with his pants pulled down, and his genitals fully exposed. *See* Nash Dep. at 79:6-11; 97:3-11; 102:1-7; 103:11-21; 122:10-20. Other than groaning in pain at 1:29 a.m., Mr. Sabbie made no sound. *Id.* at 81:5-7; 88:1-9; 97:19-98:12; 100:10-12; 102:8-11. It crossed Officer Nash's mind during her shift that Mr. Sabbie might not be alive; she "questioned" whether he was breathing but then she would see a "rise and fall."[32]  *Id.* at 118:25-119:11. According to Officer Nash, when another officer saw Mr. Sabbie in the morning—in the same position he had been in all night—the officer knew "right off the bat" that "there could possibly be something wrong with him." *Id.* at 113:16-115:20.

When asked at her deposition why she did not summon medical care sometime during her shift, Officer Nash agreed it was her understanding, based on her training, that "as long as [she] thought [she] could detect breathing or respiration, there was no need to call medical help." *Id.* at 104:2-12.  When asked where she got that understanding, Officer Nash explained as follows:

> Because of – well, for that particular situation, it was simply because [Sgt.] Hopkins assured me that he was okay; he was just tired from the use of force.

*Id*. at 104:13-19.

Officer Nash stated that when an officer starts a shift, there is supposed to be a "zone shift briefing" by the supervisor. *See* Nash Dep. at 49:18-21. The supervisor is expected to alert the officer

---

[32]  According to Dr. Peerwani, Mr. Sabbie was likely dead during the last half of Officer Nash's shift. Peerwani Report at 19.

to any special monitoring needs or if there are any inmates that would require medical attention. *See*

Nash Dep. at 50:5-19. Officer Nash's supervisor was Sgt. Hopkins. *Id.* at 50:20-21. He knew she was

new on the job and had not finished her state-mandated training. *See id.* at 21:4-22:5. Even though

Sgt. Hopkins knew Mr. Sabbie had serious medical needs, he did not tell Officer Nash to pay extra

attention to him. *Id.* at 50:22-24; *see also* Sanders Report at 18 (opining Sgt. Hopkins gave an

inadequate zone shift briefing). In fact, he told her the opposite. Nash Dep. at 50:25:51:2.

Sgt. Hopkins told Officer Nash to leave Mr. Sabbie alone and not bother him; not to try to

get him to eat if he did not eat, which was different than how she would normally treat inmates. *Id.*

at 51:3-11.   Sgt. Hopkins told her generally about the use of force but gave her no specifics. *Id.* at

53:2-54:12. As noted above, he "assured" Officer Nash Mr. Sabbie was "okay" and was "just tired."

*Id.* at 104:13-19; *see also* Sanders Report at 18 (stating Sgt. Hopkins "even told Defendant Nash to

leave Mr. Sabbie alone, knowing of his recent history and his need for enhanced observation.").

During her briefing, Sgt. Hopkins did not tell Officer Nash how Mr. Sabbie looked when he

took photos of him an hour earlier. Nash Dep. at 54:25-55:4. He also instructed her to leave the lights

off in Mr. Sabbie's cell, even though they were normally kept on and were on that night in the other

L-Pod cells. *Id.* at 76:19-77:1, 77:19-79:5; *see also* Sanders Report at 18. This prevented Officer

Nash from seeing that Mr. Sabbie's clothing was wet or that he had a white substance coming from

his nose. Nash Dep. at 79:15-21. According to Officer Nash, if Sgt. Hopkins had told her to pay

careful attention to Mr. Sabbie, she would have. *Id.* at 82:17-83:3. According to Captain Sanders,

while Officer Nash failed to check on Mr. Sabbie, Sgt. Hopkins did not report Mr. Sabbie's

condition to those responsible for monitoring him that night, "which further demonstrated []

deliberate indifference to his obvious medical needs." *See* Sanders Report at 17-18 (further noting

Sgt. Hopkins told Officer Nash to leave Mr. Sabbie alone and purposefully dimmed the lights in Mr. Sabbie's cell making observation more difficult).

### *Mr. Sabbie found unresponsive*

On the morning of July 22, 2015, at approximately, 6:22 a.m., more than twelve hours after he had been put in his cell, a corrections officer noticed Mr. Sabbie was unresponsive and alerted Sgt. Hokpins, who was still on duty. *See* Hopkins Dep. at 45:8-12. Sgt. Hopkins went to L1 to assess the situation. *Id.* at 45:13-15. Upon entering Mr. Sabbie's cell, Sgt. Hopkins saw Mr. Sabbie in "virtually the same position that he was in 12 hours earlier when [he] took the [6:00 p.m.] photos"—lying on his back on the floor of his cell, with his arms above his head, bent at the elbows, his pants pulled down, his genitals exposed, and a white substance emanating from his nose. *Id.* at 46:1-24.

Shortly thereafter, Nurse Bowens felt Mr. Sabbie's body and told Sgt. Hopkins it was cold. *Id*. at 47:21-25. According to Sgt. Hopkins, Nurse Bowens then told him to make all the necessary notifications for a death in custody, which he did. *Id*. at 48:2-23. The precise time of death of Mr. Sabbie is unknown. Peerwani Report at 19. In Dr. Peerwani's opinion, Mr. Sabbie had been dead for "a number of hours." *Id*.

The autopsy from the Medical Examiner Division of the Arkansas State Crime Laboratory concluded the cause of death was Hypertensive Arteriosclerotic Cardiovascular Disease and classified the manner of death as "Natural." Deposition of Nizam Peerwani ("Peerwani Dep."), Ex. 2 at pg. 1. The report concludes as follows:

> The autopsy revealed severe heart disease with evidence of at least two prior episodes of heart muscle damage, indicated by various ages of fibrosis in the heart, and one or more past episodes of congestive heart failure. These findings, along with the

report that the decedent had shortness of breath prior to the altercation, and that the decedent did not expire during the altercation, suggests that the altercation played a minimal role in the decedent's death, and may not have contributed at all to his death. Due to this, the altercation was not considered as contributing to the cause of death, and therefore, the manner of death was classified as natural.

*Id*. at pg. 8.

## B.    Additional evidence applicable to Plaintiffs' claims against LaSalle

### *Lack of training of officers*

Officers testified LaSalle gave them no training on recognizing potential signs of medical distress or signs that an inmate may need medical care. *See* Boozer Dep. at 105:16-18, 117:18-21; Lomax Dep. at 88:14-18; Palmer 127:20-23; Hopkins Dep. at 37:25-38:6; Nash Dep. at 124:15-18. They had no training on when to summon medical care for inmates. *See* Boozer Dep. at 107:24-108:2; Derrick Dep. at 119:2-120:3; Nash Dep. at 124:10-14. LaSalle did not train them they had an "obligation to secure medical care for inmates with serious medical needs." Boozer Dep. at 117:18-21; Nash Dep. at 124:23-125:1; Lomax Dep. at 88:24-89:2. According to Officer Boozer, he was not even aware in 2015 that he had a "constitutional obligation to secure medical care for inmates with serious medical needs." Boozer Dep. at 108:3-6.

Even so, in 2015 at the Bi-State Jail, inmates who needed medical monitoring were placed in medical observation cells where they would be monitored, not by medical personnel with medical training, but by jail security guards with no medical training. *See* Venable Dep. at 114:17-23, 115:8-15; Flint Dep. at 79:22-80:14 (noting the guards' job was to alert medical). Officer Nash stated LaSalle did not provide her adequate training to work in Zone 2 as of July 21, 2015, and that if it had, she believed she would have avoided some of the "wrongdoing [she] committed on the night shift that began on July 21, 2015." Nash Dep. at 26:15-23.

50

As of July 2015, the only thing LaSalle taught its officers to look for was "living breathing bodies." *See* Boozer Dep. at 105:10-15. They knew Mr. Sabbie did not look good; because he was "alive and breathing," they did not call a medical provider; based on their understanding of their training back then, that was how it was supposed to work at the Bi-State Jail. *See* Boozer Dep. at 107:17-23; *see also* Nash Dep. at 59:9-16, 104:2-12.

As noted above, Officer Nash had only been working at the jail for about three weeks on July 21, 2015. *See* Nash Dep. at 15:21-16:11. She had received only five days of classroom training. *Id.* at 16:12-19. Although she was supposed to receive a minimum of five days (forty hours) of on-the-job (shift) training before working alone, she only had two days (twenty-four hours) as of July 21. *Id.* at 19:24-20:8; *see also id.* at 17:6-17. According to Officer Nash's Employee Information Sheet, she received all forty hours of on-the-job training. *Id.* at 20:13-21:10; 24:15-25:13. Officer Nash stated all the employees with whom she did her LaSalle pre-service classroom training signed documentation attesting they had completed forty hours of their on-the-job training before it had even started. *Id.* at 25:9-26:9. The documentation was signed by their LaSalle supervisor as well. *See id.* According to Captain Sanders, his review of the information supplied revealed training was not being conducted, training was being falsified, and employees were given credit for training they did not attend; the training program was not properly supervised. Sanders Report at 18.

Officer Nash indicated the Bi-State Jail was short staffed so Sgt. Hopkins pulled her out of her training on her "third day of work" and asked her how she felt about working Zone 3 by herself. Nash Dep. at 22:16-23:8. Zone 3 was all female inmates, and Officer Nash agreed. *Id.* About two weeks later, Sgt. Hopkins put Officer Nash in sole charge of Zone 2, which was a "very different atmosphere" because it involved all males and included multiple segregation pods and cells. *Id.* at

17:15-19:22. Even though she had not finished her training, Officer Nash alone was responsible for monitoring all inmates in the J, K, L, M, and N Pods, as well as the holding cells and the medical observation cells. *See* Nash Dep. at 19:6-22; 41:24-42:15; 43:21-44:24, 45:3-46:10. Although she was a new employee who did not get "nearly all the training [she was] supposed to get," LaSalle put her "in charge of all these male segregation cells and other units by [her]self." *Id.* at 44:15-20. She testified LaSalle did not give adequate training to work in Zone 2 and that she was not equipped to handle it. *Id.* at 26:15-18; 44:25-45:2; *see also id.* at 47:9-49:1 (agreeing that some of her confusion as to "one-hour general housing checks" could likely be because she got "less than half of the training [she was] supposed to get"). When asked whether Zone 2 was adequately staffed on the night of July 21, 2015, she responded, "No, sir." *Id.* at 49:14-17.

Like many of the other corrections officers, LaSalle did not train Officer Nash to look out for signs and symptoms of medical distress. *See* Nash Dep. at 59:17-19. With respect to her visual checks of inmates, LaSalle trained her, like the others, only to verify "[b]reathing bodies." *Id.* at 59:9-16. So long as she could detect "breathing or respiration," LaSalle trained her not to call for medical help. *Id.* at 104:2-12. She testified this was her understanding, based on her training, as to why there was no need to summon medical care for Mr. Sabbie when he was lying on the floor, with his pants pulled down and his genitals exposed, groaning. *Id.* at 104:2-12; *see also id.* at 104:13-19 (stating she had also been assured by Sgt. Hopkins that Mr. Sabbie was "okay" and was "just tired from the use of force"). She was not taught to look out for inmates with serious medical needs. *Id.* at 124:10-125:1. Nor was she trained on the importance of doing all her thirty-minute face-to-face checks at the times listed on her log sheet. *Id.* at 62:5-8, 63:12-17. Had she been trained on this, she would have done it. *Id.* at 62:9-63:11. She had no idea the visual checks were a legal requirement.

52

*Id.* at 64:8-16. In hindsight, she understands, now, that she should have done all her checks of Mr. Sabbie. *Id.* at 64:17-19.

According to Officer Nash, "not doing all [the] checks that [she] wrote down was consistent with the standard practice at the jail as [she] understood it." *Id.* at 63:18-21. It was a "widespread practice at the jail" to leave those checks on the log even if they were not actually done.  *Id.* at 29:1-7. She explained that writing all twenty-four checks down (with specific time entries) at the beginning of a twelve-hour shift, regardless of whether the checks were ever done, was something LaSalle "literally trained" its corrections officers to do:

> Q:    And so if I understand your testimony, you were literally trained to write down your check -- the times you were doing your 30-minute checks before you actually conducted any of those checks. Is that correct?
>
> A:    Yes, sir.
>
> Q:    And to leave those checks there even if you didn't do the checks.
>
> A:    Yes, sir.

*Id.* at 28:20-29:3; *see also id.* at 28:5-19 (explaining LaSalle specifically taught her to do this on her "first night" of training). According to Officer Nash, she was not allowed to record her checks as they were done. *Id.* at 95:5-96:16 (stating it was always encouraged to go ahead and fill out the paperwork at the start of the shift and also agreeing some people would write all of their checks at the end of the shift regardless of whether they did them or not).  Officer Derrick also testified it was "normal practice" to write down a check and then leave it there even if an officer did not do it and that he had done it "countless times."  Derrick. Dep. at 141:21-142:5; *see also* Sanders Report at 18-22 (detailing LaSalle's numerous training and supervisory deficiencies with its security staff). According to Captain Sanders, his review of the information supplied revealed a pattern and practice

of falsifying housing unit activity logs and housing unit check logs, pre-filling logs, and filling out logs at the end of the shift. Sanders Report at 19; *see also id.* at 21 (stating the pattern and practice of supervisors failing to review reports, sign reports, and require subordinates to accurately submit reports and log sheets "fostered an atmosphere that led to false reports and documents").

According to Captain Sanders, there was a pattern of excessively using OC spray at the Bi-State Jail. Sanders Report at 22. LaSalle jail guards used pepper spray frequently. *See, e.g.* Venable Dep. at 178:8-179:1 (stating she had evaluated hundreds of people who had been sprayed at the jail in the five years she had been there at the time); Flint Dep. at 115:21-116:2 (stating she had evaluated about a hundred inmates who had been pepper sprayed in her three years there). Officer Boozer testified he had seen pepper spray used between twenty-five to thirty times. Boozer Dep. at 115:7-14. According to Officer Boozer, prior to July 2015, he had not received any training on pepper spray decontamination or on the need for post-OC spray monitoring. *Id.* at 115:24-116:5. He had not been trained to summon medical care for "inmates who had been pepper sprayed and who continue[d] to experience difficulty breathing or respiratory distress after decontamination." *Id.* at 116:6-11; Brown Dep. at 144:3-7 (same).

LaSalle's use of pepper spray is detailed in the supplemental expert report of Captain Sanders, who reviewed over a dozen videos produced by LaSalle in discovery. Captain Sanders opines Defendants had a pattern and practice of using chemical agents on inmates "unjustifiably and objectively unreasonably." Sanders Supp. Report at 2. In his opinion, the practices used were below the standard of correctional care and were "consistent with the practices used on Michael Sabbie." *Id.* at 3. He also saw a pattern and practice of failing to decontaminate and leaving inmates in contaminated clothing. *See id.* at 2. The videos were also reviewed by correctional nursing expert,

Lori Roscoe, who found a pattern of substandard post-OC spray exposure exams by the nursing staff. *See* Roscoe Supp. Rept. at 1-2 ("Of the 13 incidents reviewed, only three inmates were brought to medical and evaluated by the nurse, and of these, only one was seen for longer than four minutes.").

### Lack of training of nurses

According to Plaintiffs, LaSalle nurses violated LaSalle's own pepper-spray exposure protocol and basic nursing standards. *See* Venable Dep. at 179:2-23 (stating her exam of Mr. Sabbie, which lasted less than a minute, was typical of her other post-pepper spray evaluations and consistent with her training). Nurse Venable also testified it was standard practice at the jail to not follow the pepper spray exposure protocol in 2015. *Id.* at 185:3-10.

In July 2015, there were nursing protocols in effect which the nurses were required to follow in assessing inmate medical conditions. *Id.* at 39:14-19. However, the LVN/LPNs were not given training on them or on the importance of following them. *See, e.g.* Bowens Dep. at 21:2-5, 17-20; 27:3-20 (agreeing that in 2015 it was common practice at the Bi-State Jail for nurses not to follow and fill out protocols and that there was no training or guidance on the protocols); *see also* Venable Dep. at 45:23-25; Flint Dep. at 31:12-32:19, 85:24-86:24; Lynch Dep. at 66:15-67:5 (stating nurses were not expected to follow the shortness of breath protocol and did not receive training on the shortness of breath protocol). Nurse Flint, an LVN who had less than three months experience, was given no training on the nursing protocols, had no idea they were mandatory, and did not know they existed. *See* Flint Dep. at 29:20-32:19; 35:13-37:4; 40:17-20; 72:5-73:25; 74:20-23; 77:4-11; 80:19-81:13; 85:12-86:24; 101:24-102:1; 107:2-110:9 (agreeing she did not following the hypertension or shortness of breath protocols in 2015).

Following Mr. Sabbie's death, Nurse Flint's supervisors did not say anything about the need to follow the protocols in the future. Flint Dep. at 130:11-22. Nurse flint received no discipline, warnings, counseling, or guidance. *Id*. at 129:13-130:1. The nurses did not start following the protocols until the fall of 2016, *see id.* at 35:13-23, more than a year after Mr. Sabbie's death.[33] Even at the time of her deposition, Nurse Flint was unaware of basic procedures mandated by the protocols governing her job. *See, e.g.*, Flint Dep. at 82:19-22 ("Q: And do you see that you are supposed to notify the physician for medication and treatment orders for a person that has shortness of breath? A. Yes. I am learning that today."); *see also id.* at 82:12-16, 84:25-85:7.

Finally, the way the nurses treated Mr. Sabbie, as if he was faking or malingering, was common practice at the jail. *See, e.g.* Sanders Report at 20. Officer Nash testified about multiple occasions leading up to Mr. Sabbie's July 2015 confinement in which inmates reported what she believed were concerns related to the health and safety of inmates that were dismissed by the nurse or supervisor. Nash Dep. at 92:8-93:2. Specifically, she testified as follows:

> Q:     So you felt that there was a pattern or custom of them not believing inmates
>        when inmates communicated medical issues?
>
> A:     Yes.

*Id*. at 93:3-6; *see also id.* at 93:7-11 (agreeing she felt like a "troublemaker" when raising issues). Officer Nash testified her supervisor had given her a hard time in the past when she had raised concerns. *Id.* at 92:6-7. Even though she would have been able to see Mr. Sabbie if he was in a cell with lights, she was "reluctant to raise that issue with Sergeant Hopkins because of how [she] had

---

[33] According to Plaintiffs, LaSalle nurses began following the protocols months after the death of another Bi-State Jail inmate in July 2016. Flint Dep. at 35:13-23. A federal civil rights case on behalf of her estate and beneficiaries is pending in this Court. *See Leigh v. Southwest Correctional, LLC*, No. 5:16-CV-129.

been treated in the past whenever [she] raised concerns about inmate health and safety[.]" *Id.* at

96:17-23.

## IV.  APPLICABLE LAW

### A.    Fourteenth Amendment Due Process

The Fourteenth Amendment provides no state shall "deprive any person of life, liberty, or

property, without due process of law. . . ." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment

only applies directly against states, not municipalities. *Garza v. City of Donna*, No. 7:16-CV-00558,

2017 WL 6498392, at *6 (S.D. Tex. Dec. 15, 2017). "However, Congress remedied this gap by

enacting 42 U.S.C.A. § 1983, which effectively permits Fourteenth Amendment claims to proceed

against municipalities under certain circumstances." *Id.*

### B.    42 U.S.C. § 1983

Section 1983 provides a vehicle for redressing the violation of federal law by those acting

under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004).  Rather than conferring any

substantive rights, § 1983 provides "a method for vindicating federal rights elsewhere conferred."[34]

*Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3

(1979)).  A plaintiff may prevail on a claim for relief under § 1983 by showing he was (1) deprived

of a federal right (2) by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640

(1980).  A defendant acts under color of state law if he misuses or abuses official power and if there

---

[34] Section 1983 is not a general tort remedy available to "all who suffer injury at the hands
of the state or its officers." *Waddleton v. Rodriguez*, No. 16-41154, 2018 WL 4292175, at *3 (5th
Cir. Sept. 7, 2018) (quoting *White v. Thomas*, 660 F.2d 680, 683 (5th Cir. 1981)).  A § 1983 plaintiff
must show "he or she has been deprived of some right secured to him or her by the United States
Constitution or the laws of the United States." *Waddleton*, 2018 WL 4292175, at *3 (quoting *Irving
v. Thigpen*, 732 F.2d 1215, 1216 (5th Cir. 1984) (per curiam)).

is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002).

Section 1983 does not specifically articulate every action and remedy that may be brought and recovered under it. "Although Congress clearly envisioned § 1983 to serve as a remedy for wrongful killings that result[] from the proscribed conduct, the statute itself does not provide a mechanism to implement such a remedy." *Nagle v. Gusman*, No. CV 12-1910, 2016 WL 9411378, at *3 (E.D. La. Mar. 1, 2016) (quoting *Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1502 (10th Cir. 1990) (citations omitted)). When a claim under § 1983 requires further guidance than the section contains to be adjudicated, 42 U.S.C. § 1988 provides authorization for federal courts to follow a three-step process to borrow an appropriate rule from the forum state court. *Roberts v. Bodison*, No. 2:14-CV-00750-MGL-MGB, 2015 WL 13215670, at *2 (D.S.C. Nov. 20, 2015), *report and recommendation adopted*, No. CV 2:14-00750-MGL, 2015 WL 9581756 (D.S.C. Dec. 30, 2015) (citing *Burnett v. Grattan*, 468 U.S. 42, 47 (1984)). Courts must undertake the following three-step inquiry under § 1988:

> First, courts are to look to the laws of the United States 'so far as such laws are suitable to carry [the civil and criminal civil rights statutes] into effect.' If no suitable federal rule exists, courts undertake the second step by considering application of state 'common law, as modified and changed by the constitution and statutes' of the forum State. A third step asserts the predominance of the federal interest: courts are to apply state law only if it is not 'inconsistent with the Constitution and laws of the United States.'

*Burnett*, 468 U.S. at 47–48 (internal citations omitted).

## C.    42 U.S.C. § 1988

### Step 1

As courts have noted, § 1983 does not address the "survival" of civil rights claims—that is, who is the proper plaintiff when a civil rights violation results in death, and what is the appropriate measure of damages to remedy that violation? *See, e.g.*, *Nagle*, 2016 WL 9411378, at *3; *see also Bell v. City of Milwaukee*, 746 F.2d 1205, 1232 (7th Cir. 1984), *overruled in part*, *Russ v. Watts*, 414 F.3d 783 (7th Cir. 2015); *see also Robertson v. Wegmann*, 436 U.S. 584, 589 (1978) (stating one specific area not covered by federal law is that relating to "the survival of civil rights actions under § 1983 upon the death of either the plaintiff or defendant"). Under these circumstances, a court must look to 42 U.S.C. § 1988. *See Bell*, 746 F.2d at 1234 (invoking § 1988 "where the civil rights laws are deficient"); *Brazier v. Cherry*, 293 F.2d 401, 408 (5th Cir. 1961) (applying state law, per §1988, to overcome a gap in the federal regime). In such situations, state law regarding such claims dictates survivability.  *Roberts*, 2015 WL 13215670, at *2.

### Step 2

As noted above, § 1988 instructs the Court to use state "common law," or "the decisional law of the forum state," to fill the remedial gap, so long as state law "is not inconsistent with the Constitution and laws of the United States." 42 U.S.C. § 1988; *see also Slade v. City of Marshall*, 814 F.3d 263, 266 (5th Cir. Feb. 10, 2016) ("Section 1988 requires [courts to] apply state law to a section 1983 action where federal law is deficient, unless that state law conflicts with other federal law and policies."). The Court must determine the applicability of "the common law, as modified

and changed by the constitution and statutes of the [forum] State." *Roberts*, 2015 WL 13215670, at *2 (quoting 42 U.S.C. § 1988(a)).

The Original Complaint asserts not only "wrongful death claims," but also survival claims under Arkansas law. *See* Docket Entry # 1 at 27-29, ¶¶ 82, 84 & 86. Because § 1983 does not address who is the proper plaintiff when a civil rights violation results in death, nor what the appropriate measure of damages is to remedy that violation, the Court must apply Arkansas state law, pursuant to § 1988, to overcome any gap in the federal regime. *Nagle*, 2016 WL 9411378, at *3 (citations omitted). In Arkansas, there are two causes of action that arise when a person's death is caused by the negligence of another: (1) a cause of action for the estate under the survival statute, Ark. Code Ann. § 16–62–101, and (2) a cause of action for the statutory beneficiaries under the wrongful death statute, Ark. Code Ann. § 16–62–102. *Miller v. Centerpoint Energy Res. Corp.,* 98 Ark.App. 102, 250 S.W.3d 574 (2007).

Under Arkansas Code Annotated § 16–62–101, only the personal representative can file a survival action. Pursuant to Arkansas Code Annotated section 16–62–102(b), every wrongful death action "shall be brought by and in the name of the personal representative of the deceased person. If there is no personal representative, then the action shall be brought by the heirs at law of the deceased person." Ark. Code Ann. § 16–62–102(b).

A wrongful death claim benefits designated beneficiaries and compensates them for pecuniary injuries and mental anguish caused by the decedent's death. *First Commercial Bank, N.A., Little Rock, Ark. v. United States*, 727 F. Supp. 1300, 1302 (W.D. Ark. 1990); *see also Day v. United States*, No. 4:14-CV-00342-KGB, 2016 WL 3251572, at *1 (E.D. Ark. June 10, 2016), *judgment entered*, No. 4:14-CV-00342-KGB, 2016 WL 3251575 (E.D. Ark. June 10, 2016), *and*

*aff'd*, 865 F.3d 1082 (8th Cir. 2017).[35] A survival claim is simply a claim by the injured party that would have ended upon his death at common law. *See Myers v. McAdams,* 366 Ark. 435, 236 S.W.3d 504 (2006). The Arkansas survival statute permits Mr. Sabbie's estate to recover all "pre-death" damages that would have been available to him if he had survived, including damages for his mental and physical pain and suffering. *See, e.g.*, *Durham v. Marberry*, 356 Ark. 481, 486-87, 156 S.W.3d 242 (2004) (and cases cited therein). Arkansas law provides that in addition to other elements of damages, "a decedent's estate may recover for the decedent's loss of life as an independent element of damages." Ark. Code Ann. § 16-62-101(b).

In *Durham*, the Arkansas Supreme Court construed the statute to allow for damages that a decedent would have placed on her own life. 356 Ark. at 492. An estate seeking loss of life damages must present some evidence that the decedent valued her life from which a jury could infer that value and on which it could base an award of damages. *One Nat'l Bank v. Pope*, 372 Ark. 208, 214, 272 S.W.3d 98, 102 (2008); *see also Hannibal v. TRW Vehicle Safety Sys., Inc.*, No. 4:16CV00904 JLH, 2018 WL 3797500, at *2-*3 (E.D. Ark. Aug. 9, 2018) (denying summary judgment on the estate's claim for the deceased's conscious pain and suffering, citing circumstantial evidence supporting the claim).

---

[35] In *Day*, the court relied on prior federal district court decisions in the Eastern and Western Districts that hold that damages recoverable by beneficiaries under the wrongful death act are not inconsistent with the Arkansas Medical Malpractice Act. 2016 WL 3251572, at *2 (citing *McMullin v. United States*, 515 F.Supp.2d 914 (E.D. Ark. 2007); *Meredith v. Buchman*, 101 F.Supp.2d 764 (E.D. Ark. 2000); *Foncannon v. Phico Insurance Co.*, 104 F.Supp.2d 1091 (W.D. Ark. 2000)).

*Step 3*

Having determined the appropriate Arkansas law to apply to Plaintiffs' § 1983 claims, the Court now must undertake the third step in the three-part inquiry required by § 1988. *Roberts*, 2018 WL 13215670, at *3. The Court must determine if the application of Arkansas law would be "inconsistent with the Constitution and laws of the United States." *Id.* (quoting *Burnett*, 468 U.S. at 47 (1984)). Courts in numerous jurisdictions have applied the forum state's wrongful death statute to § 1983 claims. *Roberts*, 2015 WL 13215670, at *3 (citing cases).

The Fifth Circuit has held § 1988 incorporates state law wrongful death statutes under § 1983. *Rodgers v. City of Lancaster Police*, No. 3:13-CV-2031-M-BH, 2017 WL 457084, at *8 (N.D. Tex. Jan. 6, 2017), *report and recommendation adopted*, No. 3:13-CV-2031-M, 2017 WL 447216 (N.D. Tex. Feb. 2, 2017), *motion for relief from judgment denied*, No. 3:13-CV-2031-M, 2017 WL 3592410 (N.D. Tex. Aug. 21, 2017), *and aff'd sub nom. Rodgers v. Lancaster Police & Fire Dep't*, 713 Fed. Appx. 323 (5th Cir. 2018) (citation omitted). In *Brazier v. Cherry,* 293 F.2d 401 (5th Cir.1961), the Fifth Circuit held § 1988 incorporated Georgia's wrongful death statute, thereby conferring federal question jurisdiction over a widow's claims that officers had killed her husband. *Id*. at 402, 407-09.

Then, in *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992), relied upon by the LaSalle Defendants in their motion for summary judgment to argue there is no recognized cause of action for the loss of a relationship under Arkansas law for the surviving family pursuant to § 1983, the Fifth Circuit applied Texas law and allowed a prisoner's mother to sue the county and its sheriff for failing to provide reasonable medical care in violation of § 1983. *Id*. at 388. The Fifth Circuit held the Texas wrongful death law provided Rhyne with the right to recover for her son's wrongful

death and she could recover for injury to herself caused by her son's death. *Id.* at 391 ("There is no dispute that Rhyne is within the class of people entitled to recover under Texas law for the wrongful death of a child").

In survival actions as well, "42 U.S.C. § 1988(a) requires the application of state-law survival remedies in [Section] 1983 actions unless those remedies are inconsistent with the Constitution and laws of the United States." *Jefferson v. City of Tarrant, Ala.*, 522 U.S. 75, 79 (1997). "Statutes allowing the survival of actions were intended to modify the traditional rule that an injured party's claim was extinguished upon the death of either party." *Parkerson v. Carrouth*, 782 F.2d 1449, 1451 (8th Cir. 1986) (citing *Robertson,* 436 U.S. at 588-90).

In awarding damages for a plaintiff's § 1983 civil rights claim, the Fifth Circuit directs courts to include the damages accompanying both a state's survival action and its wrongful death action. *Nagle*, 2016 WL 9411378, at *4 (holding Louisiana's remedial scheme is not "inconsistent with § 1983 for its failure to award "loss-of-life damages") (citing *Brazier*, 293 F.2d at 409; *Rhyne*, 973 F.2d at 390). According to the Fifth Circuit, to fully effectuate "the policy of the Civil Rights Statutes . . . *regard has to be taken of both classes of victims*." *Nagle*, 2016 WL 9411378, at *4 (quoting *Brazier*, 293 F.2d at 409 (emphasis added)). Considering both actions together "assures that there will be a 'remedy'—a way by which [a person's civil rights] will be vindicated—if there is a violation of [them]." *Id.*

To determine whether state law is "inconsistent" with federal law under § 1988, courts look not only to the "particular federal statutes and constitutional provisions, but also [to] the policies expressed in them." *Slade*, 814 F.3d at 266 (quoting *Robertson*, 436 U.S. at 590). If the court

63

determines that the law of the forum state is inconsistent with federal law, then the court must "disregard" state law and fashion the appropriate federal common law remedy.[36]

The Court concludes the purposes of the Arkansas statutes are consistent with the goals of § 1983. *Compare St. Paul Mercury Ins. Co. v. Circuit Court of Craighead Cty., W. Div.*, 348 Ark. 197, 206, 73 S.W.3d 584, 589 (2002) (citing *Chatelain v. Kelley,* 322 Ark. 517, 910 S.W.2d 215 (1995) (stating the Arkansas wrongful death statute is "a remedial statute that should be interpreted liberally with a view toward accomplishing its purposes"), *with Berry v. City of Muskogee,* 900 F.2d 1489, 1503 (10th Cir.1990) (concluding Congress intended § 1983 to provide a "significant remedy for wrongful killings," to provide compensation to victims, and to "provide special deterrence for civil rights violations"). The Court will apply Arkansas' wrongful death and survival statutes under § 1988 to Plaintiffs' § 1983 claims to fill any remedial gaps. The Court now sets forth the applicable federal law that governs Plaintiffs' claims of alleged constitutional deprivations.

---

[36] For example, in *Jaco v. Bloechle*, 739 F.2d 239 (6th Cir. 1984), the Sixth Circuit Court of Appeals analyzed Ohio's wrongful death statute. The Ohio wrongful death statute provided a cause of action only to the victim's heirs, but the statute provided no remedy for the personal injury suffered by the victim himself. *Id.* at 242. "Because the statutory remedies provided *'no recovery at all'* for the victim of a § 1983 violation, the Ohio statute was irreconcilable with § 1988." *Warren v. Shilling*, No. 2:12-CV-13, 2015 WL 1726787, at *4 (W.D. Mich. Apr. 15, 2015) (quoting *Frontier Ins. Co. v. Blaty,* 454 F.3d 590, 603 (6th Cir. 2006) (emphasis in original) (citing *Jaco,* 739 F.2d at 243 (citing 42 U.S.C. § 1988; *Robertson,* 436 U.S. at 590))). Thus, the Sixth Circuit found Ohio's wrongful death statute, which provided a remedy *only* for survivors, was not sufficient for purposes of § 1983 and § 1988. *Warren*, 2015 WL 1726787, at *4 (citing *Blaty,* 454 F.3d at 602) (emphasis in original).

**D.      Constitutional rights of a pretrial detainee**

**1.      Governed by the Fourteenth Amendment**

"The constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).   A pretrial detainee's claim of unconstitutional conditions are governed by the Fourteenth Amendment, rather than the Eighth Amendment, because a pretrial detainee has not been convicted of a crime, and is incapable of being punished cruelly or unusually.[37] *Johnson v. City of Shreveport*, No. CV 17-0900, 2018 WL 3824380, at *5 (W.D. La. Aug. 10, 2018) (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2nd Cir. 2017)).

**2.      Supreme Court caselaw**

The United States Supreme Court has not specifically addressed the standard for pretrial detainees' medical inattention claims, but it has addressed the medical inattention claims of convicted prisoners. *See Dyer v. Fyall*, 322 F.Supp.3d 725, 736 (N.D. Tex. 2018).   The Supreme Court recently considered a pretrial detainee's § 1983 claims against several jail officers, wherein the detainee alleged the officers used excessive force against him in violation of the Fourteenth Amendment's Due Process Clause.   *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015).   A review of both lines of cases is instructive in determining and applying the standards applicable in this case raising a pretrial detainee's medical inattention and excessive force claims.

---

[37] The Eighth Amendment's prohibition against "cruel and unusual punishment" protects the rights of convicted prisoners; the rights of pre-trial detainees are protected by the "due process clause" of the Fourteenth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (citations omitted).

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held a prison official's "deliberate indifference" to an inmate's serious medical needs violates the Eighth Amendment's probation against cruel and unusual punishment. *Id.* at 104. The Court explained the rationale behind "the government's obligation to provide medical care" for incarcerated citizens:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. . . . The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common law view that 'it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.'

*Id.* at 103-04. Other than to distinguish it from mere medical negligence, the *Estelle* decision did not define the term deliberate indifference.

In *Farmer v. Brennan*, the Supreme Court elaborated on the term, noting courts of appeals had adopted inconsistent tests for deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The Court in *Farmer* noted the Eighth Amendment places restraints on prison officials who may not use excessive force against prisoners. 811 U.S. at 832. The Eighth Amendment also imposes duties on the officials, "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

According to the Court, a prison official violates the Eighth Amendment only when the alleged deprivation is "sufficiently serious" and the prison official has a "sufficiently culpable state of mind." *Farmer*, 811 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 302-303 (1991); *Hudson v. McMillian*, 503 U.S. 1, at 5, 8 (1992)). In prison conditions cases, the state of mind is

one of "deliberate indifference" to inmate health or safety. *Farmer*, 811 U.S. at 834 (citations omitted). Noting the parties in *Farmer* agreed the "deliberate indifference" standard should apply, the Court then considered the proper test for deliberate indifference, on which the parties disagreed. *Id.*

According to the Court, "[w]hile *Estelle* establishes that deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. The Court noted that in cases where officials stand accused of using excessive physical force, an Eighth Amendment claimant must show the officials applied force "maliciously and sadistically for the very purpose of causing harm," or as the Court had also put it, that officials used force with "a knowing willingness that [harm] occur."[38] *Id.* at 835-36 (quoting *Hudson v. McMillian*, 503 U.S. at 6-7). The Court instructed that this standard of "purposeful or knowing conduct" is not necessary "to satisfy the *mens rea* requirement of deliberate indifference for claims challenging conditions of confinement." *Farmer*, 811 U.S. at 836.

Noting deliberate indifference sits "somewhere between the poles of negligence at one end and purpose or knowledge at the other," *id.*, the Court reasoned deliberate indifference was akin to recklessness. *Dyer*, 322 F.Supp.3d at 736 (citing *Farmer*, 511 U.S. at 836). According to the Court, "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836.

---

[38] *But see* the Court's discussion below, *infra* at 68-69, on *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015).

The Court stated being the equivalent of reckless disregard did not "fully answer the question about the level of culpability deliberate indifference entails, for the term recklessness is not self-defining." *Id.* The Court recognized that "recklessness" has multiple definitions; the civil-law definition is an objective standard because it captures actors who should have known of a risk, and the criminal-law definition is a subjective standard because it captures only actors who are actually aware of a risk. *Dyer*, 322 F.Supp.3d at 736-37 (citing *Farmer*, 511 U.S. at 836-37).

In *Farmer,* the Supreme Court held that in order for a prison official to be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. at 837. According to the Court*,* "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," and "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* The question is whether the defendant "exposed a prisoner to a sufficiently substantial risk of serious damage to his future health[.]" *Id.* at 843 (internal quotations and citation omitted).

As noted above, in *Kingsley*, the Supreme Court considered a pretrial detainee's § 1983 claims against several jail officers, wherein the detainee alleged the officers used excessive force against him in violation of the Fourteenth Amendment's Due Process Clause. 135 S. Ct. at 2470. The question before the Court was whether, to prove an excessive force claim, a pretrial detainee

must show "the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." *Id.* (emphasis in original). The question considered by the Court was this: "In deciding whether the force deliberately used is, constitutionally speaking, 'excessive,'" should courts use an objective standard only, or instead a subjective standard that takes into account a defendant's state of mind?" *Id.* at 2472. With respect to this question, the Court held courts must use an objective standard. *Id.* at 2472-73.

The Court distinguished *Hudson v. McMillian*, relied upon by the respondents and mentioned in *Farmer*, stating the *Hudson* case concerned excessive force claims brought by convicted prisoners under the Eighth Amendment's Cruel and Unusual Punishment Clause, "not claims brought by pretrial detainees under the Fourteenth Amendment's Due Process Clause." *Id.* at 2474 (citing *Hudson*, 503 U.S. at 6–7). According to the Court, the "language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Id.* at 2475 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671–672, n. 40 (1977)). The Court stated *Hudson* was relevant only insofar as it addressed the practical importance of taking into account the legitimate safety-related concerns of those who run jails. *Kingsley*, 135 S.Ct. at 2475.

The Court now considers the relevant Fifth Circuit law.

### 3.     Fifth Circuit caselaw

The Fifth Circuit "has recognized that there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care." *Thomas v. Mills*, 614 Fed. Appx. 777, 778 (5th Cir. 2015) (quoting *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001)). "'[P]retrial detainees have a constitutional right, under the Due Process Clause of the

Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining officials,' *Thompson v. Upshur Cnty.,* 245 F.3d 447, 457 (5th Cir.2001), and the deliberate indifference standard articulated by the Supreme Court in *Farmer v. Brennan,* 511 U.S. 825, 837–40, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), applies to pretrial detainees and convicted prisoners alike, *see Hare v. City of Corinth, Miss.,* 74 F.3d 633, 643 (5th Cir.1996)." *Thomas*, 614 Fed. Appx. at 778 (noting a detainee can challenge the denial of medical care under a conditions of confinement theory).

In the Fifth Circuit, pretrial detainee Fourteenth Amendment claims may be analyzed two different ways, depending on the allegations. *See Fuentes v. Gomez*, No. 2:16-CV-390, 2018 WL 322161, at *5 (S.D. Tex. Jan. 8, 2018) (citation omitted); *see also Garza*, 2017 WL 6498392, at *7. This distinction was developed by the en banc court in *Hare,* 74 F.3d at 644–45. *See Nerren v. Livingston Police Dept.,* 86 F.3d 469, 473 n. 25 (5th Cir.1996) (describing *Hare* as "a single opinion that clearly and concisely articulates and unifies our court's case law in this area"). In this circuit, post-*Hare,* "[c]onstitutional challenges by pretrial detainees may be brought under two alternative theories: as an attack on a 'condition of confinement' or as an 'episodic act or omission.'" *Estate of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 462 (5th Cir. 2015) (quoting *Shepherd v. Dallas Cnty.,* 591 F.3d 445, 452 (5th Cir.2009) (citing *Hare*, 74 F.3d at 644–45)).

A condition of confinement case is a constitutional attack on "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644. A condition is usually the manifestation of an explicit policy or restriction: the number of bunks per cell, mail privileges, disciplinary segregation, etc. *Shepherd*, 591 F.3d at 452 (citing *Scott v. Moore,* 114 F.3d 51, 53 n. 2 (5th Cir.1997) (en banc) (listing cases deemed to state challenges to conditions of confinement));

*see also Wilson v. Seiter*, 501 U.S. 294, 303 (1991) ("Indeed the medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates."). In some cases, however, a condition may reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice." *Shepherd*, 591 F.3d at 452 (quoting *Hare*, 74 F.3d at 645).

For example, in *Shepherd v. Dallas County,* a former pretrial detainee sued Dallas County after he suffered a stroke in the Dallas County Jail allegedly as a result of not receiving proper medication and medical attention. 591 F.3d at 449. In his complaint, the plaintiff alleged the "jail's evaluation, monitoring, and treatment of inmates with chronic illness was, at the time of [the plaintiff's] stroke, grossly inadequate due to poor or non-existent procedures and understaffing of guards and medical personnel, and these deficiencies caused his injury." *Id.* at 453. On appeal, the defendant unsuccessfully argued the plaintiff – who was challenging conditions of confinement – must prove intent, specifically, deliberate indifference. *Id*. at 454. The Fifth Circuit affirmed the jury's verdict in favor of the plaintiff, holding the plaintiff properly presented a successful conditions of confinement claim. *Id.* The court emphasized the plaintiff's claim did "not implicate the acts or omissions of individuals but the jail's system of providing medical care to inmates with chronic illness." *Id.* The court stressed that the plaintiff "relied on evidence showing that the inadequate treatment he received in a series of interactions with the jail's medical system inevitably led to his suffering a stroke." *Id.* The court noted, however, that because "no single individual's error actually caused [the plaintiff's] hypertensive decline into a stroke," the district court was correct in granting

71

summary judgment to the defendant on the plaintiff's episodic acts or omissions claim. *Id.* at 453 n. 2.

When a plaintiff is challenging a condition of confinement, the Fifth Circuit applies the test established by the Supreme Court in *Bell v. Wolfish,* and asks whether the condition is "reasonably related to a legitimate governmental objective." *Estate of Henson*, 795 F.3d at 463 (citing *Hare,* 74 F.3d at 646; *Bell v. Wolfish,* 441 U.S. 520, 539 (1979)). "[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Estate of Henson*, 795 F.3d at 463 (quoting *Bell*, 441 U.S. at 539). Because "[a] State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction," the plaintiff need not demonstrate that the state actor or municipal entity acted with intent to punish.[39]  *Estate of Henson*, 795 F.3d at 463 (quoting *Hare,* 74 F.3d at 644). "[A] true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation." *Estate of Henson*, 795 F.3d at 463 (quoting *Hare,* 74 F.3d at 644–45).

An episodic acts or omissions claim, by contrast, "faults specific jail officials for their acts or omissions." *Shepherd*, 591 F.3d at 452; *see also Scott*, 114 F.3d at 53 ("[W]here the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly

---

[39] In *Sanchez v. Young Cty., Texas*, 866 F.3d 274, 279 n.3 (5th Cir. 2017), *cert. denied sub nom. Sanchez v. Young Cty., Tex.*, 139 S. Ct. 126, 202 L. Ed. 2d 198 (2018), the Fifth Circuit explained the "unconstitutional conditions" theory rests on the idea the governmental entity has imposed what amounts to punishment in advance of trial on pretrial detainees, and it requires no showing of specific intent on the part of the governmental entity.  866 F.3d at 279.

as an 'episodic act or omission' case. . . .").  In such a case, an actor is "interposed between the

detainee and the municipality, such that the detainee complains first of a particular act of, or

omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of

the municipality that permitted or caused the act or omission." *Estate of Henson*, 795 F.3d at 463

(quoting *Scott*, 114 F.3d at 53). The relevant question becomes "whether that official breached his

constitutional duty to tend to the basic human needs of persons in his charge," and intentionality is

no longer presumed. *Estate of Henson*, 795 F.3d at 463-64 (quoting *Hare,* 74 F.3d at 645). A jail

official violates a pretrial detainee's constitutional right to be secure in his basic human needs only

when the official had "subjective knowledge of a substantial risk of serious harm" to the detainee

and responded to that risk with deliberate indifference. *Estate of Henson*, 795 F.3d at 464 (quoting

*Hare,* 74 F.3d at 650). "In other words, the state official must know of and disregard an excessive

risk to inmate health or safety." *Estate of Henson*, 795 F.3d at 464. "[T]he official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,

and he must also draw the inference." *Id.* (Internal quotations and citations omitted).

Examples of episodic acts or omissions cases are *Flores v. Cnty. of Hardeman, Tex.,* 124

F.3d 736, 738 (5th Cir.1997) (applying *Hare* and classifying claim arising out of inmate's suicide

as an episodic acts or omissions claim, despite allegations regarding jail's training and staffing

policies); *Olabisiomotosho,* 185 F.3d at 526 (characterizing plaintiff's complaint as "turn[ing] on

[two detention officers'] alleged failure to take better care of [the plaintiff,] and [a third officer's]

failure to medically screen her" for asthma and explaining this complaint "fits the definition of the

episodic omission"). "Significantly, there is no rule barring a plaintiff from pleading both alternative

theories, and a court may properly evaluate each separately." *Estate of Henson*, 795 F.3d at 464 (citing *Shepherd,* 591 F.3d at 452 n. 1).

In summary, an objective test of deliberate indifference applies to conditions of confinement claims challenging a municipality's policies or customs, not acts or omissions of individual defendants. *Doe v. Robertson*, 751 F.3d 383, 392 n. 11 (5th Cir. 2014) (citing *Farmer*, 511 U.S. at 840-42; *Hare*, 74 F.3d at 649 n.4). In an episodic act or omission case, the Fifth Circuit employs different standards depending on whether the liability of the individual defendant or the municipal defendant is at issue. *Olabisiomotosho*, 185 F.3d at 526 (citing *Hare,* 74 F.3d at 649 n. 14). For the individual defendant, the plaintiff "must establish that the official(s) acted with subjective deliberate indifference to prove a violation of [her] constitutional rights." *Olabisiomotosho*, 185 F.3d at 526 (citation omitted). Subjective deliberate indifference means "the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id.* (citing *Hare,* 74 F.3d at 650). To succeed in holding a municipality liable, the plaintiff must demonstrate a municipal employee's subjective indifference and additionally that the municipal employee's act "resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights." *Olabisiomotosho*, 185 F.3d at 526 (citing *Hare*, 74 F.3d at 649 n. 14).

## V. LASALLE DEFENDANTS' MOTION

### A.    The issues

There are seven issues raised in the LaSalle Defendants' motion: (1) whether Plaintiffs' claims against Individual Defendants regarding inadequate medical care should be dismissed because there is insufficient evidence the Individual Defendants actually drew an inference of a substantial

risk of serious harm and subjectively intended any harm to Mr. Sabbie;[40] (2) whether the supervisory
defendants can be subject to individual vicarious liability for certain acts of their subordinates; (3)
whether Plaintiffs' claims for excessive force for Lt. Johnson's use of OC spray should be dismissed
because the use of force was constitutionally applied; (4) whether Plaintiffs' inadequate medical care
and excessive force claims against Defendants should be dismissed because Plaintiffs cannot
establish the actions or inactions of Defendants caused Mr. Sabbie's death; (5) whether Plaintiffs'
claims against LaSalle for the alleged constitutional deprivations should be dismissed; (6) whether
Plaintiffs' Arkansas state law claims should be dismissed because no defendant owed a duty under
Arkansas common law to provide medical care; and (7) whether Plaintiffs can bring a claim for loss
of relationship under the Arkansas statutes.

Neither party disputes, and both parties seem to assume, the present case *at least* arises from
episodic acts or omissions by the Individual Defendants. The LaSalle Defendants' primary argument
on this front is there is insufficient evidence to prove any of the individual defendants acted with
subjective and deliberate indifference to Mr. Sabbie's serious medical needs. *See Garza*, 2017 WL
6498392, at *8. Thus, they argue Plaintiffs' claims against the Individual Defendants based on
inadequate medical care under the United States Constitution and the Arkansas Constitution should
be dismissed.

Without discussing whether Plaintiffs' allegations can also properly be categorized as a
conditions of confinement action, which amounts to a constitutional attack on the general conditions,

---

[40] Two separate, but related, issues raised by the LaSalle Defendants are whether Officer
Nash's limited cell checks during the night shift of July 21, 2015 and the officers' post-use of force
check of Mr. Sabbie around 6:00 p.m. can be bases for liability regarding Plaintiffs' inadequate
medical care claims. *See* Docket Entry # 88 at 26-34.

practices, rules, or restrictions of confinement, the parties instead focus on what the appropriate standard for deliberate indifference should be in the context of Plaintiffs' claims against the Individual Defendants. According to the LaSalle Defendants, deliberate indifference in the context of an episodic failure to provide reasonable medical care to a pretrial detainee requires that the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; the official actually drew that inference; and the official's response indicates the official subjectively intended the harm to occur.  Docket Entry # 88 at 8 (citing *Thompson v. Upshur County*, 245 F.3d 447 (5th Cir. 2001) and *Alderson*, 848 F.3d at 419).  Significantly, the LaSalle Defendants argue the subjective deliberate indifference standard requires intent to harm by the Individual Defendants.  According to the LaSalle Defendants, Plaintiffs' experts were each asked whether the conduct of Individual Defendants indicated they subjectively intended the harm occur, and each expert responded no such subjective intent was indicated.  *See* Docket Entry # 88 at 9-11.

In their response, before addressing the appropriate standard, Plaintiffs characterize their claims as encompassing both "inadequate medical care and inhumane conditions of confinement," invoking language applicable to conditions of confinement claims. *See* Docket Entry # 106 at 37; *see also id.* at 56 (arguing with respect to LaSalle that it is liable when the "harm-causing actions or omissions of [] employees resulted from the actual or *de facto* policies or customs of the entity employing them."). Plaintiffs then disagree with the LaSalle Defendants' argument that the Fifth Circuit requires proof of intent to cause harm to establish deliberate indifference, asserting the United States Supreme Court expressly held in *Farmer* subjective intent to cause harm is not required.  *See* Docket Entry # 106 at 39-41, 48. In their surreply, Plaintiffs state they agree they must prove the Individual Defendants were aware of a substantial risk of serious harm but argue they can

establish this actual awareness with circumstantial evidence showing the risk was obvious.  *See*

Docket Entry # 109 at 2, n. 2 (citing *Farmer*, 511 U.S. at 842).

**B.    Whether Plaintiffs' claims could also properly be characterized as a condition of confinement claim against LaSalle**

Before considering whether Plaintiffs' claims against the Individual Defendants should be

dismissed because of insufficient evidence of subjective intent to harm, as urged by the LaSalle

Defendants in their first issue, the Court must first consider whether Plaintiffs' allegations could also

be properly characterized as a condition of confinement claim against LaSalle. *See Rodriguez*, 2018

WL 4431433, at *3 (citing *Olabisiomotosho*, 185 F.3d at 526) (stating courts considering

"constitutional challenges by pretrial detainees must begin by deciding whether to classify the

challenge as an attack on a condition of confinement or an episodic act or omission").  As noted

above, the appropriate standard to apply in analyzing constitutional challenges brought by pretrial

detainees depends on whether the alleged unconstitutional conduct is a condition of confinement or

episodic act or omission. *Westfall v. Luna*, 903 F.3d 534, 551 (5th Cir. 2018). An episodic acts or

omissions claim requires a finding that a particular person acted or failed to act with subjective

deliberate indifference to the detainee's needs. *Id*. at * 4.

According to the court in *Garza*, the Fifth Circuit has not permitted plaintiffs to "conflate

claims concerning a prison official's act or omission with a condition-of-confinement complaint."

2017 WL 6498392, at * 16 (citing *Anderson v. Dallas County, Texas*, 286 Fed. Appx. 850, 858 (5th

Cir. 2008)).  However, the Court's research has found there are rare situations where a plaintiff's

allegations can support both a condition of confinement claim and an episodic acts or omissions

claim. *See Montano v. Orange County, Texas*, No.1:13-cv-00611, 2015 WL 11110596, at * 3 (April

77

13, 2015 E.D. Tex.), *aff'd in part, vacated in part, remanded by Monato v. Orange County*, 842 F.3d 865 (5th Cir. 2016).

In *Montano*, a pretrial detainee suspected of being intoxicated died of acute renal failure after being detained in an observation cell for over four days where he consumed little, if any, food or water, his vital signs were checked once at most, he was never seen by a physician, and emergency care was requested by the jail staff only minutes before his death. *Montano*, 842 F.3d at 869. The district court in *Montano* stated the case "presented a rare situation where Plaintiffs' allegations supported both a condition of confinement claim and an episodic acts or omissions claim." 2015 WL 11110596, at *3. The court therefore submitted both types of claims to the jury.[41]

The court in *Rodriguez* construed the plaintiff's complaint as attempting to assert both claims, but without properly differentiating between the two types of claims. *Rodriguez v. Bexar Cty.*, No. SA-18-CV-248-XR, 2018 WL 4431433, at *6 (W.D. Tex. Sept. 17, 2018). Citing the *Estate of Henson* and *Montano* cases, the court first noted as follows:

> Although failure-to-provide-medical-care claims are generally brought as episodic-acts-or-omissions claims, a plaintiff may assert a conditions-of-confinement claim based on injuries suffered as a result of not receiving proper medical attention if the

---

[41] Addressing post-verdict the defendant's motion for judgment as a matter of law, the trial court, "in an extremely detailed and comprehensive opinion, ruled plaintiffs presented sufficient evidence to support the verdict on both the unconstitutional-condition-of-confinement claim and survival damages, but insufficient evidence to support the verdict on the episodic-acts claim and wrongful-death damages." *Montano*, 842 F.3d at 872. The ruling against the episodic acts finding was not at issue on appeal. *Id.*

On appeal, the Fifth Circuit affirmed the jury's verdict and clarified that when there is "striking uniformity" in jail employees' testimony "further evidence [is] not required for a reasonable juror to infer a de facto policy for conditions or practices." *Id.* at 876. The Fifth Circuit stated "[j]urors heard consistent testimony that a given protocol was followed for every similarly-situated detainee." *Id.*

plaintiff does not implicate the acts or omissions of individuals but rather the jail's system of providing medical care to inmates.[42]

*Id.* at *5 (citations omitted). "In such cases, the plaintiff establishes a *de facto* policy through evidence such as commissioned reports and consistent employee testimony." *Id.* The *Rodriguez* court then noted there is no rule barring a plaintiff from pleading conditions of confinement claims and episodic acts or omissions claims as alternative theories, and a court may properly evaluate each separately. *Id.* (citing *Estate of Henson*, 795 F.3d at 464) (construing the plaintiffs' allegations before the district court against a doctor as attacking episodic acts or omissions rather than conditions of confinement, but noting the plaintiffs claimed in the district court they had pleaded both an episodic acts and omissions case and a conditions case against the county).[43]

In *Rodriguez*, the plaintiff titled his counts as conditions of confinement claims and asserted he was subjected to an unconstitutional condition of confinement. *Id.* However, the plaintiff also asserted claims against all defendants "for their actions and omissions under color of law by

---

[42] Normally, "episodic acts liability falls not on the [c]ounty as employer, but on the individual employees for their particular acts." *Id.* (citing *Sanchez v. Young Cty., Tex.*, 866 F.3d 274, 279 (5th Cir. 2017)). "However, a government entity may incur § 1983 liability for episodic acts and omissions injurious to a pretrial detainee if the plaintiff first proves that [c]ounty officials or employees, acting with subjective deliberate indifference, violated his constitutional rights and then establishes that the [c]ounty employee's acts resulted from a municipal policy or custom adopted with objective indifference to the detainee's constitutional rights." *Rodriguez*, 2018 WL 4431433, at *4 (citing *Sanchez*, 866 F.3d at 280). The county acts with objective deliberate indifference if it promulgates a custom or policy despite the known or obvious consequences that a constitutional violation would result. The county's policy that derives from custom or practice must be "so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)).

[43] On appeal, the plaintiffs disclaimed any theory of liability against Wichita County based on episodic acts or omissions of individual officials, explicitly stating during oral argument it was not an episodic acts or omissions case. *See Estate of Henson*, 795 F.3d at 467 n. 4.

unlawfully withholding medical services and acting with deliberate indifference to the medical needs of Plaintiff in violation of his individual rights," also invoking the language of episodic acts or omissions claims. *Id.* The plaintiff alleged the defendants failed to implement and/or practice certain policies to provide adequate medical services and implemented de facto policies which actually interfered with or prevented the plaintiff from receiving medical services and medication and the conditions complained of were not reasonably related to any legitimate governmental objective. *Id.* The plaintiff then purported to set forth the elements of a cause of action against a governmental entity for "the imposition of an unconstitutional condition of confinement," but actually listed the elements for governmental liability in an episodic acts or omissions case. *Id.*

Although the complaint did not properly differentiate between the two types of claims, as noted above, the court in *Rodriguez* construed the complaint as attempting to assert both claims and then analyzed the claims under Rule 12(b)(6). *Id.* at *6. As to the individual defendants, the *Rodriguez* court construed the complaint as asserting episodic acts or omissions claims because there was no allegation any individual defendant implemented a policy. *Id.* As against the county, the court construed the complaint as asserting liability for both episodic acts and omissions and for unconstitutional conditions of confinement. *Id.*

Similarly here, as to the Individual Defendants, the Court construes the Original Complaint as asserting episodic acts or omissions claims because there is no allegation any individual defendant implemented a policy. As against the Corporate Defendants, the Court construes the Original Complaint as asserting liability for both episodic acts and omissions and for unconstitutional conditions of confinement.

Plaintiffs allege the conditions in which Mr. Sabbie was confined were "inhumane in the extreme, beyond all bounds of human decency, and in violation of his rights under the Fourteenth Amendment to the United States Constitution and Arkansas law." Docket Entry # 1, ¶ 65. Plaintiffs allege the Corporate Defendants had a pattern, practice, or custom of (1) unconstitutional conduct toward inmates and detainees with serious medical needs, including denying prescription medication and failing to secure medical care for such individuals; (2) failing to properly monitor inmates and detainees with serious medical needs, including failing to conduct thirty-minute checks;[44] (3) using excessive force on inmates and detainees, including the excessive and unconstitutional use of pepper spray on such individuals; and (4) failing to adequately train their personnel on recognizing and responding to serious medical needs of inmates and detainees, including the permissible use of pepper spray and the proper manner of decontaminating individuals who have been subjected to pepper spray. *Id*., ¶¶ 71-75. Plaintiffs allege the "failure to secure needed medical care for Mr. Sabbie was motivated by constitutionally impermissible profit-driven reasons." *Id.*, ¶ 72. According to Plaintiffs, the "Corporate Defendants had a policy, practice, and custom of budgeting and spending inadequate amounts on jail medical care to make higher profits on the contract," and it was foreseeable "the insufficient jail medical budgeting and spending would cause harm to detainees in need of medical care." *Id.*

---

[44] Plaintiffs allege the Texas Commission on Jail Standards "cited the Bi-State Jail for failing to comply with these mandated-checks shortly after the death of Michael Sabbie and, again, approximately one year later." Docket Entry # 1, ¶ 73. According to Plaintiffs' Original Complaint, other "LaSalle-run facilities have also been written up for similar non-compliance," and "corrections officers in other LaSalle-run jails in Texas have engaged in a pattern of falsifying documents indicating they conducted such checks when they did not." *Id.*

Having parsed out any claim for unconstitutional conditions of confinement against the Corporate Defendants, which the Court will address in more detail below, the Court now considers whether Plaintiffs' episodic acts or omissions claims against the Individual Defendants should be dismissed because of insufficient evidence of subjective intent to harm.

## C.  Whether Plaintiffs' claims against the Individual Defendants should be dismissed because of insufficient evidence of subjective intent to harm

### 1.  Plaintiffs' allegations

In addition to the Corporate Defendants and Municipal Defendants, Plaintiffs have sued two LaSalle nurses and nine LaSalle officers in their individual capacities for deliberate indifference to Mr. Sabbie's medical needs in violation of the Fourteenth Amendment of the United States Constitution and of the Arkansas Constitution.  Plaintiffs allege from "the beginning of his pretrial detention on July 19, 2015 until his unnecessary death on July 22, 2015, Mr. Sabbie's well-established federal constitutional (and state law) rights were continuously and repeatedly violated by the defendants named herein—resulting in three days of mental and physical agony, culminating in his death, and giving rise to this action under 42 U.S.C. § 1983 and the laws of the State of Arkansas."  Docket Entry # 1, ¶ 65.

Specifically, Plaintiffs allege the individual medical provider defendants, LVN Venable and LVN Flint, acted in violation of the applicable standards of medical care and with deliberate indifference to Mr. Sabbie's serious medical needs.[45]  *Id.*, ¶ 66.  According to Plaintiffs, all the

---

[45] The Supreme Court has held that a private physician working under contract with the state government to provide medical services for inmates at a state-prison acts "under color of state law" for purposes of § 1983 and may be sued under that statute.  *See West v. Atkins*, 487 U.S. 42, 54 (1988); *see also id.* at 56 (further noting that "[c]ontracting out prison medical care does not relieve the [government] of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive [government] prisoners of the means to vindicate their

individual correctional defendants (Jones, Johnson, Brown, Derrick, Hopkins, Boozer, Palmer, Lomax, and Nash) acted in violation of the applicable standards of correctional care and with deliberate indifference to Mr. Sabbie's serious medical needs. *Id.*; *see also id.*, ¶ 85. Plaintiffs allege the acts and omissions committed by each of the individual defendants were committed with intent, malice, and/or with reckless disregard for Mr. Sabbie's federal constitutional rights. *Id.* at ¶ 69. According to Plaintiffs, the Individual Defendants either (a) intentionally pursued a course of conduct for the purpose of causing injury, or (b) knew or should have known that their conduct would naturally and probably result in injury or damage and, nevertheless, continued the conduct with malice or in reckless disregard of the consequences. *Id.*

## 2.    Applicable standard

Having set forth the general law above, the Court now discusses the specific law applicable to Plaintiffs' episodic acts or omissions claims against the Individual Defendants. "A pretrial detainee's right to medical care is violated if an officer acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries." *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011) (internal quotations and citations omitted). A serious medical need is one for which treatment has been recommended or the need is so apparent that even a lay person would recognize that care is required. *Gobert v. Caldwell,* 463 F.3d 339, 345 (5th Cir. 2006); *Gilbert v. French,* 665 F. Supp.2d 743, 757 (S.D. Tex. 2009). The seriousness of Mr. Sabbie's medical need is not in dispute. *Salcido as Next Friend of K.L. v. Harris Cty., Texas*, No. CV H-15-2155, 2018 WL 6618407, at *9 (S.D. Tex. Dec. 18, 2018) ("That an inability to breathe is a serious medical need of which all reasonable officers would be aware is not subject to debate."). The only question is

_____

[constitutional] rights.").

whether there is a genuine issue of material fact the Individual Defendants acted with "deliberate indifference" to those needs.

The Court agrees with the court in *Dyer v. Fyall*, 322 F. Supp. 725 (N.D. Tex. 2018) "the correct standard is the *Farmer* subjective recklessness standard without the intent-to-cause harm requirement." *Id.* at 738; *see also Rodriguez*, 2018 WL 4431433, at * 6 (stating the plaintiff "must allege facts demonstrating subjective deliberate indifference, meaning that [the defendant] knew of and disregarded a substantial risk of serious harm"). In recent cases, the Fifth Circuit has neither imposed an "intent-to-cause harm" requirement nor mentioned one. *See, e.g.*, *Perniciaro v. Lea*, 901 F.3d 241, 257 (5th Cir. 2018); *M.D. v. Abbott*, 907 F.3d 237, 251-52 (5th Cir. 2018); *Williams v. Hampton*, 797 F.3d 276, 280-81 (5th Cir. 2015) (en banc). As noted by Plaintiffs, the Fifth Circuit's Model Jury Instructions do not impose the need to prove "intent to harm." *See* Fifth Circuit Pattern Jury Instructions Civil 10.11 (2016).

According to the Supreme Court, the requisite state of mind in deliberate indifference cases is a "question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *See Farmer*, 511 U.S. at 842. In cases involving inadequate medical care, the Fifth Circuit has listed several additional ways of establishing deliberate indifference: "A plaintiff can show deliberate indifference by showing that [1] [a defendant] 'refused to treat him, [2] ignored his complaints, [3] intentionally treated him incorrectly, or [4] engaged in any similar conduct that would clearly evidence a wanton disregard for any serious medical needs.'" *Alderson*, 848 F.3d at 422 (quoting *Easter v. Powell,* 467 F.3d 459, 464 (5th Cir. 2006)); *see also Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). In defense, prison

84

officials may show they did not know of the indications of substantial danger and, therefore, were unaware of the danger, or they knew the indications, but believed the risk involved was "insubstantial or nonexistent," or they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844-45.

### 3.    Analysis

The LaSalle Defendants' argument regarding the inadequate medical care claims against the Individual Defendants centers around their position, which the Court has rejected above, that the subjective deliberate indifference standard requires subjective intent to harm. According to the LaSalle Defendants, Plaintiffs' experts were each asked whether the conduct of the Individual Defendants indicated they subjectively intended the harm to occur, and each expert responded no such subjective intent was indicated. *See* Docket Entry # 88 at 9-11; *see also* Roscoe Dep. at 109:14-110:11 (agreeing she did not see anything that suggested Nurse Flint or Nurse Venable had a subjective intent that harm occur); Peerwani Dep. at 94:19-95:15 (stating he did not think the defendants intended to kill Mr. Sabbie); Sanders Dep. at 153:2-22 (stating he never intended to draw a conclusion as to the defendants' subjective intent); Cummins Dep. at 75:9-24 (agreeing he did not say any of the defendants had a subjective intent to harm Mr. Sabbie) & 86:8-24 (stating Nurse Venable had a "reckless disregard and indifference" to Mr. Sabbie's welfare but clarifying he was not saying she was trying to harm him). This is Defendants' only argument. They do not attempt to address the sufficiency of Plaintiffs' evidence, either globally or individually. As stated by Plaintiffs, "[n]either the medical defendants nor the security defendants have put forth a single innocent explanation for their abject failure to secure medical care for Mr. Sabbie or for their inhumane treatment of him." Docket Entry # 106 at 42.

Regardless of whether the standard requires subjective intent to harm, refusing to treat a detainee's complaints can give rise to § 1983 liability. *Galvan v. Calhoun* Cty., 719 Fed. Appx. 372, 375 (5th Cir. 2018) (allegation of refusal of treatment for several days despite complaints of severe pain would entitle the plaintiff to relief if proven). A four-hour delay in treatment has been considered a sufficient claim of deliberate indifference. *Easter v. Powell*, 467 F.3d 459, 461–65 (5th Cir. 2006). In *Easter*, the Fifth Circuit held the plaintiff stated a claim of deliberate indifference where he alleged the prison nurse refused to treat him even though she knew he was experiencing severe chest pain, he had a diagnosed heart condition, and he lacked access to the medication prescribed to treat it. *Id.* at 463–65. Similarly, the court has found an inmate's claim of deliberate indifference sufficient where he alleged that after an ineffective jaw surgery, he repeatedly complained of intense pain and made multiple urgent requests for medical treatment that were ignored. *Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999). "Delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference that *results in substantial harm*." *Westfall*, 903 F.3d at 551 (citations omitted) (emphasis in original). The pain suffered during the delay itself, however, can constitute a substantial harm and form the basis for an award of damages. *Id.* (citing *Alderson*, 848 F.3d at 422).

### *Whether there is sufficient evidence the nursing defendants were deliberately indifferent to Mr. Sabbie's serious medical needs*

As noted above, subjective deliberate indifference cannot be inferred from a negligent, or even a grossly negligent, response to a substantial risk of serious harm. *See, e.g.*, *Thompson*, 245 F.3d at 459. However, refusing to "treat" a prisoner, "ignoring his complaints," "intentionally treat[ing] him incorrectly, or engag[ing] in any similar conduct that would clearly evince a wanton

86

disregard for any serious medical needs" can trigger such liability. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). Defendants Flint and Venable are both licensed vocational nurses.[46] According to Plaintiffs, it is significant these medical defendants, who are LVNs with a limited scope of practice, were the gatekeepers who controlled Mr. Sabbie's access to medical professionals who could diagnose and treat him. Docket Entry # 106 at 43. Plaintiffs assert courts in this circuit have not hesitated to find deliberate indifference in cases involving nurses who disregarded their gatekeeping role. *Id*. at 43-44.

For example, in *Rodrigue v. Grayson*, 557 Fed. Appx. 341 (5th Cir. 2014), the Fifth Circuit upheld the district court's finding that a licensed practical nurse's failure to refer an inmate to the prison's medical doctor despite persistent complaints of extreme abdominal pain and bilious vomiting for over a week constituted deliberate indifference. *Id*. at 343. The district court explained its finding that the LPN was not entitled to qualified immunity as follows:

> [I]t is important to specify that the question is not whether [the LPN] is liable for failing to recognize that Rodrigue had acute appendicitis. As previously discussed, a LPN is not authorized to make a diagnosis. However, a LPN, and especially a LPN who is the sole gatekeeper for access to a physician, must be able to know when there is a risk of a serious condition that requires additional care. LPN Grayson knew that Rodrigue's complaints showed that he was at risk of serious harm. She simply decided not to respond to that risk. This is not a case where an inmate saw a physician and that physician made an unfortunately incorrect medical decision. . . . In this case, despite persistent complaints of extreme abdominal pain and bilious vomiting for over a week, a prisoner was simply denied access to a medical professional competent to diagnose and treat his condition. The Court is convinced that this conduct rose to the level of a wanton disregard for Rodrigue's serious medical needs. . . . When a gatekeeper to emergency care, like LPN Grayson, knowingly disregards a prisoner's complaints, she acts with deliberate indifference to that prison's medical needs.

---

[46] "An LVN, the Texas equivalent of a licensed practical nurse, receives nine months' training in a certificate program, and provides basic medical monitoring under the supervision of physicians or registered nurses." *Montano*, 842 F.3d at 870.

*Rodrigue v. Morehouse Det. Ctr*., No. CIV.A. 09-985, 2012 WL 4483438, at *6 (W.D. La. Sept. 28, 2012), *aff'd sub nom. Rodrigue v. Grayson*, 557 Fed. Appx. 341 (5th Cir. 2014).  The court further noted the LPN ignored the persistency, duration, and severity of Rodrigue's complaints and also failed to perform a physical exam until the day he was sent to the hospital.  *Id*. at *7.

The *Rodrigue* court found the facts distinguishable from those in *Domino v. Texas Dep't of Criminal Justice,* 239 F.3d 752 (5th Cir.2001), wherein the Fifth Circuit held a prison doctor who did not intervene before a prisoner who had threatened to commit suicide killed himself did not act with deliberate indifference. *Rodrique*, 2012 WL 4483438, at *9 (citing *Domino*, 239 F.3d at 753–54).  Noting that "suicide is inherently difficult to predict, particularly in the depressing prison setting," the Fifth Circuit in *Domino* held the medical decision of the physician not to treat the prisoner did not rise to the level of deliberate indifference.  *Rodrique*, 2012 WL 4483438, at *9 (quoting *Domino*, 239 F.3d at 756). According to the *Rodrigue* court,

> *Domino* falls squarely within the ambit of an unfortunately incorrect medical decision. The prisoner there had been treated for all of his complaints until he chose to discontinue the treatment. When he made his final complaint, he was referred by a prison psychologist to a prison psychiatrist for further evaluation. In the instant case, the continuous and intense nature of Rodrigue's complaints of vomiting and abdominal pain were simply ignored by LPN Grayson. Unlike the prisoner in *Domino,* Rodrigue was not given the opportunity for a qualified physician to attempt to diagnose his condition. Furthermore, the inherent unpredictability of suicide is not present in the instant case. Here, there is an inmate who complained for six days straight of the same extreme physical pain rather than a number of suicide threats strung out over a number of months.

*Rodrique*, 2012 WL 4483438, at *9.

Here, Mr. Sabbie repeatedly presented to the nurses with alarming symptoms. Yet, there is evidence they consistently failed to take his vitals, document his visits, follow the governing protocols, or even look at his patient chart. The nurses both knew Mr. Sabbie was an insulin-

88

dependent diabetic with a documented history of hypertension and high blood pressure at intake, but they neither checked his blood sugar nor his blood pressure.

When Mr. Sabbie told Nurse Flint he was "unable to breathe while lying down," she advised him to "sit up." When he later told Nurse Venable he was "coughing up blood," she dismissed him because the blood was "too bright," without even checking the inside of his mouth. When Mr. Sabbie returned to Nurse Venable that afternoon taking 50-60 breaths a minute, she spent less than a minute with him and then put her purported notes in the "shredder or trash."

The Court finds there is sufficient evidence for a jury to find Nurse Flint and Nurse Venable, the gatekeepers to medical professionals competent to diagnose and treat Mr. Sabbie's condition, knowingly disregarded Mr. Sabbie's complaints, thus acting with deliberate indifference to his serious medical needs.

### *Whether there is sufficient evidence the security defendants (Brown, Derrick, Boozer, Palmer, Lomax, Nash, Johnson, Jones, and Hopkins) were deliberately indifferent to Mr. Sabbie's serious medical needs*

If "a prisoner allege[s] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" by, for example, showing that "prison guards . . . intentionally den[ied] or delay[ed] access to medical care," he has stated a cognizable claim under § 1983. *Hacker v. Cain*, No. CV 3:14-00063-JWD-EWD, 2016 WL 3167176, at *9 (M.D. La. June 6, 2016). Evidence that "prison officials provided no treatment despite their own medical staff's diagnosis or professional judgment may be sufficient, depending on the nature and strength of the evidence." *Id*. Here, the evidence shows that at various times during his confinement, the security officers knew Mr. Sabbie faced obvious health risks.

According to Plaintiffs, although the security defendants appropriately played their gatekeeping role at times,[47] they failed miserably at others. For example, the evidence shows Mr. Sabbie could barely stand in the shower; he stated repeatedly he could not breathe; he then lost consciousness and fell to the ground. As he lay on the shower floor, Defendants Boozer, Brown, Lomax, and Johnson stood there. Defendant Johnson then stated Mr. Sabbie had "sit [sic] down."[48] None of the officers asked Nurse Venable, who was in the adjoining room, to assess Mr. Sabbie. Instead, they "simply lifted his limp body by his handcuffed arms," which "put enormous strain on his shoulders," Sanders Report at 13, and then dragged him toward his cell.

Defendant Jones, the jail's captain, who was standing right outside the shower, witnessed everything. He heard Mr. Sabbie repeatedly state he could not breathe before he collapsed. Even though he was standing beside Nurse Venable and did not know whether she saw Mr. Sabbie collapse to the ground, he did not tell her about it. He indicated he did not summon medical care because of the "games inmates play." There is sufficient evidence that Defendants Boozer, Brown, Lomax, Johnson, and Jones knowingly disregarded Mr. Sabbie's complaints, thus acting with deliberate indifference to his serious medical needs.

Deliberate indifference of Defendants Jones, Johnson, Boozer, Brown, and Lomax is further shown by their failure to call for a medical evaluation after Mr. Sabbie's handcuffed arms were

---

[47] Plaintiffs argue the security staff at LaSalle also played an important gatekeeping role during Mr. Sabbie's confinement—for they alone controlled his access to the LVN/LPNs. Docket Entry # 106 at 45. According to Plaintiff, in denying Mr. Sabbie access to the nursing staff at crucial times during his confinement, they are subject to liability. *Id.* (citing *Estelle*, 429 U.S. at 104-105).

[48] According to Plaintiffs, Defendant Johnson is also the one who, after being told Mr. Sabbie had fallen or collapsed on the way back to his cell following his 10:30 a.m. medical visit, directed corrections officers not to take him back to the nurse.

pulled over the top of his head to the front of his body. Defendant Derrick was also standing in the cell doorway when it happened. Yet, no one asked Nurse Venable (who was standing a few feet away) to evaluate Mr. Sabbie. Moreover, all of them knew Mr. Sabbie was being left in wet, pepper spray-contaminated clothing.

An hour-and-a-half later, Defendants Hopkins, Boozer, and Derrick entered Mr. Sabbie's cell and found him lying on his back on the concrete floor, still wearing the wet, contaminated clothing, with his pants down, genitals exposed, arms above his head, eyes barely open, and with white froth oozing from his nostrils. These defendants took photos and then left, further evidence of deliberate indifference. Thereafter, Defendant Derrick documented all his thirty-minute face-to-face checks but did not do one of them.

For this same reason, a jury could infer deliberate indifference on the part of Defendant Nash, who also indicated she did twenty-four visual checks when she did not do any. When she did see Mr. Sabbie during the four headcounts, it was clear he needed medical attention. Even though she thought he might not be breathing, she still did not call for medical aid.

In their motion, the LaSalle Defendants assert Defendant Nash's incomplete cell checks during the night shift of July 21, 2015 provide no basis for liability against Nash. Docket Entry # 88 at 26-27. The LaSalle Defendants similarly argue the post-use of force welfare check of Defendants Derrick, Hopkins, and Boozer, wherein they entered Mr. Sabbie's cell to take a photograph of Mr. Sabbie at 6:00 p.m., cannot provide a basis for their liability because there is insufficient evidence these officers subjectively intended any harm to Mr. Sabbie. *Id.* at 31-34 (citing Sanders Dep. at 153:2-22). The Court has rejected the argument that subjective intent to harm is required, and thus finds this first argument without merit.

Relying on Dr. Cummins' testimony that he thought Mr. Sabbie looked dead in the photo taken at 6:00 p.m. before Officer Nash's shift started, *see* Cummins' Dep. at 30:6-14, the LaSalle Defendants also argue Defendant Nash's failure to conduct any particular cell check and the three officers' failure to summon medical help at 6:00 p.m. when they took Mr. Sabbie's photo could not be causes of Mr. Sabbie's death. *See* Docket Entry # 88 at 28-29, 33. However, Defendant Nash herself testified she saw Mr. Sabbie breathing at 7:00 p.m. and 11:00 p.m. and that he was "groaning in pain" at 1:29 a.m. The Court further notes Plaintiffs have other experts. According to Dr. Peerwani, Mr. Sabbie had been dead for a "number of hours." Peerwani Report at 19. The Court will discuss causation as to all defendants in more detail below. For now, regarding these specific defendants, the Court finds the LaSalle Defendants' second argument regarding causation without merit.

Regarding Plaintiffs' Fourteenth Amendment episodic acts or omissions claims for inadequate medical care, there is sufficient evidence that each individual defendant knew Mr. Sabbie needed medical care and nonetheless disregarded his serious medical need. Viewing the evidence in the light most favorable to Plaintiffs, a jury could infer knowledge by Mr. Sabbie's evident need for prompt medical attention and the Individual Defendants' obviously inadequate responses to that need. The Court recommends this part of the LaSalle Defendants' motion for summary judgment be denied.

Plaintiffs' claims under the Arkansas Civil Rights Act are subject to the same analysis as the claims under § 1983. "The state standard for a plaintiff to prevail on a constitutional claim for failure to secure adequate medical care claim is the same as the federal standard; both require the plaintiff to show that corrections officers and/or jail medical providers acted with 'deliberate indifference'

to the 'serious medical needs' of the inmate." *Sabbie v. Sw. Corr., LLC*, No. 5:17CV113-RWS-CMC, 2017 WL 5907865, at *5 (E.D. Tex. Nov. 6, 2017), *report and recommendation adopted*, No. 5:17-CV-113-RWS-CMC, 2017 WL 5905270 (E.D. Tex. Nov. 30, 2017) (citing *Grayson v. Ross*, 369 Ark. 241, 249 (2007) ("Though this court is not called upon to answer the question of what standard applies for pretrial detainees under the Arkansas Civil Rights Act as part of the certified question, we adopt deliberate indifference as the proper standard.")). Thus, to the extent the LaSalle Defendants argue Plaintiffs' state law claims should be dismissed for insufficient evidence of subjective intent to harm, the Court recommends LaSalle Defendants' motion be denied.[49]

### D.    Plaintiffs' claims against supervisory defendants

In their motion, the LaSalle Defendants next assert the supervisory defendants, Captain Jones and Lt. Johnson, cannot be vicariously liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) for violations of the United States or Arkansas Constitutions.  Docket Entry # 88 at 34-39.  In *Monell*, the Supreme Court rejected governmental liability based on the doctrine of *respondeat superior* under § 1983.  *See also Perniciaro v. Lea*, 901 F.3d 241, 259 (5th Cir. 2018) ("Of course, there is no vicarious or *respondeat superior* liability under § 1983.").  Supervisory liability attaches only when: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Id.* (citation omitted).

---

[49] The Court considers below the separate issue raised in the LaSalle Defendants' motion regarding whether Plaintiffs' claims for medical malpractice under Arkansas law should be dismissed because of a lack of duty owed by any defendant.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Hicks-Fields v. Harris Cty., Texas*, 860 F.3d 803, 811 (5th Cir.), *cert. denied sub nom. Hicks-Fields v. Harris Cty., Tex.*, 138 S. Ct. 510, 199 L. Ed. 2d 387 (2017) Deliberate indifference requires factual allegations in the complaint that "demonstrate a pattern of violations and the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003). "[F]or a supervisor to be liable for failure to train, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) (quotation omitted).

To hold any of these defendants liable as supervisory officials under § 1983, Plaintiffs must show they participated in the acts that caused constitutional deprivation or that they implemented unconstitutional policies causally related to Mr. Sabbie's injuries. *Alderson*, 848 F.3d at 421. The Fifth Circuit recognizes a plaintiff may plead participation in acts that caused constitutional deprivation and implementation of unconstitutional policies in the alternative. *Id.*

Here, Plaintiffs allege the supervisory defendants, including Defendants Jones and Johnson, had a duty to oversee their subordinates and ensure compliance with correctional standards of care, and they breached those duties. Docket Entry # 1, ¶ 68. According to Plaintiffs' Original Complaint, Defendants Jones and Johnson "either actively participated in the unconstitutional conduct described in th[e] complaint or they acquiesced in the constitutionally offensive conduct by personally directing it, tacitly authorizing it, or otherwise failing to train or supervise their subordinates—thereby giving rise to individual supervisory liability for the constitutional

94

deprivations alleged [therein]." *Id.; see also id.* at ¶ 85 ("Individual liability under 42 U.S.C. § 1983 also extends to the supervisory defendants identified herein, including Defendants Jones and Johnson, for their failure to oversee their subordinates and ensure compliance with correctional standards of care as described in this complaint.").

The LaSalle Defendants focus their argument on the challenges raised in their *Daubert* motion seeking to exclude all opinions and conclusions of Plaintiffs' corrections practices expert, Kenny Sanders. Although Captain Sanders opines Defendants had a pattern or practice of lack of training or supervision and of violating the civil rights of inmates, the LaSalle Defendants argue he has no basis for these conclusions because he does not identify a single standard and he performed no statistical analysis. Docket Entry # 88 at 36-37 (citing Sanders Dep. at 119:20-120:2; 138:9-12; 139:2-16; 146:2-6, 14-21; 147:18-23). On February 12, 2019, the undersigned denied Defendants' *Daubert* motion, finding Sanders' testimony is reliable and would be helpful to the jury. *See* Docket Entry # 110 at 11.

According to Captain Sanders, his review of the information supplied revealed a pattern and a practice of supervisors failing to supervise, failing to intervene, and failing to override the decisions made by subordinate supervisors. Sanders Report at 19, ¶ 3. Captain Sanders opines supervisors had allowed the "culture, pattern, and practices" at LaSalle "to not be those reflected in the [Use of Force] policy." *Id.* at 19, ¶ 5. Captain Sanders' review of the Use of Force Reports revealed supervisors would sign reports, "where those same reports documented that staff failed to take appropriate actions prior to the use of force on an inmate." *Id.* at 19, ¶ 6.

Captain Sanders further opines there was a pattern and practice of failing to share information, even when working in the direct presence of a security co-worker or supervisor and

even when the information shared could save the life of an inmate.  *Id.* at 20, ¶ 10.  According to Captain Sanders, the "nearly 14 hours that Mr. Sabbie remained in his segregation cell without proper monitoring was the result of deliberate indifference, poor training, insufficient staffing, and a complete systemic breakdown."  *Id.*

Importantly, Plaintiffs have also alleged and produced evidence that Captain Jones and Lt. Johnson, as well as Sgt. Hopkins, were personally involved in conduct that caused constitutional deprivation. According to Plaintiffs, Defendants Johnson, Jones, and Hopkins' personal supervisory liability is in addition to their direct participatory conduct, and they are individually liable regardless of whether they are also subject to supervisory liability.  Docket Entry # 106 at 51 n. 36.

As noted above, Captain Jones, the senior commanding officer, was present for nearly every event that occurred. He knew Mr. Sabbie had been coughing up blood, and he knew Mr. Sabbie had been having trouble breathing.  He knew his subordinate was about to spray Mr. Sabbie. According to Plaintiffs, he was the only one with the rank to order his subordinate to hold off, and he could have told his officers to take the pressure of Mr. Sabbie's back and/or consulted with Nurse Venable (who was standing right there) on whether OC spray was contraindicated, which is what LaSalle's Use of Force policy requires. Later, when Mr. Sabbie collapsed in the shower, Captain Jones could have told Nurse Venable (who was standing right next to him) to assess Mr. Sabbie, but he did not intervene as his subordinates picked up Mr. Sabbie by his arms and dragged him to his cell. When his subordinates shut the door to Mr. Sabbie's cell, he knew Mr. Sabbie was still wearing wet, contaminated clothing and had just had his cuffed arms pulled over his head to his front. Again, as the commander at the scene, he could have ordered that Mr. Sabbie be taken to the medical office.

96

When Mr. Sabbie collapsed following his 10:30 a.m. visit, Officer Boozer found his supervisor, Lt. Johnson, and asked if they should take Mr. Sabbie back to medical for further evaluation. Without seeing Mr. Sabbie, Lt. Johnson directed Officer Boozer to take Mr. Sabbie to a cell instead. When Mr. Sabbie later collapsed in the shower , Lt. Johnson ordered his subordinates to pick him up and take him to his cell. Although his three subordinates disagreed with the order, they followed it. And when Lt. Johnson ordered his subordinates to close the cell door and leave, he knew Mr. Sabbie was still wearing wet, contaminated clothing and had just had his arms pulled over the top of his head. His subordinates thought Mr. Sabbie required a medical evaluation, but testified it was not "their call to make."

When Sgt. Hopkins went into Mr. Sabbie's cell with his subordinates, Mr. Sabbie was lying on the floor of his cell; his pants were pulled down; his arms were above his head, flat on the floor and bent at the elbows; his eyes were half-open; he had a white substance emanating from his nostrils; he was not breathing heavily, and other than that, not moving at all; and he was still wearing contaminated clothing.  The officers took photos but did not call for medical help.  When asked why they did not call medical, Officers Boozer and Derrick said it was Sgt. Hopkin's call to make—not theirs.

Subsequently, when Officers Derrick and Nash noted in their log books they had performed checks that were not done, they were doing as Sgt. Hopkins ordered. In addition, Captain Sanders stated the Sergeant in charge of Zone 2, Sgt. Hopkins, gave an inadequate zone shift briefing and even told Officer Nash to leave Mr. Sabbie alone, knowing of his recent history and his need for enhanced observation.  Sanders Report at 18. Officer Nash further testified the Bi-State Jail was short staffed in 2015 so Sgt. Hopkins pulled her out of her training early to work the all-female Zone

3.  Nash Dep. at 22:16-23:8.  Sgt. Hopkins later put her in sole charge of Zone 2, even though she had not finished her training.

There is evidence sufficient to create a genuine issue of material fact that the supervisory officers participated in the acts or omissions that allegedly caused constitutional deprivations or implemented unconstitutional policies. The Court also finds sufficient evidence to create a fact issue of a causal connection between the supervisory officers' conduct and the actions/inactions of their subordinates, as well as a disregard of known risks.  The Court recommends this part of the LaSalle Defendants' motion be denied.

**E.    Plaintiffs' excessive force claims**

**1.    The LaSalle Defendants' assertions**

The LaSalle Defendants next assert Plaintiffs' claims that Defendants Johnson, Brown, Boozer, and Lomax used excessive force in violation of Mr. Sabbie's constitutional rights when they applied OC spray and failed to decontaminate Mr. Sabbie should be dismissed.[50]  According to the LaSalle Defendants, only Lt. Johnson applied the OC spray, and he did so in a constitutional manner. Docket Entry # 88 at 20-21 (citing, among other cases, *Wagner v. Bay City Texas*, 227 F.3d 316 (5th Cir. 2000) (use of chemical agent to restrain person resisting arrest not excessive force)). The LaSalle Defendants state Mr. Sabbie suffered the "normal effects of a chemical agent" (choking, shortness of breath, and burning in the eyes) which do not qualify as more than *de minimis* injury to support

---

[50]  In addition to Officer Brown's initial use of force, Plaintiffs allege Lt. Johnson's subsequent act of pepper spraying Mr. Sabbie was unreasonable and amounted to excessive use of force.  Docket Entry # 1, ¶ 66.  Plaintiffs further allege the failure of Defendants Johnson, Brown, Boozer, Palmer, Lomax – and also Jones and Venable – to properly decontaminate Mr. Sabbie from the pepper spray and leaving him in soaking wet, contaminated clothing was an additional violation of Mr. Sabbie's federal constitutional and state law rights.  *Id*. (emphasis added).

an excessive force claim.  Docket Entry # 88 at 22-23.  According to the LaSalle Defendants, if any other injuries were suffered by Mr. Sabbie, they were not reasonably foreseeable from the use of the OC spray.

## 2.    Plaintiffs' response

In their response, Plaintiffs first point out the LaSalle Defendants do not move for summary judgment on Plaintiffs' claims of excessive force against Officer Brown for his forceful takedown of Mr. Sabbie nor of Officers Lomax and Brown's act of pulling Mr. Sabbie's handcuffed arms from behind his back to the front of his body.  Docket Entry # 106 at 47.  Plaintiffs next assert the LaSalle Defendants cite the incorrect legal standard.  According to Plaintiffs, the Court should apply the objective test set forth by the Supreme Court in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), set forth in the general law section above.

## 3.    The legal standard

The standard previously used to determine whether a defendant used excessive force under the Fourteenth Amendment—which required the plaintiff to show the defendant applied the force "maliciously or sadistically" for the very purpose of causing harm—has been abrogated by *Kingsley*. *See Salcido as Next Friend of K.L. v. Harris Cty., Texas*, No. CV H-15-2155, 2018 WL 4690276, at *27 (S.D. Tex. Sept. 28, 2018) (stating *pre-Kingsley* courts followed the rule that "when a pretrial detainee is allegedly the victim of a detention officer's use of excessive force, as explained in *Valencia* [*v. Wiggins*, 981 F.2d 1440, 1446 (5th Cir. 1993)] . . . such a claim is subject to the same analysis as a convicted prisoner's claim for use of excessive force under the Eighth Amendment which involved a subjective test, i.e., whether the defendant used force maliciously and sadistically for the very purpose of causing harm, or in a good faith effort to maintain or restore discipline); *see*

99

*also Jacoby v. Keers*, No. CV 12-366-CG-C, 2017 WL 2973970, at *5 (S.D. Ala. July 12, 2017). In *Kingsley*, as noted above, the Supreme Court held that instead of the subjective test previously applied in actions brought for use of excessive force by both pretrial detainees and convicted criminals, in cases brought by pretrial detainees, the appropriate standard is solely an objective one. *Salcido*, 2018 WL 4690276, at *28; *see also Kingsley*, 135 S.Ct. at 2472-73.

Therefore, in order to prevail on their claims for use of excessive force, Plaintiffs only need to show the force purposely or knowingly used against Mr. Sabbie was objectively unreasonable. *Salcido*, 2018 WL 4690276, at *28 (citing *Kingsley*, 135 S.Ct. at 2473). Objective reasonableness turns on the "facts and circumstances of each particular case," and whether the force used against a detainee by government officers was reasonable must be determined from the perspective of a reasonable officer facing the same circumstances and taking into consideration only what the officers on the scene knew at the time force was used. *Kingsley*, 135 S. Ct. at 2473 (citing *Graham*, 490 U.S. at 396). A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 135 S. Ct. at 2473 (quoting *Bell*, 441 U.S. at 540, 547).

According to the Court in *Kingsley*, "[c]onsiderations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." 135

S.Ct. at 2473. Thus, a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose. *Id.* at 2473-74.

The Court distinguished *Hudson v. McMillian*, stating the *Hudson* case concerned excessive force claims brought by convicted prisoners under the Eighth Amendment's Cruel and Unusual Punishment Clause, "not claims brought by pretrial detainees under the Fourteenth Amendment's Due Process Clause." *Id*. at 2474 (citing *Hudson*, 503 U.S. at 6–7). According to the Court, the "language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Id.* at 2475 (quoting *Ingraham v. Wright*, 430 U.S. 651, 671–672, n. 40 (1977)). The Court stated *Hudson* was relevant only insofar as it addressed the practical importance of taking into account the legitimate safety-related concerns of those who run jails. *Kingsley*, 135 S.Ct. at 2475.

## 4.    Analysis

### *Relationship between the need for force and the amount of force used by Lt. Johnson*

Officers may consider a detainee's refusal to comply with instructions "in assessing whether physical force is needed to effectuate . . . compliance." *Westfall v. Luna*, 903 F.3d 534, 548 (5th Cir. 2018). "However, officers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Id*.

According to Plaintiffs, there was no legitimate need to spray Mr. Sabbie when he was suffering from respiratory distress, and it was objectively unreasonable for Lt. Johnson to do so. The LaSalle Defendants argue courts have held a short burst of pepper spray is not disproportionate to

101

the need to control an inmate who has failed to obey a jailer's orders or to maintain discipline. *See Baldwin v. Stalder*, 137 F.3d 836, 840-41 (5th Cir. 1998) (holding the district court erred in finding that a two second use of mace, including not allowing immediate washing, was not a good faith effort to maintain or restore discipline). The LaSalle Defendants assert Mr. Sabbie refused to return to his cell pod as instructed by Officer Brown and demanded a telephone call.

Even assuming there was a need to apply reasonable force to maintain order, the initial use of force by Officer Brown's takedown is not an issue raised in the LaSalle Defendants' motion. "However, the court's inquiry does not end with the initial use of force because any unreasonable use of force can be a constitutional violation, even if other uses of force in the same set of circumstances are not unreasonable." *Salcido*, 2018 WL 4690276, at *30 (citing *Morris v. Bria*, Civil Action No. 7:17-034-O-BP, 2018 WL 2436724, *7 (N.D. Tex. May 30, 2018) (citing *Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999), *decision clarified on reh'g*, 186 F.3d 633 (5th Cir. 1999) (finding that the first instance of the defendant choking the plaintiff was not a cognizable constitutional violation as it was pursuant to a lawful search, but the second choking was not))).

In the *Salcido* case, the plaintiffs alleged a pretrial detainee "died due to an excessive use of force exerted against him during a cell extraction and subsequent transfer to the jail clinic, when the officer defendants placed him face down on a gurney, held his shackled limbs behind his back in a hogtie position while an officer sat on top of him, and ignored his pleas for help and complaints that he could not breathe." *See Salcido as Next Friend of K.L. v. Harris Cty., Texas*, No. H-15-2155, 2018 WL 6618407, at *1 (S.D.Tex. Dec. 18, 2018).[51]

---

[51] The Court relies on two extensive orders entered in the *Salcido* case. In the first order dated September 28, 2018, the court denied Harris County's motion for summary judgment on the

In the September 28, 2018 order denying Harris County's motion for summary judgment on the plaintiff's § 1983 claims, the court considered the factors and held the relationship between the need for force and the amount of force used weighed against the reasonableness of the defendants' actions. *Salcido*, 2018 WL 4690276, at *28. In its discussion of this factor, the court stated as follows:

> Construing the facts and inferences in plaintiffs' favor, the court finds that the force used in the first stage of the incident – entering Lucas's cell, and bringing him to the ground to retrieve the broken smoke detector and place him in restraints – appears to have been reasonably proportionate to the need for force. However, taking plaintiffs' version of the facts as true, the force used in the second stage when Lucas lay handcuffed, shackled in leg irons, and face down on the gurney could have been disproportionate to the need for force because, according to plaintiffs, Lucas was not resisting. It was at this point that the DCCT defendants applied most of the injurious force: effectively hogtying Lucas, and putting pressure on his legs, back, and chest, which allegedly caused his inability to breathe. Because '[o]nce a prisoner has been subdued, using gratuitous force on him is unreasonable,' *Preston v. Hicks*, 721 F. App'x 342, 345 (5th Cir. 2018) (per curiam) (citing *Cowart v. Erwin*, 837 F.3d 444, 454 (5th Cir. 2016)), a jury could reasonably find that the force used at this second stage of the incident was unreasonable under the circumstances and, therefore, excessive. The court concludes that this factor weighs against the reasonableness of the DCCT defendants' actions.[52]

*Id.* at *31.

_____

plaintiff's § 1983 claims; granted the medical defendants' motion for summary judgment on all of the claims asserted against them; and with one exception as to one individual defendant's use of excessive force, granted the motions for summary judgment filed by the individual detention officer and deputy defendants as to the plaintiffs' § 1983 claims. *See Salcido*, 2018 WL 6618407 at *2. In the second order dated December 18, 2018, the court denied Harris County's amended motion for reconsideration, denied the defendants' motion to stay, and granted the plaintiffs' motion to certify the defendants' appeal as frivolous. *Id.* at *1.

[52] In its December 18, 2018 order, the *Salcido* court referred to a Sixth Circuit case that held it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." 2018 WL 6618407, at * 14 (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004), *cert. denied*, 125 S.Ct. 1837 (2005) (citing *Simpson v. Hines*, 900 F.2d 400, 403 (5th Cir. 1990)).

Similarly here, even though Lt. Johnson claims Mr. Sabbie was still resisting being placed in hand restraints once he was prone on the ground, a jury could reasonably find the force used at this second stage of the incident was unreasonable under the circumstances and, therefore, excessive. *See id.* According to Captain Sanders, a reasonable juror would conclude that Mr. Sabbie's right arm was being pinned to the ground by an officer, thereby preventing him from putting it behind his back. *See* Sanders Report at 8. The first factor, the relationship between the need for the use of force and the amount of force used, weighs against the LaSalle Defendants' argument that Lt. Johnson's use of OC spray was reasonable under the circumstances.

### *Severity of the security problem and threat reasonably perceived by Lt. Johnson*

The LaSalle Defendants argue the need for the second use of force was substantial because of the "threat" Lt. Johnson perceived when Mr. Sabbie refused multiple direct orders, attempted to leave the secured area of the facility, and "physically resisted" Officer Brown. Docket Entry # 88 at 23-24. According to the LaSalle Defendants, the force used by Lt. Johnson was minimal; he warned Mr. Sabbie to quit resisting and applied only a one second burst of OC spray (about one-half ounce). *Id.* at 24. Plaintiffs state the "fatal flaw in this assertion is that Defendant Johnson *was not present* when those imaginary events allegedly happened. When Lt. Johnson arrived at the scene, Mr. Sabbie was prone on the ground, underneath five officers, and repeatedly exclaiming: 'I can't breathe! I can't breathe!'" Docket Entry # 106 at 49 (emphasis in original).

The Court finds a reasonable jury could find Mr. Sabbie, who can be seen in the video stopped in the hallway in the "tripod position with his hands on his knees" (Cummins Report at 9) "the way people do when they're out of breath" (Brown Dep. at 49:12-22) and then prone on the ground under five officers saying he could not breathe, posed neither a security threat nor a

reasonably perceived threat to the defendants.  Thus, these factors weigh against the reasonableness of Lt. Johnson's use of OC spray.

### *Whether Mr. Sabbie was actively resisting*

There is a "well-developed body of case law in the Fifth Circuit specifically holding that the use of physical force against a restrained, passively resisting or non-resisting subject violates the constitution." *Salcido*, 2018 WL 6618407, at *13 (citations omitted). According to the Fifth Circuit, it has "previously suggested that a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest." *See Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir.), *cert. denied sub nom. City of Fort Worth, Tex. v. Darden*, 139 S. Ct. 69, 202 L. Ed. 2d 23 (2018); *see also id.* at 730 (acknowledging Darden allegedly told the officers he could not breathe and holding "the issue of whether reasonable officers in this situation would have credited the warnings from Darden . . . is a factual question that must be decided by a jury"); *see also Westfall*, 903 F.3d at 549 ("[T]aking the facts in the light most favorable to Westfall – that she was attempting to enter her house but not actively resisting the officers – a jury could reasonably find that the degree of force Luna used – slamming Westfall onto her brick porch – did not match the need); *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (holding that a reasonable officer could not have concluded that the plaintiff posed an immediate threat to the safety of the business, laying on the ground in handcuffs, or simply pulling his arm out of the officer's grasp); *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012) (plaintiff alleged he was tased in response to telling a joke; according to him, he was a passenger in a car pulled over for a minor traffic violation, did not attempt to flee or resist, and disobeyed no commands); *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008) (holding it was objectively unreasonable for an officer to slam an

arrestee's face into a nearby vehicle when the arrestee "was not resisting or attempting to flee"); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (holding a fact issue existed as to the objective reasonableness of the officers tackling the plaintiff to the ground where he had pulled back his arm and stepped back after an officer grabbed it, there was no reasonable suspicion to detain him, and he was not fleeing).

According to Captain Sanders, Lt. Johnson's use of the chemical agent was unnecessary, unjustified, and unreasonable. Sanders Report at 8. Captain Sanders states the video supports that Mr. Sabbie was at most passively resisting, but not "actively resisting." *Id.* According to Captain Sanders, Mr. Sabbie was prone on the ground with his extremities secured and his right arm and wrist remained grasped firmly; for active resistance to have occurred, Mr. Sabbie would have had to fight against the restraint, resist application of the restraint, or move an appendage from a secured position. *Id.* "Therefore, force was used on Mr. Sabbie, all while he was unable to move due to being held in place by the Defendants." *Id.*

By virtually all accounts, Mr. Sabbie was not being verbally threatening or physically assaulting. While prone on the ground, Mr. Sabbie did not say anything threatening. *See, e.g.*, Brown Dep. at 85:2-4; Lomax Dep. at 40:1-6. Mr. Sabbie did not hurt or try to hurt any officers. *See, e.g.*, Brown Dep. at 85:8-13; Lomax Dep. at 40:13-15. Officer Brown did not see anything to indicate Mr. Sabbie was trying to be physically aggressive toward anyone. Brown Dep. at 87:10-13. As can be heard on the handheld video, and as the defendant-officers heard at the time, Mr. Sabbie repeatedly stated, "I can't breathe," underneath the pile of officers. *See, e.g.*, Brown Dep. at 83:7-10, 84:18-23; Lomax Dep. at 33:12-15, 35:25-36:3.

106

Before spraying Mr. Sabbie, Lt. Johnson did not hear Mr. Sabbie make any threats or say anything threatening to the officers during that time. Johnson Dep. at 76:20-77:13.  Lt. Johnson was aware of Mr. Sabbie's respiratory distress before spraying him, but he did not consider asking Nurse Venable (who was standing there) "if pepper spraying Mr. Sabbie was contraindicated."[53]  *Id.* at 73:2-8; 73:15-18; 75:11-16. According to Lt. Johnson, the "whole goal [was] to get the inmate in handcuffs by whatever means, so [they could] get compliance with him and less risk to him or staff." *Id.* at 75:18-21. It did not matter to Lt. Johnson whether Mr. Sabbie's purported "resistance" was active or passive, *see* Johnson Dep. at 79:7-11, even though the jail's UOF policy authorizes the use of chemical agents only on inmates engaged in "active aggression" and provides for the use of "soft hands" when dealing with inmates engaged in "passive resistance." *See* Heipt Decl., Ex. L at 12 (chart 1); *see also* Sanders Report at 10.

If a jury finds Mr. Sabbie was not actively resisting after he had been thrown to the ground by Officer Brown, then a jury could likewise conclude Lt. Johnson used excessive force in spraying Mr. Sabbie with the OC spray, especially considering Lt. Johnson knew Mr. Sabbie was saying he could not breathe and the handheld video depicts Mr. Sabbie repeatedly saying he could not breathe while on the ground underneath five officers.

_____

[53]  According to the UOF policy, if time permits before authorizing the calculated UOF, the "ranking officer should seek information from others such as professional medical staff" and should consider, among other factors, medical/mental history, "especially medical conditions or diseases which may be adversely affected by chemical agents, pepper mace or other non-lethal weapons." *See* Heipt Decl., Ex. L at 5.  The level of force used in a confrontational situation is "directly related to the amount of inmate resistance."  *Id.* at 11.

### *Extent of the Mr. Sabbie's injury*

The jury could view the severity of Mr. Sabbie's injury as evidence of excessive force. *Westfall*, 903 F.3d at 549.  "In evaluating excessive force claims, courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur." *Id.* (quoting *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (quoting *Brown v. Lippard*, 472 F.3d 384, 386–87 (5th Cir. 2006))).

### *Efforts to temper or to limit the amount of force*

Finally, the Court considers "any efforts made to temper the severity of a forceful response." *Jacoby v. Mack*, No. 16-11871, 2018 WL 5876984, at *8 (11th Cir. Nov. 8, 2018) (noting that in *Danley v. Allen*, 540 F.3d 1298, 1308 (11th Cir.2008), *overruled on other grounds as recognized by Randall v. Scott,* 610 F.3d 701 (11th Cir.2010), "[t]his factor brings up the remainder of the jailers' conduct, which amounted to a continuation and aggravation of the initial force applied to [the plaintiff] after the need for force had ended").  In *Danley,* the plaintiff alleged he was pepper sprayed and then confined in a small, poorly ventilated cell for twenty minutes.  Although he was allowed to take a two-minute shower, the plaintiff alleged it was not long enough for him to effectively decontaminate himself, and he was then confined with a group of inmates in another poorly ventilated cell.  The Eleventh Circuit Court of Appeals made clear in *Danley* that "subjecting a prisoner to special confinement that causes him to suffer increased effects of environmental conditions . . . can constitute excessive force." *Id.* at 1308. According to the court, when "jailers continue to use substantial force against a prisoner who has clearly stopped resisting . . . that use of force is excessive. *Id*. at 1309 (citation omitted).

The Eleventh Circuit found the conduct in *Danley* to amount to an excessive use of force in violation of the Fourteenth Amendment despite the initial use of pepper spray being justified and despite all of the four proceeding factors weighing against finding a constitutional violation. *Jacoby*, 2018 WL 5876984, at *8 (citing *Danley*, 540 F.3d at 1304–05). According to the Eleventh Circuit in *Danley*, the court's consideration of the factor regarding the efforts made by the officer to temper or to limit the amount of force brought up "the remainder of the jailers' conduct [confining Danley in a small cell and not permitting him to do anything to decontaminate himself after he had calmed down], which [the court held] amounted to a continuation and aggravation of the initial force applied to Danley after the need for the force had ended." 540 F.3d at 1308.

In finding the guards' failure to decontaminate Danley violated his right to be free from excessive force, the court noted "[t]he use of force in the form of extended confinement in the small, poorly ventilated, pepper spray-filled cell, when there were other readily available alternatives, was excessive." *Id.* at 1309. Danley was not merely suing based on the immediate effects of pepper spray and had sufficiently alleged he suffered chemical conjunctivitis and bronchospasms due to the effects of prolonged exposure to pepper spray without adequate decontamination (e.g., the delay in allowing him a shower and the inadequate length of the shower).[54] *J W by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1261 (11th Cir. 2018) (citing *Danley*, 540 F.3d at 1310).

---

[54] According to the allegations in Danley's complaint, after being sprayed with pepper spray the plaintiff was pushed into a cell where the spray remained on him and his clothes. *Danley*, 540 F.3d at 1304. The guards initially made fun of his distress by, among other things, laughing at him and holding their hands to their necks in a mock-choking gesture and left him for twenty minutes before taking him to a shower where he was allowed to rinse off for less than two minutes. *Id.* "Within thirty minutes of being placed in the group cell, Danley's cellmates began complaining that their eyes were burning because of the residue left on him." *Id.*

The court concluded the officers were not entitled to qualified immunity for the Eighth Amendment deliberate indifference claim, stating "[t]his is a case in which general legal principles announced by our decisions in this area of law are enough to make the right violated clearly established. . . . Danley alleged both a serious medical need and the jailers' deliberate indifference to it." *J W*, 904 F.3d at 1261 (citing *Danley*, 540 F.3d at 1313).  According to the Eleventh Circuit, "*Danley* certainly holds that, under certain circumstances in a prison setting, an officer violates the Fourteenth Amendment if he does not timely and adequately decontaminate (or provide timely and adequate decontamination services to) a prisoner who is suffering from the prolonged effects of an incapacitating chemical spray."  *J W*, 904 F.3d at 1261.

Turning to the facts of this case, the Court's evaluation of this factor brings up the subsequent conduct of Defendants Johnson, Brown, Boozer, Palmer, Lomax, Jones, and Venable, which amounted to a continuation and aggravation of the initial force applied to Mr. Sabbie after the need for force had ended.

Plaintiffs assert the subsequent failures of these defendants to properly decontaminate Mr. Sabbie from the pepper spray (including leaving him in a cell in wet, contaminated clothing) constituted excessive force by itself. The LaSalle Defendants state they took "substantial steps to temper the use of OC (pepper) spray on [Mr.] Sabbie."  Docket Entry # 88 at 25. As urged by Plaintiffs, Defendants' arguments on this issue depend upon the Court resolving disputed material facts in their favor.

The "substantial steps" relied upon by the LaSalle Defendants were as follows: Mr. Sabbie was immediately taken to Nurse Venable who "examined and cleared him;" he was placed in a shower for decontamination; he was then taken to a cell and "allowed to continue decontamination;"

110

and he was provided with "clean clothes, soap and towels." *Id*. at 25-26. However, viewing the evidence in the light most favorable to Plaintiffs, the officers took Mr. Sabbie to an LVN for an evaluation that lasted less than one minute and that violated protocol; put him in the shower for 10-20 seconds until he collapsed; dragged him to a segregation cell; pulled his handcuffed arms over his head; did not summon medical help despite his repeated pleas of respiratory distress; locked him in a cell in which he was still wearing wet, OC-contaminated clothing; failed to provide him with soap and fresh clothes; and failed to conduct state-mandated checks on him.

### *Summary*

Mindful of the fact the Court is to view the facts in a light most favorable to Plaintiffs, and further considering the video recordings, the Court finds sufficient evidence Lt. Johnson's use of force was objectively unreasonable in the circumstances. The Court also finds sufficient evidence the other defendants' actions following Lt. Johnson's initial use of OC spray were objectively unreasonable in the circumstances.   Therefore, the Court recommends this part of the LaSalle Defendants' motion be denied.

## F.    Causation

### 1.    The LaSalle Defendant's assertions

The LaSalle Defendants next move for summary judgment for lack of causation.  The LaSalle Defendants point to the autopsy conducted by the Arkansas Crime Lab listing Mr. Sabbie's cause of death as "hypertensive arteriosclerotic coronary disease" and argue Plaintiffs have failed to produce any expert testimony establishing any of the actions or inactions of Defendants were the cause of Mr. Sabbie's death.  Docket Entry # 88 at 12-19.

***Deposition testimony of Dr. Peerwani***

Specifically, the LaSalle Defendants rely on testimony from Dr. Peerwani, wherein he identified the following potential factors that may have led to Mr. Sabbie's death. *See* Peerwani Dep. at 14:10-15:1 (stating Mr. Sabbie had an enlarged heart which usually is a "chronic process"); 38:6-19 (stating Mr. Sabbie suffered from congestive heart failure); 39:7-14 (agreeing Mr. Sabbie had "left-sided failure, both diastolic and systolic, and he had right-sided heart failure" for several months prior to his death); 45:4-10 (noting the "autopsy revealed severe heart disease with evidence of at least two prior episodes of heart muscle damage indicated by various ages of fibrosis"); 48:5-11 (stating he could not quantify the effect the OC spray had on Mr. Sabbie because it "all depends . . . on the person" and further stating he had seen elderly people that "succumbed and died and others did not, so everybody reacts differently"); 57:1-12 (stating agitated delirium to a person with underlying congestive heart failure, malignant hypertension, and diabetes could be extremely dangerous and even cause death); 57:13-58:10 (stating Mr. Sabbie had malignant hypertension or "sustained uncontrolled hypertension"); 58:11-59:12 (stating a person with malignant hypertension is at risk of a sudden cardiac event, "which may occur even without malignant hypertension with such an enlarged heart, a stroke or blindness" and further stating there could be a variety of triggers that cause the sudden cardiac death, including physical confrontation, use of OC, severe physical exertion, rage); 59:13-22 (stating synthetic weed can produce death even without underlying malignant hypertension); 60:25-61:19 (stating the most common cardiovascular effects of synthetic weed are increased heart rate and increased blood pressure, both of which would be "very dangerous to somebody in Mr. Sabbie's condition"); 72:8-12 (stating he did not recall seeing any indication Mr. Sabbie filled any of his hypertensive or diabetic drugs any later than March 12, 2015, when he

received a thirty-day supply); 73:15-25 (stating not taking medication for four months or spreading a thirty-day supply of medication over five months would be an issue of noncompliance and would not have helped Mr. Sabbie); 76:4-17 (stating chronic, uncontrolled diabetes may "very well have been his underlying cause of death" and further stating chronic uncontrolled hypertension could "very well" have played a significant role in Mr. Sabbie's death if "diabetes wasn't the underlying cause of death"); 77:1-25 (stating the lack of medication could "very well" have played a role in his death and that Mr. Sabbie's failure to follow his doctor's orders lead to progressively worsening diastolic and systolic heart failure and right-sided heart failure); 78:1-15 (although he did not know whether Mr. Sabbie was high on synthetic weed on July 19, 2015, he stated "heavy usage of synthetic weed" would worsen underlying problems with hypertension but not with diabetes); 79:16-19 (stating it is uncertain whether Mr. Sabbie died of diabetes, with hyperglycemia and ketoacidosis, or whether he died of a sudden cardiac event); and 88:13-89:8 (stating there was white frothy purge which was consistent with heart failure and further stating Mr. Sabbie was having swelling in his lungs as a result of "[s]everal things, congestive heart failure, use of OC spray;" he could not say whether or not it played a role, but he did know it was deployed and that OC can cause inflammation of the respiratory mucosa and can cause increase in fluid leaking out).

### *Deposition testimony of Dr. Cummins*

The LaSalle Defendants further assert Dr. Cummins, Plaintiffs' expert in emergency medicine, verified at his deposition that the use of force and events thereafter did not cause Mr. Sabbie's death. According to the LaSalle Defendants, although Dr. Cummins believes the use of OC spray made Mr. Sabbie's pulmonary edema and his reactive airway disease worse, he could not say for sure at his deposition that Mr. Sabbie would still be alive were it not for the use of the OC spray.

*See* Cummins Dep. at 110:1-17 (stating he could not quantify it).  When pressed on the issue at his

deposition, Dr. Cummins stated as follows:

> Q:    I repeat my question. Would Mr. Sabbie have survived were there no use of force?
>
> A:    Would he have survived? It's - - it's - - it's hard to - - well, let me answer that again. If he . . . let's go back to the courtroom and his walking back towards the cell and his stopping and severe shortness of breath and he was doing tripod breathing at that point in time, I think if he had been treated appropriately at that point of time, I'm ignoring the - - the show of force, I think more likely than not he would have survived.
>
> Q:    Okay.
>
> A:    I think if the - - if he had gone on without the show of force into the cell, I think he probably would've gone ahead and gone into pulmonary edema that would just - - that would have proven fatal.
>
> Q:    Okay. So you put the point at prior to the use of force, the tripod where he's got his hands on his knees.
>
> A:    Correct.

*Id*. at 111:19-112:13.

## 2.    **Plaintiffs' response**

According to Plaintiffs' response, in making their argument, the LaSalle Defendants conflate

Plaintiffs' "wrongful death claim," which does indeed require "death," with the underlying claims

(*e.g.*, excessive force and inadequate medical care), which do not require resulting death. Plaintiffs

further assert the LaSalle "Defendants' argument that Plaintiffs cannot prove cause of death also

shrugs off the evidence."  Docket Entry # 106 at 54.  According to Plaintiffs, Mr. Sabbie's death due

to a hypertensive-related condition as found in the autopsy "is perfectly consistent with Plaintiffs'

inadequate medical care claims (which assert that defendants deprived him from medication and

treatment for his *hypertension*) and excessive force claims (which assert that the use of OC spray

exacerbated his underlying medical condition)."  *Id.* (emphasis in original).  Dr. Peerwani, the Chief

Medical Examiner for multiple Texas counties, Peerwani Report at 2, noted in his report the medical

examiner who did the autopsy did not opine on the "use of OC spray or the lack or absence of adequate medical care and supervision." *Id*. at 16. According to Plaintiffs, even had he done so, it would only create an issue of fact for the jury; it would not warrant judgement as a matter of law.

**3.    Analysis**

In considering a wrongful death claim under § 1983 against a municipality in *Rhyne*, the Fifth Circuit appeared to consider the alleged constitutional deprivation required by § 1983 in the context of municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). *Rodgers*, 2017 WL 457084, at *8 (citing *Rhyne*, 973 F.2d at 392). Accordingly, to plead a wrongful death claim under § 1983 against a municipality, a plaintiff must first plead the elements of municipal liability under § 1983 and then the causation element required for wrongful death. *See id.*; *see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 415 (1997) (noting "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights") (emphasis in original).

According to Plaintiffs, they have "two highly-qualified medical experts who have each opined that the actions and inactions of the individual defendants caused Mr. Sabbie's death and rendered their opinions 'to a reasonable degree of medical certainty.'" Docket Entry # 106 at 54-55. In his report, Dr. Peerwani detailed the disregard for adequate medical care and lack of attention to Mr. Sabbie, *see id.* at 15-17, and opined these failures (*i.e.*, failure to check blood pressure and other vitals, failure to check blood sugar, failure to medicate, failure to transfer to higher level care) "resulted in the death of Sabbie." *Id.* at 19. He also explained how the OC spray posed a "significant respiratory and cardiac threat to Mr. Sabbie," "further complicated his cardiorespiratory status," caused him pain, increased his heart rate, and elevated his already high blood pressure. *Id*.

115

In his report, Dr. Cummins opines "Michael Sabbie's death was preventable and unnecessary." He elaborates as follows:

> Despite [his] symptoms and signs the [jail's] medical staff never properly evaluated or treated [him]. They failed to properly consult with, or refer him to, emergency resources in the community. His final pathway towards death was accelerated and made inevitable by the violent, assaultive, and neglectful way he was treated by the [defendants] in the 11 minutes captured on video. There were many moments when the causal chain leading to [his] death could and should have been broken. [He] did not have to die.

Cummins Report at 4, 12 (Mr. Sabbie "would not have died" with competent care). According to Dr. Cummins, Mr. Sabbie's hypertensive crisis-induced heart failure and acute pulmonary edema were profoundly worsened by the chemical agent and sub-standard decontamination. *Id*. at 9-10.

The Court agrees with Plaintiffs that the LaSalle Defendants "cherry pick" some of their deposition excerpts. For example, although Dr. Peerwani agrees with the autopsy examiner's listed cause of death of "hypertensive arteriosclerotic cardiovascular disease," *id*. at 11:12-16, he thinks it is a "little problematic" that the examiner also found the altercation was not considered as contributing to the cause of death . . . . *Id.* at 45:11-21. According to Dr. Peerwani, the "altercation would have produced severe tachycardia, increase in heart rate, in a person that is already decompensated, having the diastolic failure, systolic failure." *Id*. at 45:22-25.

And when listing some of the potential factors that may have contributed to Mr. Sabbie's death, as outlined by the LaSalle Defendants, Dr. Peerwani also pointed out that Mr. Sabbie "did not die during the period that he was under the control of his own health," but while he was in custody. *Id*. at 76:21-23. Thus, according to Dr. Peerwani, while failing to take medications would have increased Mr. Sabbie's cardiovascular problem, it was not the "immediate cause of death." *Id.* at 76:23-25. According to Dr. Peerwani, Mr. Sabbie did not get "higher care" even though he was in

116

congestive heart failure and was complaining of shortness of breath and was constantly wheezing. *Id*. at 79:5-15, 88:1-2.

Similarly, in answering the line of questioning outlined above regarding whether Mr. Sabbie would have survived had the OC spray had been used, Dr. Cummins also stated the following regarding the use of OC spray: it was one of several factors that played a role in the death of Mr. Sabbie; it made things worse; Mr. Sabbie was going into pulmonary edema and was trying to oxygenate his blood adequately; the "force that was used and the exertion made that balance a whole lot worse;" it made him more "hypoxic," or short of breath; there were several points where Mr. Sabbie would have survived, *i.e.* if Nurse Venable had made the proper response that a reasonably prudent health care provider should have made in her post-use of force evaluation; and "survivability was there" up until when Mr. Sabbie was thrown into the cell.  Cummins Dep. at 110:19-111:18.

The Court again finds instructive the *Salcido* case, and *Darden* upon which it relies. In *Salcido*, in a motion for reconsideration of the district court's denial of its motion for summary judgment based on causation, Harris County argued the detainee's injury and death did not result from the use of force but was based on his preexisting medical conditions.  2018 WL 6618407, at *4.  According to the court in its December 18, 2018 order, Harris County's argument fails to recognize that the eggshell skull rule is applicable in § 1983 excessive force cases. *Id*. (citing *Darden*, 880 F.3d at 728) (citing *Dunn v. Denk*, 54 F.3d 248, 251 (5th Cir. 1995), *rev'd on other grounds* 79 F.3d 401 (5th Cir. 1996) (en banc))).

According to the court in *Salcido*, in *Darden*, the estate of a suspect who suffered a heart attack during his arrest filed a § 1983 action against the two arresting officers, alleging use of

117

excessive force. The district court granted the defendants' motion for summary judgment holding the "plaintiff could not establish an excessive force claim because he [could] not show that Darden's death 'resulted directly and only from the use of force that was clearly excessive to the need.'" 2018 WL 6618407, at *4 (quoting *Darden v. City of Fort Worth, Texas*, No. 4:15-CV-221-A, 2016 WL 4257469, *6 (N.D. Tex. August 10, 2016)).

Recognizing "[t]he district court's conclusion that the injury did not result directly and only from the use of force was essentially based on the fact that Darden had preexisting medical conditions that increased his risk of death during the incident," the Fifth Circuit reversed, holding genuine issues of material fact precluded granting summary judgment. *Salcido*, 2018 WL 6618407, at *4 (quoting *Darden*, 880 F.3d at 725, 728, 734). As noted by the court in *Salcido*, the Fifth Circuit in *Darden* explained as follows:

> [a]ccording to the eggshell skull rule, 'a tortfeasor takes his victim as he finds him.' . . . The eggshell skull rule is applicable in § 1983 excessive force cases. . . . Darden's preexisting medical conditions increased his risk of death during a struggle, and in that way, they contributed to his death. However, the evidence suggests that Darden would not have suffered a heart attack and died if the officers had not tased him, forced him onto his stomach, and applied pressure to his back. Indeed, the medical expert ultimately concluded that 'Darden's manner of death should not have been ruled as Natural.' Accordingly, the plaintiff can show that the use of force was the direct and only cause of Darden's death.

*Salcido*, 2018 WL 6618407, at *4 (quoting *Darden*, 880 F.3d at 728 (citations omitted)).

Like the defendants in *Darden*, Harris County argued the detainee died from cardiac arrest and therefore the plaintiffs could not show his death resulted from the officer defendants' use of force. *Salcido*, 2018 WL 6618407, at *4. According to the court, "[a]lthough Lucas' preexisting medical conditions may have increased his risk of death from cardiac arrest during restraint, and in that way, contributed to his death, as in *Darden*, there is evidence from plaintiffs' medical experts,

Dr. Cohen and Dr. Hall, that Lucas would not have suffered a heart attack and died had the officer defendants not forced him onto his stomach and applied pressure to his limbs, chest, and back that impaired his ability to breathe." *Id*.  One of the experts stated in his report that:

> [c]orrectional uniformed and supervisory staff, during the cell extraction, transportation to the clinic and while in the clinic, restrained Kenneth Lucas in a manner which proximately caused his death. . . . The use of the hog-tie position on Mr. Lucas, an extremely agitated individual for an extended period of time, and their constant compression of his chest, continued after his last complaint of inability to breathe, contributed significantly to his death.

*Id.* at * 5. The court concluded the evidence was sufficient to raise an issue of material fact for trial as to whether the detainee's sudden cardiac death was caused by his preexisting conditions or by the defendant officers' use of force.  *Id.*

Similarly here, the evidence is sufficient to raise an issue of material fact for trial as to whether Mr. Sabbie's death was caused by his preexisting conditions or by the defendant officers' uses of force.  The Court recommends this part of the LaSalle Defendants' motion be denied.

**G.    Plaintiffs' claims against LaSalle for the alleged constitutional deprivations**

**1.    Applicable law**

Plaintiffs allege Corporate Defendants are liable under the U.S. Constitution and Arkansas Constitution for the alleged inadequate medical care and excessive force used against Mr. Sabbie. Docket Entry # 1, ¶¶ 81-82.  Although LaSalle "is a private corporation, [it] may be sued under 42 U.S.C. § 1983 for alleged constitutional injury, because the operation of a prison is a fundamental government function." *Jenkins v. LaSalle Sw. Corr.*, No. 3:17-CV-1376-M-BN, 2018 WL 3748196, at *7 (N.D. Tex. July 11, 2018), *report and recommendation adopted*, No. 3:17-CV-1376-M, 2018 WL 3743945 (N.D. Tex. Aug. 7, 2018) (quoting *Olivas v. Corrs. Corp. of Am.*, 408 F.Supp.2d 251,

254 (N.D. Tex. 2006) (citing *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 461 (5th Cir. 2003) ("We agree with the Sixth Circuit and with those district courts that have found that private prison-management corporations and their employees may be sued under § 1983 by a prisoner who has suffered a constitutional injury.")), *aff'd*, 215 Fed.Appx. 332 (5th Cir. 2007) (per curiam)). "The standards applicable to determining liability under § 1983 against a municipal corporation are applicable to determining the liability of a private corporation performing a government function." *Olivas*, 408 F.Supp.2d at 254-55 (citing *Eldridge v. CCA Dawson State Jail*, No.3:04-CV-1312-M, 2004 WL 1873035, at *2 (N.D. Tex. Aug. 19, 2004), *report and recommendation adopted*, 2004 WL 2075423 (N.D. Tex. Sept. 16, 2004)); *see also J.M. v. Mgmt. & Training Corp.*, No. 3:15CV841-HSO-JCG, 2017 WL 3906774, at *7 (S.D. Miss. Sept. 5, 2017) ("The parties do not dispute that MTC, even though it is a private prison-management company, is treated as a municipality for purposes of Plaintiff's § 1983 claims." (citations omitted)).

As the Court noted previously, *Monell* liability requires proof of four elements: (1) a policymaker; (2) an official policy; (3) a constitutional violation; and (4) a violation of that constitutional right whose "moving force" is "the policy or custom." *Cleveland v. Gautreaux*, No. CV 15-744-JWD-RLB, 2018 WL 3966269, at *18 (M.D. La. Aug. 17, 2018) (citing *Piotrowski*, 237 F.3d at 578). The *Cleveland* case involved § 1983 episodic acts claims against the warden in his individual capacity, 2018 WL 3966269, at *2, *17, and official capacity conditions of confinement claims against the warden and another "sheriff defendant" (Gautreaux) regarding services for detainees with serious medical and chronic conditions, which the sheriff defendants argued implicated the actions of individuals and did not show a "systematic failure" at the prison. *Id*. at *12, *18.

120

The *Cleveland* court first noted that to succeed in holding a municipality liable in an "individual or episodic acts" case, the plaintiff must demonstrate "a municipal employee's subjective indifference and additionally that the municipal employee's act 'resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the [plaintiff]'s constitutional rights.'" *Id.* at *18 (quoting *Olabisiomotosho*, 185 F.3d at 526 (quoting *Hare*, 74 F.3d at 649 n.4); *see also id.* at 529 (city was not liable where the plaintiff failed to state a § 1983 claim against any of its officers)). The *Cleveland* court then stated: "To maintain a conditions-of-confinement claim, a plaintiff must show (1) a condition of a pretrial detainee's confinement that is (2) not reasonably related to a legitimate governmental interest and that (3) violated that detainee's constitutional rights." 2018 WL 3966269, at *18 (citing *Edler v. Hockley Cty. Comm'rs Court*, 589 Fed. Appx. 664, 668 (5th Cir. 2014)). For purposes of such a claim, a plaintiff need not show deliberate indifference on the part of the municipality. *Cleveland*, 2018 WL 3966269, at *18 (citing *Duvall*, 631 F.3d at 207 ("[A] plaintiff must show deliberate indifference on the part of the municipality only in a case in which the constitutional violation resulted from an episodic act or omission of a state actor.")).

The *Cleveland* court noted the two standards are "similar and frequently overlap." *Cleveland*, 2018 WL 3966269, at *18 (citing *Colbert v. City of Baton Rouge/Parish of East Baton Rouge*, 2018 WL 2224062, at *6 (M.D. La. May 15, 2018) ("Because of Plaintiffs' failure to plausibly plead *Monell* liability, Plaintiffs are unable to satisfy the pleading requirements of the conditions of confinement theory."); *Duvall.*, 631 F.3d at 208 ("The jury found that Duvall's injury was caused by a policy or custom of the County. Although the jury found this fact in response to the court's instruction on municipal liability under the *Monell* test, the jury's finding satisfies the need for such

121

a showing in connection with the underlying [conditions-of-confinement] constitutional violation as well. . . . We see no meaningful difference between these showings. . . . [W]e are convinced that the jury's finding of a custom or policy under the municipal-liability jury instruction satisfies the custom-or-policy element for purposes of the underlying constitutional violation.")).

The *Cleveland* court discussed *Shepherd v. Dallas County*, discussed by the Court above, *supra* at 71, wherein the Fifth Circuit reviewed an appeal from a jury verdict in a detainee's favor, evaluating a county's argument that certain claims were episodic acts or omissions claims concerning specific county employees, rather than conditions of confinement claims challenging county policy, and finding Shepherd was "the rare case in which a plaintiff demonstrated deficiencies in the conditions of confinement that amounted to punishment before he was adjudicated guilty[.]" 2018 WL 3966269, at *19 (citing *Shepherd*, 591 F.3d at 449, 452-53). Although the sheriff defendants in *Cleveland* argued the plaintiffs' claims implicated particular acts or omissions of specific individuals, the court noted the plaintiffs had pled the claims as challenging overall conditions of confinement and/or a policy, not merely the acts of individual officers as alleged elsewhere in the complaint. *Id.* at * 20. Relying on *Shepherd*, the court stated it would "would certainly be permitted to analyze Plaintiffs' allegations under both standards and let the theory with evidentiary support proceed." *Cleveland*, 2018 WL 3966269, at *20 (citing *Shepherd*, 591 F.3d at 452 n. 1, 453 n. 2). The court held the plaintiffs had adequately alleged and substantiated the possible existence of unconstitutional conditions of confinement concerning the treatment of chronic conditions. *Cleveland*, 2018 WL 3966269, at *20.

As previously held, the Court finds Plaintiffs have asserted liability for both episodic acts and omissions and for unconstitutional conditions of confinement against Corporate Defendants based

on the same events. Similar to the court in *Cleveland*, the Court considers the conditions of confinement claim in the context of its discussion of *Monell* liability. 2018 WL 3966269, at *18. *Monell* requires evidence of an official policy; a condition of confinement is usually the manifestation of an explicit policy but may reflect an unstated or *de facto* policy.  *See Shepherd*, 591 F.3d at 452.

Unconstitutional policies or customs can be shown in various ways. These include the entity's failure to provide proper training to its employees. *See, e.g.*, *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000). While *Monell*'s "'official policy' requirement may be met in at least three different ways,"[55] and "establishing a municipal policy is usually done via 'written policy statements, ordinances, or regulations,' this circuit also views municipality customs—'widespread practice that is so common and well-settled'—as municipal policy." *Jenkins*, 2018 WL 3748196, at *8 (citing *Skyy v. City of Arlington*, 712 Fed. Appx. 396, 399-400 (5th Cir. 2017) (per curiam) (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (citing *Gates v. Tex. Dep't of Prot. & Regulatory Servs.*, 537 F.3d 404, 436 (5th Cir. 2008) ("A custom is shown by evidence of a persistent, widespread practice of government officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents government policy.")))). "'Isolated violations are not the

---

[55] (1) When the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy; (2) Where no "official policy" was announced or promulgated but the action of the policymaker itself violated a constitutional right; and (3) Even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymake[r] ... can reasonably be said to have been deliberately indifferent to the need." *Burge v. Parish of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999) (internal quotations and citations omitted).

persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability.' [And a] customary municipal policy cannot ordinarily be inferred from single constitutional violations." *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984); citation omitted)).

For a failure-to-train claim, a plaintiff must demonstrate (1) the municipality's training procedures were inadequate; (2) the municipality was deliberately indifferent in adopting its training policy; and (3) the inadequate training policy directly caused the violations in question. *Koshnick v. City of Lakeway*, No. 1:17-CV-852-LY, 2018 WL 4623665, at *2 (W.D. Tex. Sept. 26, 2018) (citing *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for [Section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of person with whom the police come into contact.")).

The Supreme Court in *Canton* advanced two ways of proving deliberate indifference: (1) through proof of a pattern of violations that make the need for further training obvious to policymakers or (2) for failing to provide training when "the risk of constitutional violations was or should have been obvious or highly predictable." *Koshnick*, 2018 WL 4623665, at *2 (quoting *Little v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (internal quotation marks omitted)). "For liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." *Koshnick*, 2018 WL 4623665, at *2 (quoting *Benavides v. Cty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992)). The plaintiff must also prove "the identified deficiency in the training program" is "closely related to the ultimate injury." *Koshnick*, 2018 WL 4623665, at *2 (quoting *Canton*, 489 U.S. at 379).

2.    **Analysis**

The LaSalle Defendants assert Plaintiffs cannot produce sufficient evidence of a pattern of failing to train or supervise by the Corporate Defendants, again relying on their *Daubert* motion regarding Captain Sanders.  Docket Entry # 88 at 42.  As noted above, the Court has denied the *Daubert* motion.  The expert report of Captain Sanders speaks to *Monell* liability in detail, describing patterns, practices, and failures to train over the course of many pages. *See* Sanders Report at 18-22. His supplemental report, which is focused on widespread practices, as well as the supplemental report of Nurse Practitioner Roscoe, also support *Monell* liability.

There is evidence Defendant LaSalle failed to train its nursing staff on the corporate protocols that governed the jail.  Plaintiffs argue as follows:

> Despite their strictly limited scope of practice and the fact that they held the role of gatekeeper, the nurses either had no idea the protocols were mandatory or, worse, did not even know they existed—*because they were not trained*. This was the moving force behind their failure to attend to Mr. Sabbie's medical needs time and time again over the course of his three days in jail. It was a practice that existed in fact—and a practice that existed because of a complete lack of training. Even after Mr. Sabbie's death the practice of ignoring medical protocols continued, unabated, for *more than a year*, and did not stop until months after *another* inmate died under similar circumstances to Mr. Sabbie. She, too, was an insulin-dependent diabetic whose blood sugar was not checked, causing her to go into diabetic ketoacidosis and causing her death.

Docket Entry # 106 at 57 (emphasis in original).

Although there were nursing protocols in effect in July 2015 which the nurses were required to follow in assessing inmate medical conditions, the LVN/LPNs were not given training on them or on the importance of following them. *See, e.g.* Bowens Dep. at 21:2-5, 17-20; 27:3-20 (agreeing that in 2015 it was common practice at the Bi-State Jail for nurses not to follow and fill out protocols and that there was no training or guidance on the protocols); *see also* Venable Dep. at 45:23-25; Flint

125

Dep. at 31:12-32:19, 85:24-86:24; Lynch Dep. at 66:15-67:5 (stating nurses were not expected to follow the shortness of breath protocol and did not receive training on the shortness of breath protocol). Nurse Flint, an LVN who had less than three months experience, was given no training on the nursing protocols, had no idea they were mandatory, and did not know they existed. *See* Flint Dep. at 29:20-32:19; 35:13-37:4; 40:17-20; 72:5-73:25; 74:20-23; 77:4-11; 80:19-81:13; 85:12-86:24; 101:24-102:1; 107:2-110:9 (agreeing she did not follow the hypertension or shortness of breath protocols in 2015). Following Mr. Sabbie's death, Nurse Flint's supervisors did not say anything about the need to follow the protocols in the future. Flint Dep. at 130:11-22. Nurse Flint received no discipline, warnings, counseling, or guidance. *Id*. at 129:13-130:1. Even at the time of her deposition, Nurse Flint was unaware of basic procedures mandated by the protocols governing her job. *See, e.g.*, Flint Dep. at 82:19-22 ("Q: And do you see that you are supposed to notify the physician for medication and treatment orders for a person that has shortness of breath? A. Yes. I am learning that today."); *see also id.* at 82:12-16, 84:25-85:7.

It was also common practice among the medical and security staff of assuming inmates were faking or malingering. *See, e.g.* Sanders Report at 20. Officer Nash testified about multiple occasions leading up to Mr. Sabbie's July 2015 confinement in which inmates reported what she believed were concerns related to the health and safety of inmates that were dismissed by the nurse or supervisor. Nash Dep. at 92:8-93:2. Specifically, she testified as follows:

> Q:    So you felt that there was a pattern or custom of them not believing inmates
>        when inmates communicated medical issues?
> A:    Yes.

*Id*. at 93:3-6; *see also id.* at 93:7-11 (agreeing she felt like a "troublemaker" when raising issues). Officer Nash testified her supervisor had given her a hard time in the past when she had raised

126

concerns. *Id.* at 92:6-7. Even though she would have been able to see Mr. Sabbie if he was in a cell with lights, she was "reluctant to raise that issue with Sergeant Hopkins because of how [she] had been treated in the past whenever [she] raised concerns about inmate health and safety[.]" *Id.* at 96:17-23.

There is also evidence the security staff were not properly trained. According to Captain Sanders, his review of the information supplied revealed training was not being conducted, training was being falsified, and employees were given credit for training they did not attend. He states the training program was not properly supervised. Sanders Report at 18. Officers testified LaSalle gave them no training on recognizing potential signs of medical distress or signs that an inmate may need medical care. *See* Boozer Dep. at 105:16-18, 117:18-21; Lomax Dep. at 88:14-18; Palmer 127:20-23; Hopkins Dep. at 37:25-38:6; Nash Dep. at 124:15-18. They had no training on when to summon medical care for inmates. *See* Boozer Dep. at 107:24-108:2; Derrick Dep. at 119:2-120:3; Nash Dep. at 124:10-14. LaSalle did not train them they had an "obligation to secure medical care for inmates with serious medical needs." Boozer Dep. at 117:18-21; Nash Dep. at 124:23-125:1; Lomax Dep. at 88:24-89:2. According to Officer Boozer, he was not even aware in 2015 that he had a "constitutional obligation to secure medical care for inmates with serious medical needs." Boozer Dep. at 108:3-6. Thus, according to Plaintiffs, the officers ignored Mr. Sabbie when he collapsed in the shower, when he was immobile on the concrete floor of his cell with white foam coming from his nose, and when he lay unmoving half-clothed on the concrete floor all night.

There is evidence LaSalle had a medical observation policy that foreseeably put inmates, like Mr. Sabbie, at substantial risk of serious harm because LaSalle put its security staff in charge of the medical monitoring. In 2015 at the Bi-State Jail, inmates who needed medical monitoring were

placed in medical observation cells where they would be monitored, not by medical personnel with medical training, but by jail security guards with no medical training. *See* Venable Dep. at 114:17-23, 115:8-15; Flint Dep. at 79:22-80:14 (noting the guards' job was to alert medical). According to Plaintiffs, these risks were compounded by the fact that LaSalle failed to give its security staff guidance on how to monitor inmates with serious medical needs.

Not only is there evidence LaSalle failed to train its officers on their constitutional obligations, but there is also evidence LaSalle affirmatively taught its officers not to summon care so long as the inmates were "alive and breathing."[56] According to Plaintiffs, this policy was the moving force behind the security defendants' failure to call for medical help.  Officer Nash further illustrates the unconstitutional policies, customs, and practices of LaSalle. She was a new employee who had not completed her state-mandated training because the jail was short-staffed.  Like the other guards, Officer Nash was taught only to look for "breathing bodies." This is one of the reasons she did seek help for Mr. Sabbie.

There is also evidence regarding what Plaintiffs characterize as falsification of documentation training.  Plaintiffs rely on Officer Nash's testimony regarding her thirty-minute check documentation, wherein she stated it was a "widespread" practice at LaSalle to reflect checks that were not done. According to Officer Nash, she was not allowed to record her checks as they were done. *Id.* at 95:5-96:16 (stating it was always encouraged to go ahead and fill out the paperwork at the start of the shift and also agreeing some people would write all of their checks at the end of the

_____

[56] As of July 2015, the only thing LaSalle taught its officers to look for was "living breathing bodies." *See* Boozer Dep. at 105:10-15. According to Officer Boozer, the officers knew Mr. Sabbie did not look good; because he was "alive and breathing," they did not call a medical provider; based on their understanding of their training back then, that was how it was supposed to work at the Bi-State Jail. *See* Boozer Dep. at 107:17-23; *see also* Nash Dep. at 59:9-16, 104:2-12.

shift regardless of whether they did them or not).  Officer Derrick also testified it was "normal practice" to write down a check and then leave it there even if an officer did not do it and that he had done it "countless times."  Derrick. Dep. at 141:21-142:5; *see also* Sanders Report at 18-22 (detailing LaSalle's numerous training and supervisory deficiencies with its security staff). According to Captain Sanders, his review of the information supplied revealed a pattern and practice of falsifying housing unit activity logs and housing unit check logs, pre-filling logs, and filling out logs at the end of the shift.  Sanders Report at 19; *see also id.* at 21 (stating the pattern and practice of supervisors failing to review reports, sign reports, and require subordinates to accurately submit reports and log sheets "fostered an atmosphere that led to false reports and documents").

On the excessive-force front, Plaintiffs have produced evidence that LaSalle had constitutionally deficient policies, customs, and practices regarding inmates subjected to OC spray. According to Captain Sanders, there was a pattern of excessively using OC spray at the Bi-State Jail. Sanders Report at 22.  LaSalle jail guards used pepper spray frequently. *See, e.g.* Venable Dep. at 178:8-179:1 (stating she had evaluated hundreds of people who had been sprayed at the jail in the five years she had been there at the time); Flint Dep. at 115:21-116:2 (stating she had evaluated about a hundred inmates who had been pepper sprayed in her three years there). Officer Boozer testified he had seen pepper spray used between twenty-five to thirty times.  Boozer Dep. at 115:7-14.  According to Officer Boozer, prior to July 2015, he had not received any training on pepper spray decontamination or on the need for post-OC spray monitoring.  *Id*. at 115:24-116:5.  He had not been trained to summon medical care for "inmates who had been pepper sprayed and who continue[d] to experience difficulty breathing or respiratory distress after decontamination."  *Id*. at 116:6-11; Brown Dep. at 144:3-7 (same).

LaSalle's use of pepper spray is detailed in the supplemental expert report of Captain Sanders, who reviewed over a dozen videos produced by LaSalle in discovery.  Captain Sanders opines Defendants had a pattern and practice of using chemical agents on inmates "unjustifiably and objectively unreasonably." Sanders Supp. Report at 2. In his opinion, the practices used were below the standard of correctional care and were "consistent with the practices used on Michael Sabbie." *Id.* at 3. He also saw a pattern and practice of failing to decontaminate and leaving inmates in contaminated clothing. *See id.* at 2. The videos were also reviewed by correctional nursing expert, Lori Roscoe, who found a pattern of substandard post-OC spray exposure exams by the nursing staff. *See* Roscoe Supp. Rept. at 1-2 ("Of the 13 incidents reviewed, only three inmates were brought to medical and evaluated by the nurse, and of these, only one was seen for longer than four minutes.").

Plaintiffs argue the "utterly reckless conduct by the medical and security defendants toward this . . . medically fragile citizen—failing to follow protocols, ignoring his serious medical needs, not checking his blood pressure and blood sugar, pepper spraying him in the midst of a respiratory crisis, neither medically evaluating him nor decontaminating him following his OC exposure, failing to monitor him, keeping him in an inadequately-staffed jail, falsifying training records and state-mandated monitoring records, refusing to 'open the gate' to his care, and violating basic norms, standards, and laws—was part of the routine customs, policies, and practices of LaSalle."  Docket Entry # 106 at 59.

There is sufficient evidence of patterns, practices, and failure to train. Whether any of these *de facto* policies or practices were maintained with objective deliberate indifference by LaSalle and resulted in individuals' subjective deliberate indifference to Mr. Sabbie's constitutional rights (necessary to hold a governmental entity liable in an episodic acts or omissions case) are material

fact issues on which the parties are in dispute. The Court finds Plaintiffs have also "adequately alleged and substantiated the possible existence of unconstitutional conditions of confinement. . . ." *Cleveland,* 2018 WL 3966269, at *20.

The final showing required by *Monell* is a determination of whether the policies at issue were the "moving force" behind a constitutional violation. *Smith v. Kaufman Cty. Sheriff's Office*, No. 3:10-CV-703-L-BK, 2011 WL 7547621, at *16 (N.D. Tex. Dec. 14, 2011), *report and recommendation adopted sub nom. Smith v. Kaufman Cty. Sheriff*, No. 3:10-CV-703-L, 2012 WL 850777 (N.D. Tex. Mar. 14, 2012) (citing *Duvall,* 631 F.3d at 209). "In other words, in addition to culpability, Plaintiff[s] must show a direct causal link between the jail's policies and a constitutional deprivation." *Smith*, 2011 WL 7547621, at *16 (citing *Piotrowski,* 237 F.3d at 579). In the *Smith* case, the court held there could "be no serious question that, but for the jail's policies or lack thereof relating to its treatment of chronically ill and recently hospitalized patients, Plaintiff would not have suffered the injuries he did. *See* Jacobson Dec, Plaintiff's App'x. 1 (averring that the failure to provide Plaintiff with proper medical treatment 'caused [Plaintiff] to end up with surgery and permanent loss of his colon.')." *Smith*, 2011 WL 7547621, at *16.

Here, the Court finds sufficient evidence of a causal link between the jail's policies and a constitutional deprivation. The court in *Smith* noted the plaintiff still must demonstrate that the jail's policies were unconstitutional. *Id.* (citing *Piotrowski,* 237 F.3d at 579). "Without question, the right to receive adequate medical care during pretrial confinement is well established." *Smith*, 2011 WL 7547621, at *16 (citation omitted). To make a showing of unconstitutional medical care in a "conditions of confinement case," the court asks whether the particular condition is reasonably

131

related to a legitimate governmental objective. *Smith*, 2011 WL 7547621, at *16 (citing *Bell,* 441 U.S. at 539).

As held by the court in *Smith*, the Court concludes Plaintiffs have adduced sufficient evidence to enable a reasonable jury to find that while Mr. Sabbie was detained at the Bi-State Jail, he was deprived of constitutionally adequate medical care. Specifically, a reasonable jury could find the medical plan at the jail suffered from various deficiencies, including inadequate follow-up care, medication administration, and monitoring. *See Palo,* 2007 WL 2140590 at *10 (denying summary judgment where jail lacked adequate intake screening, follow-up care, medication administration, and staffing). The *Smith* court noted a jury also could reasonably find the plaintiff was subjected to these inadequate medical conditions, noting the sheriff did not argue the inadequate medical conditions were reasonably related to a legitimate government purpose. Therefore, according to the court, a reasonable jury could find, under the *Bell* standard, that the conditions to which the plaintiff was subjected were not reasonably related to a legitimate government interest and thus "punished" the plaintiff in violation of his Fourteenth Amendment rights. *Smith*, 2011 WL 7547621, at *16 (citing *Palo,* 2007 WL 2140590 at *10) (denying summary judgment where county did not argue that jail's inadequate medical care was reasonably related to a legitimate government purpose). The court held the plaintiff had presented sufficient evidence to withstand the sheriff's motion for summary judgment.

Similarly here, Plaintiffs have presented sufficient evidence to withstand the LaSalle Defendants' motion for summary judgment as to the claims against LaSalle. Therefore, the Court recommends this part of the LaSalle Defendants' motion be denied.

**H.    Plaintiffs' state law claims**

**1.    Plaintiffs' allegations**

Finally, the Court considers Plaintiffs' state law claims. The Original Complaint asserts "Arkansas Wrongful Death and Survival" claims against the LaSalle Defendants as follows:

> Based on the allegations set forth in the complaint, the Corporate Defendants (LaSalle and LaSalle Management) are liable under the Arkansas Wrongful Death and Survival laws, Ark. Code Ann. §§ 16-62-101 & 102, for tortuously causing the death and pre-death pain and suffering of Michael Sabbie by violating the applicable correctional and medical standards of care and by violating Article 2 § 8 and Article 2 § 15 of the Arkansas Constitution—giving rise to a claim under the Arkansas Civil Rights Act, Arkansas Code § 16-123-105.

Docket Entry # 1, ¶ 82.  Thus, Plaintiffs have alleged wrongful death claims against the LaSalle Defendants based on both the Arkansas Civil Rights Act and common law negligence.  Plaintiffs' claims under the Arkansas Civil Rights Act are subject to the same analysis as claims under § 1983. Because the evidence is sufficient to survive summary judgment regarding the alleged federal civil rights claims, all state civil rights claims survive as well.

**2.    Common law negligence claim**

The LaSalle Defendants first argue no defendant had a duty under Arkansas common law to provide adequate healthcare to Mr. Sabbie.  Docket Entry # 88 at 43-44. In their reply, the LaSalle Defendants assert "other than the United States Constitution and Arkansas Constitution, the Plaintiffs have not even advanced a possible theory under the common law of Arkansas for the imposition of such a duty upon any Defendant."  Docket Entry # 108 at 4.

In their surreply, Plaintiffs state this argument overlooks Arkansas state law that allows plaintiffs to seek redress for any "medical injuries" caused by "medical care providers," including nurses, who were "acting in the course and scope of their employment" when providing "medical

care." Docket Entry # 109 at 5 (quoting Ark. Code. Ann. § 16-114-201).  According to Plaintiffs, plaintiff-inmates often assert supplemental state law medical malpractice claims in § 1983 cases, and although courts sometimes dismiss them for lack of proof, there is no case that has adopted the LaSalle Defendants' theory that there is no duty under common law.  Docket Entry # 109 at 5 (citing, among other cases, *Kemp v. Correct Care Sols., Inc*., No. 6:17-cv-06084, 2018 WL 6579919, at *8- *9 (W.D. Ark. Dec. 13, 2018) (analyzing inmate's medical malpractice claim separately from § 1983 claim and dismissing claim because of lack of necessary expert testimony to demonstrate the appropriate standard of care, a deviation therefrom, or a causal link to damages)).  Plaintiffs argue the testimony from their medical experts is more than sufficient under Arkansas law.  The Court agrees.

Regarding the non-medical defendants, Ark. Code Ann. § 12-27-101 provides as follows:

> (a)(1) The purpose of this act is to establish a Department of Correction that shall assume the custody, control, and management of the state penitentiary, execute the orders of criminal courts of the State of Arkansas, and provide for the custody, treatment, rehabilitation, and restoration of adult offenders as useful law-abiding citizens within the community.

*Id.*  With respect to Corporate Defendants, LaSalle and LaSalle Management, the Original Complaint alleges as follows:

> The Corporate Defendants had a duty to treat Mr. Sabbie in accordance with the applicable standards of medical and correctional care. The Corporate Defendants breached those duties, and Mr. Sabbie's damages, including his pain and suffering and his death, were the direct and foreseeable result of the tortious actions and inactions of the Corporate Defendants alleged herein.

Docket Entry # 1, ¶ 78.

With respect to LaSalle and LaSalle Management, the complaint explains their overall obligations at the Bi-State Jail and specifically that LaSalle manages the day-to-day operations of

134

the Bi-State Jail. Corporate Defendants are alleged to have obligations that include providing jail-related services, meeting the needs of detainees, and fulfilling their constitutional obligations. It is further alleged that pursuant to the contract to operate the jail, the Corporate Defendants undertook an affirmative duty to train their employees to prevent unconstitutional violations. Considering these allegations, and the evidence submitted in support of the allegations, the Court finds LaSalle, as the entity in charge of managing jail operations and as a policy-maker responsible for meeting the needs of detainees, had a duty to Mr. Sabbie, who died while in custody as a pretrial detainee. The Court further notes at the motion to dismiss stage it held the Original Complaint alleged facts that support the existence of a duty and additionally spelled out directly that each of the Defendants owed a duty to Mr. Sabbie. *See* Docket Entry # 39 at 11.

The Court finds Defendants' argument that there is no duty under state law to provide medical care to a confined citizen is without merit. The Court recommends this part of the LaSalle Defendants' motion for summary judgment be denied.

### 3.    Loss of society and companionship claim

#### *The LaSalle Defendants' assertions*

The LaSalle Defendants assert the Court should not recognize Mr. Sabbie's family's independent § 1983 claim for violation of a protected right to familial association. In their motion, the LaSalle Defendants assert the Fifth Circuit Court of Appeals has allowed § 1983 claims brought by the family of a deceased inmate when considering the Texas wrongful death statute but has denied such claims under the Louisiana wrongful death statute. The LaSalle Defendants assert the Fifth Circuit has yet to address the Arkansas wrongful death statute, and it is not clear whether such a right exists under the Arkansas wrongful death statute. Docket Entry # 88 at 46. From there, the LaSalle

135

Defendants argue the Arkansas law requires such claims to be brought by the personal representative of the estate; according to the LaSalle Defendants, even though this case was brought by the personal representative of Mr. Sabbie's estate, it must be brought only by the "representative of the estate of the decedent OR all the heirs, but not both."  Docket Entry # 88 at 46 (emphasis in original).

Although the LaSalle Defendants never characterize the issue as one of standing, Plaintiffs address the issue in their response as whether Mr. Sabbie's surviving family members have constitutional standing. *See* Docket Entry # 106 at 59-60.  According to Plaintiffs, the LaSalle Defendants concede courts "look to state law on the issue and that if [] state law allows surviving family to pursue wrongful death claims, then they can pursue those claims under federal law too." *Id*. at 59.  The LaSalle Defendants do not address the issue in their reply; thus, the Court interprets the issue with what is contained in the motion.

Because this case is brought by the personal representative of Mr. Sabbie's estate and Mr. Sabbie's siblings and on behalf of his minor children contrary to Arkansas law, the LaSalle Defendants argue the Court should not recognize Mr. Sabbie's family's independent § 1983 claim for the violation of a protected right to familial association and should grant summary judgment for the "family's claims of excessive force and inadequate healthcare giving rise to a violation of their constitutional rights."  Docket Entry # 88 at 47. Without citing any cases in support of their position that also including the beneficiaries on whose behalf the personal representative sues is a "fatal pleading flaw," as characterized by Plaintiffs, the LaSalle Defendants generally assert the Texas wrongful death statute is not the same as the Arkansas wrongful death statute so the Court should

not follow the Fifth Circuit cases which have allowed surviving members to collect damages on their own behalf in a § 1983 claims for the wrongful death of another.[57]

### Applicable law

Under current Arkansas law, when a person's death is caused by the negligence of another, two causes of action arise. *Meredith v. Buchman*, 101 F. Supp. 2d 764, 766 (E.D. Ark. 2000) (citing *Matthews v. Travelers Indemnity Ins. Co.,* 245 Ark. 247, 249, 432 S.W.2d 485, 487 (1968)). First, there is a cause of action for the estate under the survival statute (Ark. Code Ann. § 16-62-101), and, second, there is a cause of action for the statutory beneficiaries under the wrongful death statute (Ark. Code Ann. § 16-62-102). *Id.* Under Ark. Code Ann. § 16–62–101 (Supp.2001), only the administrator could file a survival action. *St Paul Mercy Ins. Co., v. Circuit Court of Craighead County,* 348 Ark. 197, 201, 73 S.W.3d 584, 586 (2002).

The Wrongful Death Act creates a class of beneficiaries who may recover for their own mental anguish and pecuniary losses and provides as follows:

> Every action shall be brought by and in the name of the personal representative of the deceased person. If there is no personal representative, then the action shall be brought by the heirs at law of the deceased person.

Ark. Code Ann. § 16-62-102(b).

---

[57] The Texas Wrongful Death Statute provides that "[a]n action to recover damages . . . is for the exclusive benefit of the surviving spouse, children, and parents of the deceased." *Estate of Baker by & through Baker v. Castro*, No. CV H-15-3495, 2018 WL 4762984, at *13–14 (S.D. Tex. Aug. 31, 2018), *report and recommendation adopted,* No. CV H-15-3495, 2018 WL 4762958 (S.D. Tex. Oct. 2, 2018) (quoting Tex. Civ. Prac. & Rem. Code § 71.004(a)). However, under the Texas statute, "[i]f none of the individuals entitled to bring an action have begun the action within three calendar months after the death of the injured individual, his executor or administrator shall bring and prosecute the action unless requested not to by all those individuals." Tex. Civ. Prac. & Rem. Code § 71.004(c).

Among the "heirs at law" are the deceased person's children, brothers, and sisters. Ark. Code Ann. § 16-62-102(d)(1). If there is no personal representative of the deceased person, then a wrongful death action must be brought by all the heirs at law of the deceased. *Ramirez v. White County Circuit Court,* 38 S.W.3d 298, 343 Ark. 372 (2001). These actions are statutory creations, and plaintiff's must strictly comply with the statutory dictates. *St Paul,* 73 S.W.3d at 588 (2002).

"It is quite clear that actions for survivorship and actions for wrongful death are separate and distinct in nature." *First Commercial Bank, N.A., Little Rock, Ark. v. United States*, 727 F. Supp. 1300, 1302 (W.D. Ark. 1990); *see also St. Paul,* 73 S.W.3d at 589 ("An action for wrongful death brought by a plaintiff in his capacity as an administrator pursuant to Ark. Code Ann. § 16–62–102 involves neither the same action, nor the same plaintiff as in a survival action brought by the same person in his individual capacity pursuant to Ark. Code Ann. § 16–62–101."). The *First Commercial Bank* court explains as follows:

> While both are brought by the administrator of an estate, the role of the administrator is different in each action. In a survival action, the administrator asserts the decedent's own cause of action, and only the administrator may bring this cause of action. *Daughhetee v. Shipley,* 282 Ark. 596, 669 S.W.2d 886 (1984). The wrongful death statute, on the other hand, creates a cause of action in the survivors, and it may be brought by the administrator in their behalf, or by the heirs themselves if there is no administrator. Ark. Code Ann. § 16–62–102(b).

*First Commercial Bank*, 727 F. Supp. at 1302.

The court in *Myers v. McAdams,* 366 Ark. 435, 236 S.W.3d 504 (2006), provides the following helpful "distinction between a survival claim and a wrongful-death claim:"

> Upon the death of an individual two separate claims come into existence. Under the survival statute the tort claims that would have been asserted by the decedent no longer abate as they did at common law. They now survive, to be asserted by the personal representative on behalf of the estate. Specifically, the cause of action for injuries to an individual survive the death of the victim and the death of the

tortfeasor. Similarly, an action must be brought against the personal representative
of the deceased tortfeasor, not against the heirs.

The companion statute . . . permits the statutory beneficiaries to recover for the
personal losses they have suffered by virtue of the death of the decedent. . . . The
survival claim is brought for the benefit of the estate; in contrast, the estate is merely
a conduit through which to channel claims and the resulting recovery for the losses
to the beneficiaries as defined in the wrongful death statute. Compensation awarded
to the beneficiaries under the wrongful death statute cannot be shifted to the estate
to pay the debts of the estate.

*Id.* at 507 (quoting Howard W. Brill, *Arkansas Law of Damages* § 34:1 (5th Ed.2005)(internal

citations omitted)).

"In Arkansas, only a real party in interest may bring a cause of action." *St. Paul*, 73 S.W.2d

at 586 (citing ARK. R. CIV. P. 17; *see also TB of Blytheville v. Little Rock Sign & Emblem,* 328 Ark.

688, 946 S.W.2d 930 (1997)). The real party in interest is considered to be the person or corporation

who can discharge the claim on which the allegation is based, not necessarily the person ultimately

entitled to the benefit of any recovery.  *St. Paul*, 73 S.W.2d at 586 (citing *Forrest Const. v. Milam,*

345 Ark. 1, 43 S.W.3d 140 (2001)). Arkansas Rule of Civil Procedure 17 "specifically notes that an

administrator . . .  may bring suit for the benefit of another without joining a party for whose benefit

the action is being brought." *St. Paul*, 73 S.W.2d at 589.  According to the court in *St. Paul*, the "real

parties in interest were the heirs at law; however, under the statute, the administrator had to file suit

and did not do so."[58]  *Id.*

---

[58] In *St. Paul,* all but one of the deceased's heirs-at-law filed a *pro se* complaint prior to the
expiration of the statute of limitations and claimed medical malpractice. *Hackelton v. Malloy*, 364
Ark. 469, 475, 221 S.W.3d 353, 358 (2006). Later, the appointed administrators, who consisted of
some of the plaintiffs who had filed the original complaint, filed an amended complaint after the
statute-of-limitations period had expired. *Id*. The court in *St. Paul* held the *pro se* plaintiffs had no
standing to sue when they filed the original complaint. "Even though the plaintiffs who filed the
original complaint and those who filed the amended complaint were substantially the same persons,

The Supreme Court of Arkansas has addressed the role of administrators in wrongful death claims. *Davenport v. Lee*, 72 S.W.3d 85, 90–91 (2002). According to the court in *Davenport*, a "personal representative is not acting for himself and in connection with his own affairs, but to the contrary is acting for others who would ordinarily be the beneficiaries." *Id.* The court further explained that proceeds from a wrongful death action are for the sole benefit of the statutory beneficiaries and are held in trust by the administrator "for the benefit of the widow and next of kin." *Id.* at 91 (quoting *Douglas v. Holbert,* 335 Ark. 305, 314, 983 S.W.2d 392, 396 (1998); *see also Brewer v. Lacefield,* 301 Ark. 358, 784 S.W.2d 156 (1990)). In *Davenport*, the appellants as the administrators of the estate were acting on behalf of all the heirs at law when they filed the wrongful death action. *Davenport*, 72 S.W.3d at 91.

The *Davenport* court then discussed the rights of individual heirs and stated "an individual may not file suit where a personal representative has been appointed." *Id.* Pursuant to Ark.Code Ann. § 16–62–102(b) (1987), every wrongful death action must be brought by and in the name of the personal representative. *Id.* (citing *Brewer,* 301 Ark. 358, 784 S.W.2d 156). The wrongful-death code does not create an individual right in any beneficiary to bring suit. *Id.* (citing *Cude v. Cude,* 286 Ark. 383, 691 S.W.2d 866 (1985)). They would have no standing to bring individual claims for wrongful death. *See Davenport*, 72 S.W.3d at 92.

---

they were not the same parties and, thus, were not acting in the same capacities. We noted that while they did not have standing to sue when they filed the original *pro se* complaint, they did have standing when they filed the amended complaint as appointed administrators." *Id*. Unfortunately, the statute of limitations had expired in the meantime. *Id.* (citing *St. Paul*, 73 S.W.3d at 589).

*Discussion*

Any party bringing suit must have standing to do so. "Standing under the Civil Rights Statutes is guided by 42 U.S.C. § 1988, which provides that state common law is used to fill the gaps in administration of civil rights suits. Therefore, a party must have standing under the state wrongful death or survival statutes to bring a claim under 42 U.S.C. §§ 1981, 1983, and 1988." *Brazier,* 293 F.2d at 409 (5th Cir.1961) (citations omitted).

Here, there is no dispute a personal representative has been appointed or that Teresa Sabbie is that personal representative.  There is also no dispute this action was brought by Teresa Sabbie, in her capacity as the personal representative of Mr. Sabbie's estate (for the benefit of all statutory beneficiaries).  Docket Entry # 1, ¶ 6. The Court finds no inconsistency in applying the Arkansas statutes to provide standing to Teresa Sabbie as personal representative to bring this § 1983 action.

Regarding the issue of whether other survivors should be allowed to recover for loss of "familial association," the Court was unable to locate any federal cases interpreting Arkansas law. However, the Court finds instructive two recent § 1983 cases, one from within the Fifth Circuit applying Louisiana law and one applying Alabama law. The plaintiffs in both cases cited *Rhyne* in support of their positions.[59]

---

[59] As previously noted in the general law section, in *Rhyne*, the Fifth Circuit applied Texas law and allowed a prisoner's mother to bring a § 1983 claim. 973 F.2d at 388.  Rhyne did not seek to recover as a representative of her son's estate for the injuries that her son incurred. There had been no administration of her son's estate, and she had not brought the action in her representative capacity. Rather, Rhyne sought to recover for her own injuries arising out of the wrongful death of her son.  *Rhyne*, 973 F.2d at 390. The Fifth Circuit held the Texas wrongful death law provided Rhyne with the right to recover for her son's wrongful death and she could recover for injury to herself caused by her son's death.  *Id.* at 391 ("There is no dispute that Rhyne is within the class of people entitled to recover under Texas law for the wrongful death of a child").

In *Carter v. Cain*, No. CV 17-201-SDD-RLB, 2019 WL 846053 (M.D. La. Feb. 21, 2019), the plaintiffs were the decedent's mother, sister, and other siblings. *Id.* at *1. The defendants argued that under Louisiana law the mother was the only proper plaintiff to bring the claim. *Id.* at *3. The court agreed, noting that under Louisiana law siblings are permitted to recover only if the decedent left no spouse, child, or parent. *Id.* The court stated the decedent's mother (plaintiff Irma Jean Carter) excluded any of the decedent's siblings from recovering in a wrongful death action.

The plaintiffs argued *Rhyne* created a "blanket right for family members under § 1983," but the court disagreed. *Id*. at *4. According to the court, "*Rhyne* demonstrates the right to recover for one's own injuries is derivative of the right to pursue a wrongful death action under state law." *Id.* Under Louisiana law, the right of a survival or wrongful death action is afforded to four exclusive categories of survivors. "However, the statutes do not allow for multiple classes of survivors, *e.g.*, both the mother and siblings of the decedent, to recover." *Id.* at *3 (citations omitted). "Rather, the existence of a person within a higher class precludes a person in a lower class from filing suit." *Id.* The primary category includes the surviving spouse and/or children of the decedent, and the second category includes "the surviving father and mother of the deceased, or either of them if he left no spouse or child surviving." *Id.* Siblings are only permitted to recover under the third category, and then only if "[the decedent] left no spouse, child, or parent surviving." *Id.*

The court stated the plaintiffs pleaded no facts that would support the existence of standing on the part of the siblings. *Id.* at *4. The court dismissed the claims of all plaintiffs except Irma Jean Carter with prejudice because the siblings lacked standing to bring their wrongful death and survival claims, and allowed the Louisiana wrongful death claim to continue with Irma Jean Carter as the

142

plaintiff. *Id*. at *3. Because Irma Jean Carter was the only plaintiff with standing under Louisiana's wrongful death and survival statutes, she was the only proper party for a claim under § 1983. *Id.*

Similarly, in *Gunn v. City of Montgomery, Alabama*, No. 2:16-CV-557-WKW, 2018 WL 1740933, at *5 (M.D. Ala. Apr. 11, 2018), the plaintiff cited *Rhyne* (and other cases) for the proposition that she should be able to recover under § 1983 for injuries personal to her (such as loss of consortium) that were incidental to the constitutional violation inflicted on her son. According to the court in *Gunn*, unlike Texas law, Alabama law does not "contemplate[] that a surviving parent may, in conjunction with a wrongful death action, assert damages personal to the surviving parent incident to the death of his or her adult child, such as loss of consortium." *Id*. at *7. The *Gunn* court further stated the "Fifth Circuit's approach in *Rhyne* does not require, as a matter of federal policy, that the survivor should be allowed to recover for loss of consortium in a § 1983 wrongful death action if the applicable state wrongful death law does not allow it." *Id*. The court in *Gunn* stated there "are strong suggestions that, even under *Brazier* [applying Georgia law], the damages a survivor is entitled to recover in a § 1983 wrongful death action are intended to compensate for injuries to the victim, not to compensate for damages the survivor personally suffered incident to the deprivation of the victim's constitutional rights. *Id*.

The court then stated as follows:

> Moreover, although Alabama law does not permit a parent to assert her own damages arising out of the death of her adult child, Alabama law is not the starting point for resolving the issue presented in this case. While it is clear that, under *Brazier* and *Carringer* [*v. Rodgers*, 331 F.3d 844 (11th Cir. 2003)], § 1983 protects the right of the survivor to maintain a § 1983 wrongful death *cause of action* for damages resulting from death caused by unconstitutional state action, *Carringer*, 331 F.3d at 849 and *Brazier*, 293 F.2d at 409, the *kinds of damages* that are recoverable in such an action are determined by first looking to federal law. *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1047 n.9 (11th Cir. 2011) (citing

*Gilmere v. City of Atlanta, Ga.*, 864 F.2d 734, 739 (11th Cir. 1989)). That is, '[f]ederal courts are to turn to state law [only] to fill gaps which may exist in federal law,' but, '[w]here federal law is sufficient to carry the policies of the civil rights statutes into effect, resort to state law is not necessary.' *Gilmere v. City of Atlanta, Ga.*, 864 F.2d 734, 738 (11th Cir. 1989).

*Gunn*, 2018 WL 1740933, at *7.

As the Fifth Circuit did in *Brazier* to determine whether a gap exists in federal law, the *Gunn* court first looked to the text of the applicable statute and emphasized as follows: "Section 1983 provides that '[e]very person who, under color of [state law], subjects, or causes to be subjected, *any citizen of the United States or other person within the jurisdiction thereof* to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable *to the party injured.*'" *Gunn*, 2018 WL 1740933, at *7 (quoting 42 U.S.C. § 1983 (emphasis in original)). The plaintiff's reading of § 1983 suggested the "citizen . . . or other person" deprived of privileges and immunities and "the party injured" by the deprivation and to whom liability is owed need not necessarily be one and the same person.

The *Gunn* court then relied on *Robertson v. Hecksel*, 420 F.3d 1254 (11th Cir. 2005), wherein the decedent's mother sought to recover damages based on injuries she suffered to her relationship with her adult son as a result of her son's death by an unconstitutional police shooting. *Gunn*, 2018 WL 1740933, at *7. The Eleventh Circuit in *Robertson* held the mother could not recover because the Constitution does not protect a parent's due process interest in the right of a parent to her relationship with her adult child, at least where the infringement of the parental association right is only incidental to the defendant's actions against the decedent. *Id.* As pointed out by the *Gunn* court, the court in *Robertson* distinguished *Brazier* and *Carringer* as follows:

144

*Brazier* and *Carringer* were both instances where state law was used to fill gaps in federal law through § 1988's borrowing provision. [The decedent's mother] would have us also look to [Florida] law through § 1988's borrowing provision to decide her case. Her argument misses the dispositive difference between *Brazier* and *Carringer* and our case. In those cases, the plaintiffs were seeking vindication of the *decedent's* rights under § 1983. Here, [the decedent's mother] alleges a violation of *her* rights. *Regardless of whose rights are being asserted, before § 1983 and § 1988 can come into play, the plaintiff must still establish the existence of a federal right. Because [the decedent's mother] has failed to establish a federal right, we never reach § 1983, let alone § 1988 and state law.*

The plaintiffs in *Brazier* and *Carringer* passed the first hurdle of bringing a § 1983 suit—identifying a federal right—by relying on the rights of the decedent. *Cf.* Steven H. Steinglass, *Wrongful Death Actions and Section 1983*, 60 Ind. L.J. 559, 621 (1985) ("Wrongful death statutes permit survivors to sue when a killing violated their decedent's rights. . . . [B]oth survival and wrongful death actions assert the identical legal rights of the decedent."). In essence, they were bringing wrongful death suits under federal law. Although the survivors' claims were separate from the claims of the decedents' estates, the *Brazier* and *Carringer* plaintiffs' claims necessarily required a finding that the decedents' deaths were wrongful in some way. Conversely, whether the decedent's rights in our case were violated has no bearing on the ability of his mother to argue a loss of companionship, because her alleged cause of action is based on a violation of rights personal to her, not rights personal to the decedent. For that reason, *Brazier* and *Carringer* are not controlling.

*Gunn*, 2018 WL 1740933, at *8 (quoting *Robertson*, 420 F.3d at 1260–62 (third emphasis added)).

The *Gunn* court then stated the plaintiff's individual § 1983 claims did not serve to vindicate her son's constitutional rights affected by the unlawful searches and seizures, excessive force, and equal protection violations directed at her son, noting the plaintiff's representative capacity claims adequately served that purpose. 2018 WL 1740933, at *9.  With respect to the plaintiff's individual capacity § 1983 claims, the right the plaintiff was seeking to vindicate was her own right to maintain her familial relationship with her son. The court noted, to be sufficient for carrying out the purposes of the civil rights statutes, neither § 1983 nor Alabama law is required to provide for the plaintiff to recover compensation for her own injuries, such as loss of consortium and loss of financial support,

145

that she incurred because her familial relationship with her son was forever interrupted by his death. *Id*.

It further rejected the plaintiff's attempts to distinguish *Robertson* on grounds that her loss of consortium damages were not couched as familial association claims, but were "instead derivative of, and require[d] proof of, the unconstitutional deprivation of her son's constitutional equal protection and due process rights." *Id*. According to the court, even if the plaintiff's claims were "viewed in their derivative context, and not as attempts to recover for loss of Plaintiff's and/or decedent's familial association rights, the relevant point of *Robertson* is that, between a parent and deceased adult child, there is no constitutionally or federally protected right of companionship and support, particularly where (as here) the defendant's wrongful conduct was not directed at the parent or at the decedent's familial association with the parent." *Id*. "Thus, even though Plaintiff was careful to frame her loss-of-consortium claims as derivative of an unconstitutional deprivation of her son's equal protection and due process rights, Plaintiff still cannot establish that, *to effectuate the purpose of § 1983*, she must be entitled to recover derivative damages for her own 'severe emotional distress and mental anguish and other pain and suffering; lost regular financial support that the decedent, Gregory Gunn, had provided her; and lost the society and companionship of her son, with whom she had resumed a close family unit for multiple years before his murder.'" *Id.* (emphasis in original).

Regardless of whether the problem was characterized as one of lack of standing or as the nonexistence of a cause of action, the court held the "practical outcome" was the same – dismissal of the plaintiff's § 1983 claims for injuries personal to her. *Id*. at n. 12. The *Gunn* court dismissed the plaintiff's individual capacity claims because she had "not shown that effectuating the purpose

146

of the civil rights laws requires (or, if borrowing from state law, permits) recovery for damages personal to her, such as loss of consortium, incident to the death of her adult son—particularly where, as here, the unconstitutional deprivation of her son's rights was not specifically targeted at the parent-child relationship." *Id*. at *9.

In this case, in addition to the claims asserted by Teresa Sabbie as personal representative on behalf of all statutory beneficiaries (which include pecuniary injuries and mental anguish suffered), the Original Complaint asserts individual claims by Mr. Sabbie's siblings and on behalf of Mr. Sabbie's minor children. Arkansas law is clear these individuals do not have standing to bring a wrongful death action or survival action in Arkansas (or by extension a § 1983 claim) because there is a personal representative. Plaintiffs explain the reason why both the personal representative of Mr. Sabbie's estate and the individuals are named in this case is because Plaintiffs have federal causes of action that include derivative federal claims for loss of society and companionship, "claims that are typically pursued by *individual* family members – not estates." Docket Entry # 106 at 60 (emphasis in original). However, Plaintiffs do not cite any specific cases applying Arkansas law that allow surviving family members to recover under derivative federal claims for loss of society and companionship.

Considering this, and further considering the issues discussed in *Gunn*, the Court recommends the individual claims of Kimberly Williams, Marcus Sabbie, Charlisa Crump, and Teresa Sabbie be dismissed. The Court further recommends the claims by Teresa Sabbie, as parent of minor children T.S., T.S., and M.S., and Shanyke Norton, as parent of minor child M.S., be dismissed. Teresa Sabbie, as administratrix of Mr. Sabbie's estate and as personal representative

147

representing Mr. Sabbie's wife, children, and siblings for whom claims are made, is the only proper party for the wrongful death and survival claims, as well as any claims under 42 U.S.C. § 1983.

Having considered all of the issues raised in the LaSalle Defendants' motion, the Court turns to LaSalle Management's motion.

## VI.  LASALLE MANAGEMENT'S MOTION

### A.    The parties' assertions

Separate defendant, LaSalle Management Company ("LaSalle Management"), also moves for summary judgment, asserting it had no involvement whatsoever in the facts and matters of this suit and merely provides accounting and payroll services for the other LaSalle entities.  Docket Entry # 87 at 2. LaSalle Management relies on the Affidavit of Rodney Cooper ("Cooper Aff.") and the February 2013 Facility Operation and Management Services Agreement ("Agreement") between Southwestern Correctional, LLC doing business as LaSalle Corrections, LLC (referred to herein as "LaSalle") and Bowie County, Texas for the operation of the Bi-State jail.

In response, Plaintiffs assert the February 13, 2013 Agreement between Bowie County and LaSalle Corrections Center, attached as an exhibit to LaSalle Management's motion, is incomplete. According to Plaintiffs, LaSalle Management did not provide the "highly-relevant final page (or addendum) to that agreement," wherein LaSalle Management acknowledges it is the "Parent Company" of Southwestern Correctional, LLC; that Southwestern Correctional, LLC is its "Subsidiary," and that, as the parent company, LaSalle Management itself explicitly and "unconditionally" guarantees "performance of all obligations and duties under and pursuant to" the operative jail operations contract with Bowie County.  Docket entry # 95 at 1-2.

148

**B.      Summary judgment evidence**

**1.      LaSalle Management's evidence**

Cooper is the Executive Director of LaSalle. Cooper Aff. at 2.  According to Cooper, LaSalle Management is a "separate, independent Louisiana entity that provides accounting and support services" to LaSalle.  *Id*.  Cooper states LaSalle Management has "never owned, or been owned by [LaSalle and] does not manage or operate the Bi-State Jail or Bowie County Correctional Facility in any way."  *Id*.  Cooper further states no employee or officer of LaSalle Management was present during any of the facts described in Plaintiffs' Original Complaint.  *Id*.  Captain Sanders testified at his deposition he did not differentiate between LaSalle and LaSalle Management; thus, Captain Sanders asserts he has no opinion as to LaSalle Management.  *See* Sanders Dep. at 148:9-12.

**2.      Plaintiffs' evidence**

***Bowie County's responsibility for operation of the Bi-State Jail***

Bowie County, Texas is a governmental entity and political subdivision of the State of Texas and is a "person" for purposes of 42 U.S.C. § 1983. *Compare* Plaintiffs' Original Complaint (Docket Entry # 1, ¶ 11, Sentence 1) *with* Answer to Plaintiffs' Original Complaint (Docket Entry # 14, ¶ 11 admitting Sentence 1). Bowie County admits it is "responsible for operating the Bi-State Justice Center Jail ("Bi-State Jail"), which sits on the border of Texas and Arkansas." *Compare* Plaintiffs' Original Complaint (Docket Entry # 1, ¶ 11, Sentence 2) *with* Answer to Plaintiffs' Original Complaint (Docket Entry # 14, ¶ 11 admitting Sentence 2).

149

***Bowie County's Agreement with Southwestern Correctional, LLC (LaSalle)***

Effective February 13, 2013, Bowie County contracted with Southwestern Correctional, LLC to operate and manage the Bi-State Jail. The Agreement became effective February 13, 2013. Docket Entry # 87-2 at Page ID # 780. The contract was for a primary term of three years and covered the period of Michael Sabbie's confinement during July 19-22, 2015. Docket Entry # 87-2 at Page ID # 782. Under the Agreement, Bowie County delegated responsibility to LaSalle for the "operation and management" of the jail. Docket Entry # 87-2 at Page ID # 780. Pursuant to the Agreement, LaSalle agreed to "operate, manage and supervise the [Bi-State Jail] for the County, and to receive, detain and care for all properly classified inmates for which the [Bi-State Jail] is approved. . .," including detainees, like Mr. Sabbie, being confined pursuant to the authority of the City of Texarkana, Arkansas. *Id*. at Page ID #s 780, 781, 782.

LaSalle was acting as an Independent Contractor for the County, and not a partner or joint venturer of the County, under the Agreement. *Id*. at Page ID # 781. According to the Agreement, all inmate housing contracts for housing in the Bi-State facility must be with either the County, the City of Texarkana, Arkansas, or the City of Texarkana, Texas and the jurisdiction or agency seeking the services. *Id*.

The delegation of jail-operation duties to LaSalle specifically included all "medical care" for inmates. *Id*. at Page ID # 784 ¶ (j). It also included "training of jailers" and the "custody, care and housing of inmates" in compliance with all applicable laws. *Id*. at Page ID # 784, 785 ¶¶ (k), (o). With regard to medical care of inmates specifically, Bowie County delegated all such responsibility to Southwestern Correctional, LLC. *Id*. at Page ID # 787. And the hiring, employment, training,

150

assignment, control, and management of all jail staff were also delegated by Bowie County to Southwestern Correctional, LLC. *Id*. at Page ID # 786 ¶ 4.07.

Cooper signed, on behalf of LaSalle Management, a "Guaranty of Obligation by LaSalle Management Company, LLC" ("Guaranty"), the final page (or addendum to) the Agreement.  The omitted page is provided by Plaintiffs.  *See* Declaration of Edwin S. Budge ("Budge Decl."), Ex. 1.

The Guaranty by LaSalle Management Company, LLC provides, in pertinent part, as follows:

> Payment and performance of all obligations and duties under and pursuant to the Facility Operation and Management Services Agreement ('Agreement') to Bowie County, Texas are hereby unconditionally guaranteed by LaSalle Management Company, LLC, a limited liability company organized under the general laws of the State of Louisiana (hereinafter 'LaSalle Management') and the 'Parent Company' of Southwestern Correctional, LLC, a limited liability company organized under the general laws of the State of Texas (the 'Subsidiary') doing business as LaSalle Corrections, LLC.
>
> * * *
>
> It is the intention of the parties hereto that LaSalle Management shall be liable, jointly and severally, with Southwestern Correctional, LLC doing business as LaSalle Corrections, LLC and that payment and performance of all duties, obligations, and rights under the Agreement may be sought and recovered in the same or separate actions.

Docket Entry # 95-1 at Page ID # 1411.

It further provides "[t]his Guaranty shall not create or grant any right to any third party and shall be solely for the benefit of Bowie County under the Agreement." *Id.*  According to Plaintiffs, the Guaranty was also signed by LaSalle Management through its managing member, William McConnell, who also signed the balance of the underlying contract with Bowie County as a managing member of Southwestern Correctional, LLC. *Compare* Budge Decl., Ex. 1 p. 16 *with* p. 17.

## C.    Discussion

In its motion, LaSalle Management relied exclusively on representations concerning its lack of control or operation of the Bi-State Jail and of LaSalle.  Plaintiffs' response provided an omitted and relevant page from the operative agreement, which undermined the sole basis for LaSalle Management's motion.  In its reply, LaSalle Management claims, for the first time, the Guaranty did not create a right to any third party and was solely for the benefit of Bowie County.  The Court finds this argument unavailing.

Plaintiffs assert they have not sued for breach of contract or claimed to be a third-party beneficiary of any agreement; their supplemental state law claims sound solely in tort law, not contract law. Thus, according to Plaintiffs, the last sentence of the Guaranty is irrelevant to Plaintiffs' § 1983 claims, "which impute state action and § 1983 liability to private companies that agree to assume the public function of operating jails and jail services under contract with public entities."  Docket Entry # 95 at 5.

The Guaranty indicates LaSalle Management guaranteed the "performance of all obligations and duties," including the contract's obligations for complete and total operation of the Bi-State Jail. It also confirms LaSalle Management is the "Parent Company" of Southwestern Correctional, LLC, that Southwestern Correctional, LLC is its "Subsidiary," and that Southwestern Correctional, LLC "shall be liable, jointly and severally" with Southwestern Correctional, LLC for all duties and obligations of the underlying contract. According to Plaintiffs, LaSalle Management had all the same duties and obligations as its subsidiary company, Southwestern Correctional, LLC, and, "in essence,

stands in the same position as LaSalle Corrections as it relates to the obligations to operate the Bi-State Jail in accordance with the underlying agreement." Docket Entry # 95 at 7.

The Court, having considered all of the evidence in the light most favorable to Plaintiffs, recommends LaSalle Management's motion for summary judgment be denied.

## VII.  MUNICIPAL DEFENDANTS' MOTIONS

### A.    The parties' assertions

According to Plaintiffs' Original Complaint, although Bowie County, Texas (the "County") and City of Texarkana, Arkansas (the "City") sought to privatize the operation of their jail by delegating their final policy-making authority to LaSalle, they have a "non-delegable duty" to ensure the Bi-State Jail satisfies its constitutional duties to pretrial detainees, including the right to adequate medical care and the right to be free from constitutionally excessive force. Docket Entry # 1, ¶¶ 11-13. Plaintiffs allege Municipal Defendants cannot contract-away their constitutional obligations and are liable for any unconstitutional corporate customs or policies that resulted in harm to any detainees and inmates confined in the jail. *Id*., ¶ 13. Plaintiffs further allege the County and the City adopted and ratified the policies, customs, and practices of the Corporate Defendants as their own and are liable for any unconstitutional corporate policies, customs, and practices that resulted in harm to Mr. Sabbie. Docket Entry # 1, ¶¶ 79-80.

Municipal Defendants have filed two substantially similar motions for summary judgment, which the Court considers together. Municipal Defendants state they were not directly involved in the operation of the Bi-State Jail sufficiently to be directly liable. Bowie County, Texas (the "County") relies on the Agreement it had with LaSalle to operate the Bi-State Jail. The City of

153

Texarkana, Arkansas (the "City") states its only involvement was the fact Mr. Sabbie was "originally arrested by Texarkana Arkansas Police Department." Docket Entry # 86 at 5. Municipal Defendants assert they are not liable under *Monell*, and they have immunity to certain state law claims (i.e., medical malpractice and Arkansas constitutional claims).

## B.    Summary judgment evidence

### 1.    Municipal Defendants' evidence

According to Robert Page, the warden of the Bi-State Jail in July 2012, neither Bowie County, Texas nor Texarkana, Arkansas "manage or operate the Bi-State Jail," which was managed and operated by Southwestern Correctional, LLC. Affidavit of Robert Page ("Page Aff.") at 2. According to Page, no Bowie County officer or employee played a role in any of the facts described in the Original Complaint. *Id*. Page states no City of Texarkana, Arkansas officer or employee played a role in the use of force involving Mr. Sabbie or the rendition of medical evaluation or treatment of Mr. Sabbie, or any of the facts described in the Original Complaint "other than those surrounding Michael Sabbie's arrest on July 19, 2015 and his appearance in District Court thereafter." *Id*.

Captain Sanders did not have any specific criticisms regarding the County. Sanders Dep. at 148:13-15. Nor did he have any specific criticisms of the City. *Id.* at 148:16-18.

### 2.    Plaintiffs' evidence

In addition to the evidence set forth above on the County's Agreement with LaSalle for operation of the Bi-State Jail, Plaintiffs assert it is undisputed that, at all material times, Mr. Sabbie was an unconvicted pretrial detainee of the City. City officers took Mr. Sabbie to the Bi-State Jail after his arrest and confined him there to face Arkansas charges because, as the City states in its

154

moving papers, "[t]he Bi-State Jail is a facility which houses detainees for [both] Bowie County, Texas and Texarkana, Arkansas." Docket Entry # 94 at 1 (quoting Docket Entry # 86, ¶ 5). The City "routinely arrests and brings Arkansas detainees, such as Mr. Sabbie, to the Bi-State Jail for pretrial detention and post-conviction sentencing." *Compare* Plaintiffs' Original Complaint (Docket Entry # 1, ¶ 12) *with* Answer to Plaintiffs' Original Complaint (Docket Entry # 14, ¶ 12). Pursuant to the Bi-State Criminal Justice Center Compact, contained in Ark. Code Ann. § 12-49-301, Arkansas maintained "jurisdictional situs" over Mr. Sabbie at all times during his pretrial detention due to his status as an Arkansas detainee. Docket Entry # 1, ¶¶ 30-31.

Plaintiffs assert the Agreement between the County and LaSalle was enacted for the purpose of confining and caring for inmates from both the County and the City and was signed by representatives of the County and LaSalle. Docket Entry # 86-2 at Page ID #s 741, 742, 743. According to Plaintiffs, public records of an audit of Bi-State operations confirm the following: (1) in the year immediately before Mr. Sabbie's confinement, more than 42% of all costs and expenditures specifically relating to detention of people at the Bi-State Jail were the result of inmates being confined there by the City; (2) the City paid more than $2 million to detain its inmates at the jail and otherwise contribute to the operations of the Bi-State Justice Center; (3) the Bi-State Justice Center is "jointly occupied by the law enforcement and criminal justice agencies of the City" along with the County and the City of Texarkana, Texas; and (4) operations at the Bi-State Justice Center are overseen by a committee comprised, in part, of two members of the City's Board of Directors. *See* http://arkansas.txkusa.org/departments/finance/documents/Bi-State%20Justice%20Center%20report.pdf at pp. 4, 6, 9.

C.     **Discussion**

1.     **The non-delegable duty doctrine**

Municipal Defendants argue they cannot be "directly liable" for the events in this case and cannot be liable under a traditional *respondeat superior* theory.  In their response, Plaintiffs agree with this statement insofar as the County and City did not directly control the operations at the Bi-State Jail but instead delegated (or in the case of the City, benefitted from the delegation of) those operations to a private company under contract. According to Plaintiffs, this does not relieve Municipal Defendants of their constitutional obligations.  Plaintiffs assert Municipal Defendants ignore that they can be held indirectly liable through the "non-delegable duty" doctrine—"a doctrine that has been well-established for at least three decades and which is now well-settled nationwide" – for policies, practices, or customs of LaSalle.  Docket Entry # 93 at 4, # 94 at 5.

The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. The "non-delegable duty doctrine" grew out of the Supreme Court's decision in *West v. Atkins*, where the United States Supreme Court reasoned that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *Trujillo v. City & Cty. of Denver*, No. 14-CV-02798-RBJ-MEH, 2016 WL 5791208, at *12 (D. Colo. Sept. 7, 2016) (quoting *West*, 487 U.S. 42, 56 (1988) (holding that a private physician who was under contract with a state prison "acted under the color of state law" pursuant to § 1983)).

According to the Eleventh Circuit Court of Appeals, when a county contracts out its obligation to provide jail medical care and correctional services, the "county itself remains liable for any constitutional deprivations caused by the policies or customs of the [corporate jail services provider]." *Ancata v. Prison Health Servs*., Inc., 769 F.2d 700, 705 (11th Cir. 1985). In *Ancata,* the personal representative of the estate of a deceased inmate brought a civil rights action under § 1983 after the inmate died from alleged medical neglect in the Broward County Jail. Broward County had contracted out the government function of providing medical care to jail inmates to a private company called Prison Health Services. *Id.* The court first found the private company could be constitutionally liable for the inmate's death. *Id*. at 703 ("Although Prison Health Services and its employees are not strictly speaking public employees, state action is clearly present.").

The court then considered whether the claims against Broward County should be dismissed as being solely based upon *respondeat superior*. *Id.* at 704. The court noted the plaintiff alleged the actions and policies of the county and the sheriff's office affected in various ways the health care received by the deceased and were not solely based upon their status as a public body. *Id*. at 704, n. 6. The court disagreed with the district court, noting the county's duty to provide medical care to incarcerated individuals was "non-delegable," that its "duty [was] not absolved" by contracting with a private entity. *Id.* at 704-05. Citing two Fifth Circuit cases, the court stated lack of funds cannot justify an unconstitutional lack of competent medical care and treatment for inmates. *Id.* at 705 (*Gates v. Collier,* 501 F.2d 1291 (5th Cir.1974); *see also Miller v. Carson,* 401 F.Supp. 835, 889–91 (M.D.Fla.1975), *aff'd* 563 F.2d 741 (5th Cir.1977)). The court concluded as follows:

> if Broward County established or utilized a policy or custom requiring that inmates needing medical assistance obtain court orders and the result of that policy or custom played a role in the delay in treatment and deliberate indifference shown towards

157

> Anthony Ancata, then the county may be liable. . . .  Furthermore, if the county permitted the sheriff and/or prison health officials that it contracted with to establish such a policy or custom, it may also be liable. . . . Such liability would not be based upon notions of respondeat superior. The liability would be a result of the county's own policy.

*Ancata*, 769 F.2d at 705 (citations omitted).

In their replies, Municipal Defendants assert no Fifth Circuit case law has applied the non-delegable duty doctrine to a § 1983 civil rights case. *See, e.g.,* Docket Entry # 99 at 3 (citing *McGeee v. Carillo*, 297 Fed. Appx. 319, (5th Cir. 2008) (court stated *Douthit v. Jones*, 619 F.2d 527 (5th Cir. 1980) confirmed prison officials' "non-delegable duty to incarcerate only prisoners committed by a lawful authority")). Municipal Defendants assert the court in *Douthit* was discussing certain non-delegable duties imposed under Texas law, rather than federal law.  According to Municipal Defendants, if a non-delegable duty is applicable, it is limited and would only apply to a prisoner's health care claims, as those were the claims involved in the Supreme Court case.

Even though the Fifth Circuit has not expressly recognized the non-delegable duty doctrine in the context of a § 1983 case, the Court has not located a Fifth Circuit case that has rejected or even questioned the doctrine.  As urged by Plaintiffs in their reply, the non-delegable duty is ultimately supported by the Supreme Court's decision in *West v. Atkins*, which has long held: "Contracting out prison medical care does not relieve the [government] of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive [government] prisoners of the means to vindicate their [constitutional] rights." 487 U.S. at 56.

Moreover, Municipal Defendants do not address the numerous circuit and district court decisions cited in Plaintiffs' response. *See, e.g., King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) (holding a county "cannot shield itself from § 1983 liability by contracting out its duty to provide

158

medical services" and noting that "[t]he underlying rationale is not based on respondent [sic] superior, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it."); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1250 (6th Cir. 1989) (*West* "indicates that contrary to the Sheriff's contentions, the State (and here the County) retains responsibility despite having contracted out the medical care of its prisoners."); *Lemmons v. Cty. of Sonoma*, No. 16-cv-04553-WHO, 2018 WL 452108, at *3 (N.D. Cal. Jan. 17, 2018) ("While [private company] provides the medical care for Sonoma County's prisoners, Sonoma County remains liable for any constitutional deprivations caused by the policies, practices or customs of [private company]" and by "ceding control and final decision making to [private company] as it relates to providing adequate healthcare to prisoners, [private company's] policies effectively become the policies of Sonoma County."); *Trujillo v. City & County of Denver*, No. 14-cv-02798-RBJ-MEH, 2016 WL 5791208, at *12-*16 (D. Colo. Sept. 7, 2016) (recognizing, in extensive analysis, the non-delegable duty doctrine when the government contracts to provide jail healthcare services); *Simmons v. Corizon Health, Inc.*, 122 F. Supp. 3d 255, 267 (M.D.N.C. 2015) ("[W]hen the County purportedly contracted out the performance of inmate medical care, at least some of Corizon's policies became 'that of the County,' and thus potential § 1983 liability is not based on respondeat superior."); *Scott v. Clarke*, 64 F. Supp. 3d 813, 819-22 (W.D. Va. 2014) ("[I]t is well settled that choosing to meet the duty to provide prisoners with medical care through the services of a private contractor has no bearing" on government's constitutional duties; governments "may not insulate themselves from Eighth [or Fourteenth] Amendment claims premised upon allegations of deficient medical care by delegating responsibility for the provision of medical care to third parties" and "the contractor's policies and decisions effectively become and constitute the

159

policies and decisions of the State."); *McGill v. Corr. Healthcare Cos*., *Inc*., No. 13-cv-01080-RBJ-BNB, 2014 WL 5423271, at *7 (D. Colo. Oct. 24, 2014) (The court "cannot absolve the County of indirect liability if a jury finds that [private jail healthcare company] did in fact have a policy, custom, or practice in place that directly caused the alleged constitutional deprivation . . . . This theory alleges a policy, practice, or custom of [private company], which may be attributed to the County through the non-delegable duty doctrine" and is not a "theory of respondeat superior."); *Kellogg v. Kitsap County*, No. C12-5717, 2013 WL 2181808, at *4 (W.D. Wash., May 20, 2013) (County "cannot shield itself from § 1983 liability by contracting out its duty to provide medical services. The underlying rationale is not based on respondeat superior, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it."); *Sullivant v. Spectrum Med. Servs*., No. 11-00119-M-JCL, 2013 WL 265992, *8 (D. Mt. Jan. 23, 2013) (County "cannot shield itself from § 1983 liability by contracting out its duty to provide medical services."); *Anglin v. City of Aspen, Colo*., 552 F. Supp. 2d 1229, 1244 (D. Colo. 2008) ("[T]he State cannot, by choosing to delegate its constitutional duties to the professional judgment of others, thereby avoid all liability flowing from the attempted fulfillment of those duties under Section 1983."); *Irby v. Erickson*, No. 03-C-1801, 2004 WL 783103, at *6 (N.D. Ill. Jan. 16, 2004) (contracting out prison medical care "does not relieve the county of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the detainees of the means to vindicate their Fourteenth Amendment rights"); *Gil v. Vogilano*, 131 F. Supp.2d 486, 493 (S.D.N.Y. 2001) (rejecting county's claim that any "'custom' or 'policy' involving medical care at Westchester County Jail cannot be attributed to it because it contracted with [private company] to provide for inmates' medical needs" because "municipality's duty to provide medical care to

inmates is non-delegable and not absolved by contracting with a third party"); *Bryant v. Maffucci*, 729 F. Supp. 319, 324 (S.D.N.Y. 1990) ("[A]lthough defendants deny any substantive responsibility for the treatment of inmates and deny and control over or direct responsibility for Correctional Health Services, they may not avoid liability by delegating the duty to provide medical care.").

Among recent examples of a court's applying the non-delegable duty doctrine is *Estate of Walter by & through Klodnicki v. Corr. Healthcare Companies, Inc.,* 323 F. Supp. 3d 1199 (D. Colo. 2018). In *Walter*, the estate of a pretrial detainee who died in a county jail after being deprived of prescription medication brought a § 1983 action. Jail health services had been delegated to a private contractor for healthcare services company under contract. *Id*. at 1203. As here, *Monell* allegations were made against the private contractor. *Id*. at 1215. The county argued it could not be liable because there was no evidence the county was on notice of any deficiencies in the care being provided by the private contractor. *Id*.

Noting the Tenth Circuit had never decided whether to adopt the non-delegable duty doctrine, the court was "nonetheless persuaded by the decisions of many other courts that the doctrine is correct. . . , at least where, as here, the government delegates final policymaking authority to the third party." *Id*. at 1215–16. The court held a delegation of jail services to a private company effectively makes the policies of the private company those of the county. "Thus, [the private company's] policies became the County's policies." *Id*. at 1216. The court found that if the private company was found to be liable under *Monell*, so too would the county "because the [private company] stepped into the County's shoes with the County's permission." *Id*.

Regarding Plaintiffs' claims against the City, the Court finds *Ford v. Suffolk County*, 154 F. Supp. 2d 131 (D. Mass. 2001) instructive. There, "the city and county had an agreement under

161

which the county took custody of and housed the city's female arrestees." *Trujillo*, 2016 WL
5791208, at *13 (citing *Ford*, 154 F. Supp. 2d at 133–34). The county subjected all jail admittees
"to strip and visual body cavity searches." *Trujillo*, 2016 WL 5791208, at *13 (citing *Ford*, 154 F.
Supp. 2d at 133). A certified plaintiff class challenged the constitutionality of the searches. *Trujillo*,
2016 WL 5791208, at *13 (citing *Ford*, 154 F. Supp. 2d at 133–34). The *Ford* court held the city
would be liable for the county's unconstitutional policies or customs. *Trujillo*, 2016 WL 5791208,
at *13 (citing *Ford*, 154 F. Supp. 2d at 149).

      The question was whether the City of Boston (which customarily transferred its inmates to
the jail of neighboring Suffolk County) could be held liable for the policies, practices, and customs
of the county's jail when the City of Boston itself had no control or involvement over what was
occurring in the county jail after its inmates were confined there. *Ford*, 154 F.Supp. 2d at 148. The
court analyzed the issue in depth. *Id*. at 148-150. In particular, it took note of the fact that the
city—which had arrested the female inmates—had no policy of its own relating to strip searches and
had no control over the county's policies relating to such searches after the inmates were taken to
the county jail. *Id*. at 148. No city employee was alleged to have taken part in the unconstitutional
conduct or had any involvement on the subject of strip searches or polies and customs relating
thereto. *Id.*

      Even so, the court found the plaintiffs' claims against the city were "clearly actionable under
§ 1983" because of the arrangement between the city and the county whereby the county took
custody of, and housed, the city's arrestees in the county jail. *Id*. Finding "the [city's] duty [to
detainees in its care] is non-delegable," the court determined "the [city] itself remains liable for any
constitutional deprivations caused by the policies or customs of the [county]." *Id*. at 149 (internal

quotations omitted; bracketed language in original). The court explicitly decided the non-delegable duty would apply even though the county was a public entity, and not a private one. "[T]here is no reason to suppose that a municipality's constitutional obligations to its detainees are somehow more acceptably delegated to a public than a private entity."[60] *Id*. at 149, n. 37.

The *Ford* court interpreted *West* to mean that "any entity, public or private, that takes on the city's obligations may be held liable as a state actor under § 1983, but the city, too, retains its oversight obligations." *Ford*, 154 F. Supp. 2d at 138 n.37. The court in *Trujillo* agreed. 2016 WL 5791208, at * 14 ("Even though Ms. Trujillo brings a § 1983 claim against Denver Health directly, the policy forces at play suggest that the city cannot dodge its obligation to provide medical care. In sum defendant's argument must fail because it does not account for the important aim of preventing a public entity from avoiding liability by strategically choosing to contract with another public entity.").

The Court finds these cases persuasive, noting like the *Trujillo* court the important aim of preventing a public entity from avoiding liability by contracting with another public entity.  *Id.* According to Plaintiffs, when the City arrested Mr. Sabbie and took him to the Bi-State Jail as part of its routine practice, it took on a constitutional responsibility to him that it could not delegate-away to the County or LaSalle. Whether the direct responsibility to Mr. Sabbie was that of the County or

---

[60] The *Ford* court cited a case from the Eighth Circuit with similar facts. *Ford*, 154 F.Supp. 2d at 149 n.38. In *Young v. City of Little Rock*, the city had delegated the housing of prisoners to the county. The Eighth Circuit upheld a jury verdict for the plaintiff who had been subjected to an unconstitutional strip search at the county jail. 249 F.3d 730, 736 (8th Cir. 2001). The appellate court reasoned that "the jury could reasonably infer that the City knew that a person entering the [County] jail . .  would be strip-searched. In these circumstances, it is far from unfair to attribute to the City the policies routinely used by the County jail in the housing and processing of City prisoners." *Id.*

LaSalle (or both) does not affect the analysis, for the City's constitutional obligation to its detainees is non-delegable.

For all these reasons, the Court recommends this part of Municipal Defendants' motions be denied.

**2.    Immunity defenses to state law claims**

*Bowie County, Texas*

The County asserts it is entitled to immunity under Texas law. In response, Plaintiffs argue that with regard to Mr. Sabbie, the County was an Arkansas actor, and Arkansas law applies to it. Docket Entry # 102 at 6.  According to Plaintiffs, pursuant to the Bi-State Criminal Justice Center Compact contained in Ark. Code Ann. § 12-49-301, Arkansas maintained "jurisdictional situs" over Mr. Sabbie at all times due to his status as an Arkansas detainee. *Id.*

Plaintiffs further point out the only supplemental state law claims against the County arise under Arkansas law.  Docket Entry # 102 at 6, n.5.  As urged by Plaintiffs, the County asserts no Arkansas-based immunity defense at all and "fails to answer the question of how a Texas-law based immunity defense would apply to claims asserted against it under the laws of Arkansas."  Docket Entry # 102 at 6.

In *Norfleet By & Through Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289 (8th Cir. 1993), the defendants asserted they were absolutely immune from § 1983 liability under Arkansas law. *Id.* at 293 (citing Ark. Code Ann. §§ 12-12-517 and 9-28-412). The district court held "conduct that is wrongful under section 1983 cannot be immunized by state law." *Norfleet*, 796 F.Supp at 1201.  On appeal, the Eighth Circuit affirmed, stating state statutory law cannot be used as a shield from liability under federal law. *Norfleet*, 989 F.2d at 293 (citing *Martinez v. California,*

164

444 U.S. 277, 284 n. 8 (1980); U.S. Const. art. 6, cl. 2).  The court stated the complaint set forth

allegations of deliberate or conscious indifference, and if proven, these allegations are sufficient to

give rise to a § 1983 claim irrespective of any immunity granted under Arkansas law.  *Norfleet*, 989

F.2d at 293.  The Court similarly holds here.

### The City of Texarkana, Arkansas

Unlike the County, the City asserts Arkansas-law based immunity as to Plaintiffs' state law

tort claims.  The City specifically relies on Ark. Code Ann. § 21-9-301, the statute that grants

immunity to municipalities for unintentional torts:

> (a) It is declared to be the public policy of the State of Arkansas that all counties,
> municipal corporations, school districts, special improvement districts, and all other
> political subdivisions of the state and any of their boards, commissions, agencies,
> authorities, or other governing bodies shall be immune from liability and from suit
> for damages except to the extent that they may be covered by liability insurance.
>
> (b) No tort action shall lie against any such political subdivision because of the acts
> of its agents and employees.

*Lewis v. Dunn*, No. 6:08-CV-6022, 2009 WL 10707829, at *3 (W.D. Ark. Apr. 15, 2009) (quoting

Ark. Code Ann. § 21-9-301).[61]

---

[61] In cases involving the existence of immunity under § 21–9–301, the Supreme Court of Arkansas has "utilized the analysis performed in interpreting the counterpart qualified-immunity statute that applies to state employees, Ark. Code Ann. § 19–10–305 (Repl.2007)." *City of Fayetteville v. Romine*, 373 Ark. 318, 321, 284 S.W.3d 10, 13 (2008) (citing *Smith v. Brt*, 363 Ark. 126 (2005); *City of Farmington v. Smith*, 366 Ark. 473, 237 S.W.3d 1 (2006)). Section 19–10–305 provides state employees with qualified immunity from civil liability for non-malicious acts occurring within the course of their employment. *Beaulieu v. Gray*, 288 Ark. 395, 705 S.W.2d 880 (1986). In interpreting § 19–10–305, the Arkansas Supreme Court has "traditionally been guided by the analysis adopted by the United States Supreme Court for qualified-immunity claims in federal civil-rights actions." *Romine*, 373 Ark. at 322 (citing *Fegans v. Norris*, 351 Ark. 200, 89 S.W.3d 919 (2002) (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982))); *see also Baldridge v. Cordes*, 350 Ark. 114, 119, 85 S.W.3d 511, 514 (2002) ("As applied by this court, the doctrine of qualified immunity is akin to its federal counterpart.")).

The City has not established it is entitled to immunity under Ark. Code Ann. § 21-9-301. As pointed out by Plaintiffs in their response, the Arkansas Supreme Court has made clear "the defendant had to plead and prove an absence of liability coverage to be entitled to the immunity afforded by the statute." *Harris v. Beth*, 2017 Ark. App. 186, 5, 518 S.W.3d 126, 129 (2017) (citing *Vent v. Johnson*, 303 S.W.3d 46, 53 (Ark. 2009)). In *Harris*, the court denied summary judgment based on Ark. Code Ann. § 21-9-301 due to "black-letter principle" that the moving party must "plead and prove that the city lacks liability coverage" to obtain summary judgment. 518 S.W.3d at 129 ("This fact is reason enough to affirm the circuit court's denial of summary judgment.").

Although the City referenced § 21-9-301 in its First Amended Answer, Docket Entry # 17, ¶ 93(c), it did not plead it lacks liability coverage.  In its motion, the City again referenced § 21-9-301 but failed to claim a lack of insurance coverage, let alone prove such an absence. Notwithstanding, the City attached two affidavits to its reply, asserting the City does not have any general liability insurance which would provide coverage for any claims asserted in this litigation. Docket Entry # 101 at 4-5.

In the Affidavit of Dr. Kenny Haskin ("Haskin Aff."), Dr. Haskin, the City Manager of the City, states the City is a "participant in the Arkansas Public Entities Risk Management Association [APERMA] which is a self-funded risk management pool," and the City has not purchased any additional insurance which would provide coverage for any claims asserted in this litigation.  Haskin Aff. at 2.  According to Dr. Haskin, to the extent the City has any benefits available to a plaintiff who allegedly incurred damages as a result of the negligence of City employees, those benefits would only be available through the APERMA.  *Id.*  The City also relies on the Affidavit of Jim Bergemann

166

("Bergemann Aff"), an employee of the company that is the administrator of the APERMA. Bergemann Aff. at 2.

The Court is simply not convinced the affidavits, submitted for the first time in a reply brief, prove no liability insurance covers the claims asserted here. The City has not met its burden to plead and provide it is entitled to the affirmative defense of Ark. Code Ann. § 21-9-301 due to a lack of insurance. More importantly, as noted above in its discussion of the County, state statutory law cannot be used as a shield from liability under federal law. *Norfleet*, 989 F.2d at 293 (citing *Martinez,* 444 U.S. 277, 284 n. 8; U.S. Const. art. 6, cl. 2). In *Martinez*, the United States Supreme Court stated as follows:

> Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced. *See McLaughlin v. Tilendis*, 398 F.2d 287, 290 (7th Cir. 1968). The immunity claim raises a question of federal law. *Hampton v. Chicago*, 484 F.2d 602, 607 (CA7 1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471.

444 U.S. at 284, n.8. In *Norfleet*, the Eighth Circuit stated the complaint set forth allegations of deliberate or conscious indifference, and if proven, the allegations were sufficient to give rise to a § 1983 claim "irrespective of any immunity granted under Arkansas law." *Norfleet*, 989 F.2d at 293.

The Court recommends this part of Municipal Defendants' motions for summary judgment be denied.

## VIII. RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Defendant Bowie County, Texas' Motion for Summary Judgment (Docket Entry # 85) be **DENIED**.  It is further

**RECOMMENDED** Defendant City of Texarkana, Arkansas' Motion for Summary Judgment (Docket Entry # 86) be **DENIED**.  It is further

**RECOMMENDED** that Defendant LaSalle Management Company's Motion for Summary Judgment (Docket Entry # 87) be **DENIED**.  It is further

**RECOMMENDED** that Defendants' Motion for Summary Judgment (Docket Entry # 88) be **GRANTED IN PART and DENIED IN PART**.  Specifically, the Court finds only Teresa Sabbie, as administratrix of Mr. Sabbie's estate and as personal representative representing Mr. Sabbie's wife, children, and siblings for whom claims are made, has standing to bring any claims, including state law wrongful death and survivor claims, as well as constitutional claims asserted through the remedial vehicle of § 1983.

## Objections

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge.  28 U.S.C.A. 636(b)(1)(C).

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from de novo review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court.  *Douglass v. United Servs. Auto. Ass'n.*, 79

F.3d 1415, 1430 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. §

636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 6th day of March, 2019.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE